STATE OF CONNECTICUT *v.* TODD RIZZO
(SC 16197)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 30, 2002—officially released October 14, 2003

*Martin Zeldis*, senior assistant public defender, with whom were *John Holdridge*, assistant public defender, and, on the brief, *Ronald Gold*, senior assistant public defender, and *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Michael E. O'Hare*, supervisory assistant state's attorney, with whom were *John A. Connelly*, state's attorney, *Maureen M. Keegan*, supervisory assistant state's attorney, and, on the brief, *Susan C. Marks*, supervisory assistant state's attorney, *Harry Weller* and *Carolyn K. Longstreth*, senior assistant state's attorneys, and *Robert J. Scheinblum*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. This is an appeal[1] from the judgment of the trial court sentencing the defendant to death, following: (1) his pleas of guilty to murder in violation

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 53a-46b (a).

of General Statutes § 53a-54a (a),[2] and to capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (9);[3] and (2) in the penalty phase of the proceedings, a jury verdict finding that the state had proved an aggravating factor, that the defendant had proved a mitigating factor or factors, and that the aggravating factor outweighed the mitigating factor or factors. The dispositive issues are whether: (1) the trial court properly instructed the jury, under General Statutes (Rev. to 1997) § 53a-46a (e) and (f),[4] regarding the burden of

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[3] General Statutes (Rev. to 1997) § 53a-54b provides: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety or of any local police department, a chief inspector or inspector in the Division of Criminal Justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility, or any fireman, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for economic gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

[4] General Statutes (Rev. to 1997) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the

## persuasion on the process of weighing the aggravating

nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any factor set forth in subsection (h), the existence of any aggravating factor or factors set forth in subsection (i) and whether any aggravating factor or factors outweigh any mitigating factor or factors found to exist pursuant to subsection (d).

factors against the mitigating factors; and (2) the state's closing argument constituted prosecutorial misconduct

"(f) If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death.

"(g) If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist or (2) none of the aggravating factors set forth in subsection (i) exists, or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

"(h) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) he was under the age of eighteen years or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (4) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(i) The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; or (7) the defendant committed the offense with an assault weapon, as defined in section 53-202a."

in violation of the defendant's right to due process of law under the fourteenth amendment to the United States constitution. We conclude that: (1) the court did not properly instruct the jury regarding the burden of persuasion on the weighing process under § 53a-46a (e) and (f); and (2) the state's final argument violated the defendant's right to due process of law. Accordingly, we reverse the judgment of the trial court and remand the case for a new penalty phase hearing.

The state filed an information charging the defendant, Todd Rizzo, with the intentional murder of the victim, Stanley G. Edwards, in violation of § 53a-54a (a), and capital felony for the murder of a person under the age of sixteen in violation of § 53a-54b (9). Following a finding of probable cause by the trial court, *Iannotti, J.*, the defendant pleaded not guilty and elected a jury trial. Thereafter, the state filed a substitute information and bill of particulars charging the defendant with the same two offenses. The defendant thereafter withdrew his prior pleas and elections, and pleaded guilty to both offenses. The court, *Holden, J.*, accepted the defendant's pleas of guilty, and the defendant elected a jury trial for the penalty phase. The state filed a notice of an aggravating factor alleging that the defendant had committed the capital felony in an especially heinous, cruel or depraved manner. Following the penalty hearing, the jury, by way of a special verdict, found that: (1) the state had proved the aggravating factor beyond a reasonable doubt; (2) the defendant had proved the existence of a mitigating factor or factors; and (3) the aggravating factor outweighed the mitigating factor or factors. The trial court accepted the verdict and, accordingly, rendered judgment sentencing the defendant to death. This appeal followed.

The basic, underlying facts of the crimes, namely, murder and capital felony, as established by the defendant's guilty plea, are as follows. During the evening of

September 30, 1997, the defendant murdered the victim, then age thirteen, at the defendant's home in Waterbury. He did this by luring the victim into the backyard of the home, where he bludgeoned the victim to death by repeated blows to the head with a three pound sledgehammer.

## I

## THE BURDEN OF PERSUASION ON THE STATUTORY WEIGHING PROCESS

Under our death penalty statutory scheme, the state has the burden at the penalty phase of a capital felony trial to establish the existence of an aggravating factor, specified in § 53a-46a (i); see footnote 4 of this opinion; by proof beyond a reasonable doubt. *State* v. *Daniels*, 207 Conn. 374, 394, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). The defendant has the burden to establish the existence of a mitigating factor by a preponderance of the evidence. Id., 385. In this regard, the statutory scheme sets out two types of mitigating factors: (1) statutory mitigating factors, as defined in § 53a-46a (h), which, if found, preclude the imposition of the death penalty under any circumstances;[5] and (2) nonstatutory mitigating factors, as defined in § 53a-46a (d).[6]

---

[5] In summary, the statutory mitigating factors are that, at the time of the capital felony: (1) the defendant was under eighteen years of age; (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired; (3) he was criminally liable as an accessory, but his participation in the crime was relatively minor; and (4) he could not reasonably have foreseen that his conduct would cause death, or a grave risk thereof, to another person. General Statutes (Rev. to 1997) § 53a-46a (h).

[6] A nonstatutory mitigating factor is any "particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime . . . [which] is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpabil-

Prior to 1995, a death sentence could be imposed only if the jury found that an aggravating factor existed and that no mitigating factor existed.[7] Thus, under the prior statutory scheme, if the jury found that a mitigating factor of either type existed, the mandatory sentence was life imprisonment without the possibility of release. General Statutes (Rev. to 1995) § 53a-46a (f); see also *State* v. *Johnson*, 253 Conn. 1, 56, 751 A.2d 298 (2000).

In 1995, the legislature amended the statutory scheme to provide for a weighing process by the jury at the penalty phase. See Public Acts 1995, No. 95-19, § 1 (P.A. 95-19). Under the statutory scheme as amended in 1995, the burdens of persuasion regarding proof of the existence of aggravating and mitigating factors remain the same. The state must still establish the existence of an aggravating factor by proof beyond a reasonable doubt, and the defendant must still establish the existence of a mitigating factor by a preponderance of the evidence. Furthermore, the role of a *statutory* mitigating factor remains the same: proof of its existence will preclude the imposition of the death penalty and mandate a sentence of life imprisonment without the possibility of release. General Statutes (Rev. to 1997) § 53a-46a (g) and (h); see footnote 4 of this opinion.

Under the 1995 amended scheme, however, the role of the *nonstatutory* mitigating factors has changed. Pursuant to General Statutes (Rev. to 1997) § 53a-46a (e), the jury must return "a special verdict setting forth . . .

---

ity or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes (Rev. to 1997) § 53a-46a (d).

[7] General Statutes (Rev. to 1995) § 53a-46a (f) provided in relevant part: "If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release."

whether any aggravating factor or factors outweigh any [nonstatutory] mitigating factor or factors," and, pursuant to General Statutes (Rev. to 1997) § 53a-46a (f), if the "mitigating factors . . . are outweighed by . . . [the] aggravating factors . . . the court shall sentence the defendant to death." See footnote 4 of this opinion. Thus, under these provisions, the jury must weigh the aggravating factors proven against the nonstatutory mitigating factors proven, and if the aggravating factors outweigh the mitigating factors, the court must impose the death sentence. The statute is silent, however, with respect to a burden of persuasion on the weighing process itself.

The defendant claims that the applicable burden of persuasion on the weighing process is the traditional criminal burden of beyond a reasonable doubt.[8] Before

[8] At trial, the defendant filed the following request to charge: "Each juror must weigh the aggravating factor with all the mitigating factors he or she has found. Weighing does not mean that you compare the relative number of the aggravating and mitigating factors. Nor does it mean that you assign numerical weights to each factor. The factors must be considered in terms of their substantiality and persuasiveness. Each juror must determine in his or her own judgment the cumulative or combined weight, i.e., substantiality and persuasiveness, of the mitigating factors proven; then each juror must determine in his or her own judgment whether the aggravating factor substantially outweighs or does not outweigh all the mitigating factors proven.

"The state must prove that the aggravating factor substantially outweighs the mitigating factors beyond a reasonable doubt. The reasonable doubt standard here means something different than it does when applied to fact-finding. Weighing is not fact-finding but the exercise of judgment. The beyond a reasonable doubt standard represents the level of confidence you must have in your judgment as to the appropriate sentence. It represents the high degree of certainty that society requires because of the severity and irrevocable nature of the death penalty. It is meant to convey the solemnity of the task before you and the necessity for a high degree of certitude before you may impose the death penalty."

Thus, the defendant sought instructions to the jury that (1) the aggravating factor "substantially" outweighed the mitigating factor beyond a reasonable doubt, and (2) in this context, the standard of beyond a reasonable doubt "means something different than it does when applied to fact-finding." The defendant "maintains that the court's failure to instruct the jury on the reasonable doubt standard as requested was constitutional reversible error."

considering the defendant's claim, we must first identify it, because it is subject to two different interpretations: one interpretation focuses on *measuring the balance* between the aggravating factors and the mitigating factors; and the other interpretation focuses on the *level of certitude* required of the jury in determining that the aggravating factors outweigh the mitigating factors. In other words, we first must clarify whether the defendant claims that: (1) in performing the weighing process, the jury must be persuaded that the aggravating factors outweigh the mitigating factors by some quantum or amount measured by the "beyond a reasonable doubt" standard; or (2) in performing the weighing process, the jury must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors by any degree or amount. Under the first interpretation, the jury must be persuaded that the balance of the aggravating factors against the mitigating factors must tip greatly—in the words of the defendant's request to charge, "substantially"; see footnote 8 of this opinion;—in favor of the aggravating factor such that the quantitative difference between the two factors would be aptly described as "beyond a reasonable doubt." Under the second interpretation, the jury need only determine that the aggravating factor is greater in some degree or amount than the mitigating factor, but, in arriving at that determination, it must be persuaded by a level of certitude of beyond a reasonable doubt. Although it is not altogether clear, a fair reading of the defendant's briefs is that he claims that: (1) the first interpretation is constitutionally required by our state constitution; but (2) even if the constitutional claim fails, the second interpretation should be adopted to fill a gap left by the legislature on the burden of persuasion applicable to the ultimate weighing decision.

Against this background, we consider the defendant's challenge to the constitutionality, under our state con-

stitution, of § 53a-46a (e) and (f). Specifically, the defendant claims that, under our state due process clauses, embodied in article first, §§ 8 and 9, of the state constitution,[9] in order for the death penalty to be imposed, the jury must be instructed that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. More specifically, the defendant claims that "[the] jury was not instructed about the standard of certainty that the jury needed to employ when deciding whether or not the aggravating [factor] outweighed the mitigating factors. The defendant maintains that this absence of a statutory standard [of certitude] means that the legislature has left it to the courts to provide an appropriate standard. . . . [T]he proper standard of certitude for this question of first impression should be that, in order for there to be a death sentence, the proven aggravating factor(s) must outweigh the proven mitigating factor(s) beyond a reasonable doubt."

We disagree with the defendant that, as a state constitutional matter, in order for the jury to render a verdict of death it must be instructed that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt. We also conclude, however, that the weighing statute should be construed such that the jury must be instructed that its level of certitude be beyond a reasonable doubt when determining that the aggravating factors outweigh the mitigating factors and that, therefore, death is the appropriate penalty in the case.

We first address the defendant's state constitutional contention, namely, that our constitution requires that the jury be instructed that the aggravating factors out-

---

[9] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

weigh the mitigating factors beyond a reasonable doubt. We understand this contention to mean that the jury must be instructed that, in performing the weighing process itself, the outcome of that process must be that the aggravating factors outweigh the mitigating factors by a standard or quantum measured by the concept of "beyond a reasonable doubt." We reject this contention.

It is settled law that, under the federal constitution, "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Zant* v. *Stephens*, 462 U.S. 862, 875–76 n.13, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Jurek* v. *Texas*, 428 U.S. 262, 270, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). The question presented by the defendant's claim, therefore, is whether our state constitution does require the standard sought by the defendant.

A

The Aggravating Factor

The capital felony that the defendant committed was "murder of a person under sixteen years of age." General Statutes (Rev. to 1997) § 53a-54b (9). The aggravating factor relied on by the state for the imposition of the death penalty was that "the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." General Statutes (Rev. to 1997) § 53a-46a (i) (4). It is settled that this aggravating factor means "that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." (Emphasis in original; internal quotation marks omit-

ted.) *State* v. *Courchesne*, 262 Conn. 537, 545, 816 A.2d 562 (2003).

At the penalty phase hearing, the jury reasonably could have found the following facts[10] in support of the aggravating factor.[11] On September 30, 1997, the victim was thirteen years old. He lived with his mother and his eighteen year old sister in the Bunker Hill section of Waterbury. He spent the afternoon of that day playing with friends from the neighborhood. At approximately 6:30 p.m., after eating dinner with his mother and his sister, the victim left his house and got onto his bicycle. He told his mother he was "going up the street to the bike track . . . ."

Meanwhile, the defendant had left his job at Arett Sales in Cheshire and, at approximately 5 p.m., returned to his house in the Bunker Hill section, where he lived with his mother, his older brother and his younger sister. The defendant drove his car, a red Isuzu hatchback, to the Fun Stuff Video store and, upon leaving the store, he visited Violet Boisvert, a friend who lived next to the video store. The defendant stayed with Boisvert in her apartment for approximately one hour. He asked Boisvert if he could make some brownies in her kitchen because his mother's stove was broken, and Boisvert agreed.

The defendant left Boisvert's apartment and drove home, arriving there at approximately 7:45 p.m. He parked his car in front of his house and went inside to

---

[10] As we must, in this part of the opinion we state the facts as the jury reasonably could have found them in support of its finding of the aggravating factor. Thus, these facts are stated with all inferences drawn in the state's favor.

[11] In this part of our opinion we also consider, and explicitly reject, the defendant's claim that there was insufficient evidence for the jury to have found the aggravating factor proven beyond a reasonable doubt. We do so because there was sufficient evidence in the record for the jury reasonably to have found the aggravating factor proven beyond a reasonable doubt.

get the ingredients for the brownies. As he returned to his car, the victim rode up to the defendant on the victim's bicycle. The defendant recognized the victim because he had spent time at the video store where the defendant previously had worked. The defendant asked the victim if his mother or anyone else knew where he was that evening, and the victim replied in the negative. When the defendant heard this, he decided to kill the victim "for no good reason and get away with it."

The defendant decided to lure the victim to a secluded place where he could kill him unobserved. Believing that the victim would be interested in snakes, the defendant told him that there were snakes in his backyard, and he asked the victim if he wanted to see them. When the victim agreed, the defendant told him that they would need a flashlight to see the snakes in the darkness, and that he would get one from his car. The defendant went to his car and retrieved a flashlight and a three pound sledgehammer with a handle approximately ten inches long, which he had taken from work, from under the front passenger seat where he had concealed it. The defendant slipped the sledgehammer down the front of his pants, rejoined the victim and took him into the backyard.

The defendant handed the flashlight to the victim so that he could look for snakes. As the victim was doing so, the defendant took the sledgehammer from his pants, approached the victim from behind, raised the sledgehammer over his head, held it there for a moment, and then hit the victim on the side of the head with the flat surface of the side of the sledgehammer. The victim fell forward on his face. The defendant then swung again, missing with the second attempted blow. The victim rolled over and implored the defendant to stop hitting him, but the defendant straddled him "like a horse," and began to hit him in the head "because [he] didn't want [the victim] to scream out and alert the

neighbors." After the defendant had delivered eleven or twelve blows with the sledgehammer, the victim made a gurgling sound. The defendant then delivered another one or two blows to ensure that the victim was dead.

In all, the defendant delivered thirteen blows to the victim—four on the head and nine on the back and shoulders. The blows to the back and shoulders were not fatal, and did not result in bleeding. None of these blows would have rendered the victim unconscious. Any of the blows to the head, however, could have been fatal, fracturing the victim's skull and causing numerous lacerations that bled profusely. Moreover, although any of the blows to the head could have rendered the victim unconscious, none of them necessarily did so.

During the attack, the victim covered his head in an attempt to protect himself, causing the biking gloves that he was wearing to become saturated with the blood from his head wounds. One of the blows punched out a large fragment of the victim's skull, creating a gaping hole. The defendant also stomped on the victim, leaving a bruise on his back that matched the pattern on the sole of the defendant's work boot.

At that point, two dogs in a neighbor's yard began to bark, and the dogs' owner came out of his house to quiet them down. The defendant stopped the beating, and held the flashlight against his body so that the neighbor would not see light coming from the yard. After the neighbor returned to his house, the defendant shone the flashlight on the victim's body, and saw that he was covered in blood and had a large hole in his skull. The defendant then took the flashlight and sledgehammer into his house and cleaned them off.

The defendant then decided to dump the victim's body on Fulkerson Drive, which was located a few blocks from the defendant's house. Realizing that his

car was too small to carry both the victim's body and his bicycle in one trip, the defendant took the bicycle to Fulkerson Drive and left it next to a dumpster. He then returned to his house, put garbage bags over the victim's head and lower part of his body, dragged the body to his car, and opened the hatchback. He then removed the rug that covered the rear portion of his car to ensure that it would not be stained with blood, placed the victim's body into the rear portion of the car, and drove to Fulkerson Drive.

At approximately 8:30 p.m., the defendant drove into a condominium complex on Fulkerson Drive, looking for a place to dispose of the body. Eventually, he located a dark, secluded area, where he stopped the car, threw the victim's body onto the pavement, and tossed the fragment of the victim's skull that had been dislodged during the beating onto the grass a few feet from the body.

The defendant then drove back to his house, where he placed his bloody work boots under a miniature trampoline that was in his bedroom. He put the sledgehammer and his blood-soaked shirt into plastic bags. After cleaning up, he returned to Boisvert's apartment where, according to her testimony, he acted normally. The next morning, the defendant took the plastic bags containing the sledgehammer and his shirt with him to work, and he threw them into his employer's trash compactor.

The victim's body was discovered on Fulkerson Drive at approximately 8:45 p.m. that same night. By the next day, October 1, 1997, the investigation of the victim's murder had focused on the defendant, and at 1 p.m., Waterbury Police Sergeants Eugene Coyle, Gary Pelosi and four other detectives were assigned to stake out his house. At approximately 5 p.m. that day, the defendant drove up to his house. Coyle asked the defendant if he

would be willing to go to the police station and answer some questions. The defendant agreed.

At the police station, Coyle advised the defendant of his *Miranda*[12] rights. The defendant waived his rights and agreed to speak with the detectives. When the detectives questioned him about the murder of the victim, the defendant denied any knowledge of the murder or that he knew the victim. The defendant then consented to a search of his house and car.

The police officers returned to the defendant's house. While Pelosi searched the car, Coyle, Detective Robert Cammilletti and the defendant entered the house. Pelosi then entered the house and directed Coyle to the car. Coyle observed that in the rear portion of the car the rug had been pulled back, revealing a masonite board, which appeared to be smeared with blood. Coyle returned to the house and brought the defendant out to the car. When he showed the defendant the smear on the board and asked him what it was, the defendant said, "I feel sick," and "I did it."

The defendant's confession prompted the police to terminate the search of the car and house, and to secure the location until search warrants could be obtained. Coyle then questioned the defendant further about the murder, and the defendant told Coyle that, as he was talking to the victim, he "had an urge." He explained that "he was interested in serial killings and Jeffrey Dahmer,"[13] and that when he saw the victim the urge to commit murder "just came over him . . . ."

---

[12] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[13] Jeffrey Dahmer was a notorious serial killer in Wisconsin. In his subsequent written confession, the defendant stated: "I have been really interested in serial killings. I have read about them and seen videos. My favorite book was the one about [Jeffrey] Dahmer. I have it in my bedroom. I even have the two books that his father wrote after he was killed in prison. [They're] also in my room with a bunch of [videotapes] about the subject. After I found out that no one knew where [the victim] was I decided I wanted to

Coyle, Pelosi and the defendant then drove to Fulkerson Drive, where the defendant showed them where he had left the victim's body and bicycle. They then drove to Arett Sales, where the defendant showed them the trash compactor into which he had thrown the sledgehammer and shirt. They then drove to the Waterbury police station, where the defendant was again advised of his *Miranda* rights, and he gave a written confession.

Searches of the house, car and trash compactor, pursuant to search warrants, yielded the defendant's sledgehammer, shirt and work boots. The blood on the boots matched that of the victim, and the pattern on the soles of the boots matched a bruise on the victim's back.

On October 2, 1997, Coyle drove the defendant to court for his arraignment. On the way, Coyle asked the defendant why he murdered the victim. The defendant replied that he just wanted to know what it was like to kill somebody.

In addition to the facts of the crime and its aftermath, the jury also reasonably could have found that the defendant had served in the United States Marine Corps from November, 1996, to September, 1997. While the defendant was stationed in Hawaii, his sergeant had asked the members of his platoon to make a list of their ten goals in life and to post the list in the barracks. The second goal on the defendant's list was to kill a man.

The jury also reasonably could have found that the defendant intended to inflict extreme physical and psychological pain and suffering on the victim over and above that necessary to accomplish the underlying killing. This finding was supported by: the choice of the sledgehammer as the weapon, its concealment and,

try and kill him for no good reason and get away with it. It was like a sort of urge I guess."

because of its size, the ease with which it could be concealed; the ways in which it was wielded; the defendant's long-standing fascination with violent death and serial killers; his preexisting desire to kill; and the callous way in which he disposed of the victim's body.

The jury also reasonably could have found that the victim experienced extreme physical and psychological pain and suffering as a result of the defendant's intentional conduct. This finding was supported by: the number of blows to the victim's head, back and shoulders; the victim's consciousness during the beating; his attempt to protect himself; the profuse bleeding from his wounds; and his last words, imploring the defendant to stop hitting him.

## B

### The Mitigating Factor or Factors

There were no statutory mitigating factors in this case. The defendant offered evidence to prove a number of nonstatutory mitigating factors.[14] The jury found proven by a preponderance of the evidence the existence of a "mitigating factor," but did not specify which factor or factors it had found proven.[15] Because we

---

[14] In his brief in this court, the defendant divides the proffered mitigating factors into seventeen different categories. We have grouped them somewhat differently, into a total of twelve categories.

[15] Specifically, the jury responded "Yes" to the following special interrogatory: "Do *any of you* find the existence of any mitigating factor concerning the character, background, or history of the defendant . . . or the nature and circumstances of the offense to have been proven by a preponderance of the evidence?" (Emphasis added.) In addition, consistent with this question, the trial court instructed the jury, without objection by the state, that, in determining whether the defendant had proved any one or more mitigating factors, the jury was not required to make a unanimous determination; it was sufficient to trigger the weighing process if any one or more jurors found a mitigating factor proven by a preponderance of the evidence. The state has not presented this issue to us as a ruling to be reviewed in the event of a new trial. Thus, the propriety of this instruction and its corresponding jury interrogatory have not been briefed or argued in the present appeal. See Practice Book § 63-4 (a) (1).

Under the prior, nonweighing statute, however, our law was clear that a

cannot determine which of these mitigating factors the jury found proven, it is necessary to refer to each of them. Thus, insofar as this record discloses, the jury also reasonably could have found any one or more of the following claimed mitigating factors.[16]

First, at the time of the murder on September 30, 1997, the defendant was eighteen years old, having been born on October 11, 1978. Thus, he was approximately

---

finding of a mitigating factor or no mitigating factor must be made by a unanimous jury, and that, in the absence of such unanimity, there would be no finding regarding mitigation or the lack thereof, one way or another. *State* v. *Daniels*, supra, 207 Conn. 387–88. In addition, we subsequently clarified our holding in *Daniels*. In *State* v. *Ross*, 230 Conn. 183, 243, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), we rejected the defendant's claim "that our death penalty system, as construed in *State* v. *Daniels*, supra, [374], is facially unconstitutional because it requires the jury to be unanimous in finding the existence of a mitigating factor before an individual juror can give effect to any mitigating factor," purportedly contrary to the decision of the United States Supreme Court in *McKoy* v. *North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). In rejecting this challenge, we stated: "Our holding in *Daniels* did not imply that individual jurors are precluded from considering and giving effect to all mitigating evidence in a death penalty sentencing hearing. *The unanimity requirement in our statute requires unanimity only in the sense that each juror must find at least one mitigating factor that was proved by a preponderance of the evidence. The jury need not unanimously find the same mitigating factor to have been proven by a preponderance of the evidence.* So construed, our death penalty sentencing statute avoids the unanimity problem identified in *McKoy*, because our unanimity requirement does not interfere with the ability of each individual juror to consider and to give effect to any mitigating factor of which he or she is convinced by a preponderance of the evidence." (Emphasis added.) *State* v. *Ross*, supra, 244. Thus, in *Daniels* and *Ross*, we made clear that: (1) *all* the jurors must agree that *a* mitigating factor exists, in order for there to be a valid determination that such a factor existed; but (2) the jurors *need not be* unanimous regarding *which* mitigating factor has been established.

Neither party, however, has discussed in this court this apparent conflict with our analysis in *Ross*. We address it here because, on the retrial, it should be considered by the trial court and the parties.

[16] As with the facts stated in favor of the aggravating factor found proven by the jury, in this part of the opinion we state the facts as the jury reasonably could have found them in favor of its finding of a mitigating factor. Thus, these facts are stated with all inferences drawn in the defendant's favor.

eleven and two-thirds months beyond the statutory mitigating factor of being "under the age of eighteen years" at the time of the offense. General Statutes (Rev. to 1997) § 53a-46a (h) (1); see footnote 4 of this opinion. In addition, there was evidence that he was immature and impulsive, namely, his decision to join the Marine Corps upon graduating from high school, and, when he could not meet the physical regimen, arranging to secure an administrative separation from service on less than honorable conditions for his use of marijuana.

Second, the murder could be considered out of character for the defendant, considering the life that he had led. This was supported by the following evidence. Although his home life was chaotic and dysfunctional, as discussed later in the opinion, he had no prior criminal record, he had no disciplinary or academic problems at school, he had been an active participant in his church services and activities, he had been studying, with some degree of success, to be a culinary chef and had received an award in culinary arts, and at an earlier time he had been accepted in the culinary arts program at Johnson & Wales University. Furthermore, he had been consistently employed throughout his teenage years.

Third, in confessing to the murder, the defendant cooperated with the police. This was supported by the following evidence. Upon being confronted with the blood smears in his car, the defendant stated, "I feel sick," and then stated, "I did it." He then responded orally to Coyle's questioning in full detail, and subsequently gave a detailed written confession at the police station. In these confessions, he made no effort to spare or justify himself, even describing his fascination with Jeffrey Dahmer. These confessions helped the state to marshal the evidence supporting the imposition of the death penalty.

Fourth, the defendant cooperated with the police by consenting to the searches of his car and house, by showing them where the murder weapon was located, and by showing them where he had left the victim's bicycle and body. This was supported by the following evidence. Although he initially had denied knowing the victim or anything about his murder, the defendant subsequently went willingly to the police station for questioning, and thereafter consented to a search of his car and home, knowing that there was incriminating evidence in both places. All of this took place within approximately one hour on the evening of October 1, 1997. He then gave a full written confession, told and showed the police how and where he had disposed of the victim's body and bicycle, and where he had disposed of the sledgehammer. He also agreed to, and did, draw a map of precisely where in his backyard he had committed the murder.

Fifth, the defendant took personal and legal responsibility for the murder of the victim. This was supported by the following evidence. Although at first he pleaded not guilty, that was a pro forma plea handled by his counsel. Thereafter, he pleaded guilty to capital felony, thus sparing the state the cost of presenting a guilt phase proceeding, and the family of the victim the anguish and uncertainty of a jury trial and verdict.

Sixth, the defendant had been a good student generally, had been accepted into a college level culinary program, had demonstrated a talent for food preparation, and had desired to make it a career. This was supported by the following evidence. The defendant's grades in grammar and middle school had been good, mostly in the 80s and 90s. While in middle school, he was highly recommended for and accepted into the culinary arts program at Warren F. Kaynor Regional Vocational-Technical School (Kaynor). During his four years at Kaynor, he consistently ranked in approxi-

mately the middle of his class, maintaining a C to C+ average. During his senior year, he was accepted at Johnson & Wales University, a college well-known for its culinary arts program. He did not attend, however, because he would have needed financial aid, and his parents never filled out the necessary forms. He received an award for his cooking skills and had a passion for cooking. He prepared most of the meals for his family, and while in high school, held jobs in the food industry, such as at McDonald's, Pizza Hut, Friendly's, Morrissey's, a family style restaurant, and Rosemary's Bakery, and hosted several church socials where he made cakes, cookies and pastries for the other parishioners. While participating in a Christmas bazaar, he made a gingerbread house that became the subject of a newspaper article.

Seventh, the defendant was active in his church. This was supported by the following evidence. He and his family were congregants of the Bunker Hill Congregational Church. In 1993, when the defendant was fifteen years old, he lit an advent candle on one Sunday morning, read scripture to the congregation on at least two occasions, and played the part of Joseph in the Christmas pageant. During his high school years, he attended Sunday church services approximately twice per month, although his father did not attend at all, and his mother attended only on Christmas and Easter. The minister, Mark Abernathy, testified that the defendant's church attendance, at his age, was unusual, especially because he came without his parents. He also participated in the after-service coffee hours, and approximately five or six times hosted the coffee hours, selecting, providing and serving the refreshments. When he did so, he baked the refreshments himself, without help from family members. Abernathy also testified that, in his recollection, the defendant was the only child or teenager to have hosted the coffee hours.

Eighth, the defendant had maintained a steady history of employment. This was supported by the following evidence. Between the ages of thirteen and fifteen, while in middle and early high school, the defendant worked at Fun Stuff Video, where he was given significant responsibilities, including going out of town with the owner to purchase new stock, and managing the store when the owner was not there. While in high school, the defendant also worked at Morrissey's, Pizza Hut, Friendly's and Rosemary's Bakery. After leaving the Marine Corps and returning to Waterbury, he immediately found work at Arett Sales, where he was working when he was arrested.

Ninth, the defendant was small for his age until his junior year in high school, he had been taunted by his peers, and he had been subjected to hazing and sexual harassment in school. This was supported by the following evidence. Several witnesses testified to his small stature during that time period and to the harassment and cruel treatment to which he was subjected by other children because of his size. There was also evidence that, while he was a student at Kaynor, there was a locker room incident in which the defendant and other culinary arts students were forced to touch the genitals of male upperclassmen. In addition, a state department of education investigation disclosed that, while he was at Kaynor, the defendant was subjected to beatings, sexual comments, exposure of the penis, having his face put in the crotches of other students, and having his head locked between the legs of another student. As a result of the investigation, the head of the culinary arts program resigned from his position pursuant to a stipulated agreement because he had failed to act on the reports of the incidents, and five students were subjected to disciplinary actions ranging from expulsion to suspension.

Tenth, the defendant was raised in a filthy and deplorable home environment. This was supported by the following evidence. Before the defendant's father left the home, he intended to fix the kitchen floor. He therefore pulled up the tiles, exposing the subflooring, but never finished the job. Eight years later, the floor was in the same condition, with the subflooring exposed. The downstairs toilet did not work, so that water and human waste stayed stagnant in it, and, even though his father brought another toilet to the house, the defendant's mother never had it installed, so that it remained in the garage. The bathroom sink was not in working order. In addition, the oven did not work, and the refrigerator did not work so that food was left to rot in it. Pots of food were left on the stove with old food in them. No one cleaned the house. From the winter of 1993 on, the gas that fueled the stove and the furnace was shut off approximately eighteen times. Furthermore, there were many cats in the house, and cat litter overflowed the boxes. There was cat excrement on the floors, and one could smell cat urine from the outside, the stench of which became overwhelming inside the house. In the dining room, there was debris piled up, including garbage and broken glass, and a door to the kitchen was coming off its hinges. There were a refrigerator and freezer in the living room, and the living room ceiling had water damage and part of it had fallen down. The living room was littered with garbage, boxes and assorted debris. A mattress was on the upstairs landing, blocking the access to the second floor. Upstairs, all of the bedrooms were in disarray. The defendant's mother's bedroom was difficult to enter because of the piles of clutter and debris strewn about. In the defendant's bedroom, there was so much debris that his bed could not be seen. The upstairs bathroom had mold, mildew and peeling paint. The smell of cat excrement and urine pervaded the upstairs, and a raccoon

and other wild animals lived in the attic. The basement was also in shambles. The house was in such a deplorable state that the defendant's friends were forbidden from visiting him because of its condition and the lack of adult supervision.

The outside of the house was also in disrepair. Windows were broken, screens ripped and the grass overgrown. The paint was peeling, and the gutters were overgrown with foliage. The steps were crumbling, and the driveway was so overgrown with brush that it was unusable.

Eleventh, the defendant's parents were often physically and emotionally absent, and provided him with little guidance, supervision or discipline, as a result of which he raised himself without the benefit of positive role models. This was supported by the following evidence. The defendant's parents divorced when he was nine years old. After the divorce, his father fell behind on support payments, moved to distant states and remarried. His mother found it necessary to take, first, a part-time job, then two part-time jobs, and ultimately a full-time and a part-time job. She was overwhelmed by the divorce, became depressed and exhausted, found it difficult to tend to her own needs and had little time to care for or supervise her children. The defendant came and went as he pleased. By the time he was eleven, the defendant undertook the responsibility of preparing and cooking meals, and taking care of his younger sister, because his mother was unavailable and his older brother declined to undertake the responsibilities. By the time he was thirteen, he had taken to wandering for great distances around the city by himself. His mother was usually absent and made no arrangements for babysitting, thus leaving the children on their own, often being out after dark without supervision. The defendant was never disciplined for misbehavior. Often there was no food in the home, and no one cleaned the

house. When he was fifteen, while working at the Fun Stuff Video store, he met Boisvert, who lived next door to the store. The defendant spent much of his time at the video store, even when not working, because he did not want to go home. When he was sixteen, he began to visit at Boisvert's home, where he was made to feel welcome. Boisvert had two young children, with whom the defendant played like an older brother, and Boisvert trusted him with them. He visited almost every day, and when he entered he called out, "I'm home." The defendant continuously asked Boisvert if he could move in with her family.

In addition, the defendant applied to Johnson & Wales University on his own, but when he was accepted his parents did not fill out the financial aid forms that would have enabled him to attend. When, as a high school sophomore, he was subjected to hazing and sexual harassment, his parents gave him no support or guidance, and his mother, with whom he was living at the time, appeared to know little or nothing about the matter.

Twelfth, without appropriate supervision and guidance, the defendant became influenced by violent books and movies that were inappropriate for his age. This was supported by the following evidence. Without any parental guidance or supervision, the defendant developed an unusual and unhealthy interest in violent killings, collecting books and videos on the subject. At about eleven or twelve, he became interested in a series of movies called the "Faces of Death," which depicted a collection of live killings and mutilations. When the defendant began to work at the video store at approximately age fourteen, the owner catered to his morbid interests by giving him violent videos to watch. In addition, although his mother claimed to disapprove of his interest in violent videos, she could not effectively

supervise him in this respect and, in fact, sometimes watched such videos with him.

## C

### The Statutory Weighing Process

With this factual background in mind, we next determine the meaning of the statutory weighing process enacted by the legislature. We conclude, from the language and the legislative history of § 53a-46a (e) and (f), that the statute requires, for the imposition of the death penalty, that the jury conclude that the aggravating factors outweigh the mitigating factors by any degree or amount. We further conclude that, in the present case, the trial court instructed the jury in accordance with that standard and, therefore, we presume that the jury followed those instructions.

In the first instance, whether the statute as enacted imposes any particular standard for weighing the balance between the aggravating factors and the mitigating factors presents a question of statutory interpretation. Thus, beginning with the statutory language, and including all other relevant evidence of its meaning, it is our task to determine the meaning of that language as applied to the facts of the case. *State* v. *Courchesne*, supra, 262 Conn. 577–78.[17]

---

[17] In *Courchesne*, we explained the process of statutory interpretation employed by this court. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

The relevant statutory language is: "The jury[18]. . . shall return a special verdict setting forth its findings as to the existence of . . . any aggravating factor or factors . . . and whether any aggravating factor or factors *outweigh* any mitigating factor or factors . . . found to exist . . . ." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (e). "If the jury . . . finds that . . . one or more of the aggravating factors . . . exist and . . . one or more mitigating factors exist but *are outweighed by* one or more aggravating factors . . . the court shall sentence the defendant to death." (Emphasis added.) General Statutes (Rev. to 1997) § 53a-46a (f). The words "outweigh" and "are outweighed by" very strongly suggest a balancing process that results in one side of the balance scale being greater, more weighty, more compelling, more important, or more significant, than the other side. All of the relevant dictionary meanings of the word "out-

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be the meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 577–78.

[18] We recognize that the defendant may elect to have the penalty phase heard by a panel of judges. By focusing on the decision by a jury to impose the death penalty, we do not intimate that the decision by such a panel is any different from that of a jury. Thus, all that we say about a jury's task is equally applicable to the same task performed by a panel of judges. We refer in the text of this opinion to the decision by a jury only because it was a jury that made the decision in the present case.

weigh" that we have consulted disclose a meaning consistent with this suggestion. See, e.g., Merriam-Webster's Collegiate Dictionary (10th Ed.) ("to exceed in weight, value, or importance"); The American Heritage Dictionary of the English Language ("[t]o weigh more than . . . [t]o be more significant than"); Webster's Third New International Dictionary ("to exceed in weight, value, or importance").

In addition, the legislative history of P.A. 95-19 firmly buttresses this very strong linguistic indication. That history is replete with considered statements that the legislature intended the weighing process to incorporate a balance whereby the aggravant was merely more significant or weighty than the mitigants. Representative Dale W. Radcliffe, the ranking House member of the judiciary committee, which sponsored the legislation, repeatedly stated that to be the case. See, e.g., 38 H.R. Proc., Pt. 3, 1995 Sess., pp. 941–42, remarks of Representative Radcliffe ("[W]hat is involved here is a weighing process. That if the aggravating factors by a fair preponderance of the evidence[19] which means more probable than not, outweigh the mitigating factors, then the ultimate penalty may be imposed. . . . [T]he trier of fact will clearly know that it is involved in a weighing or a standard of more probable than not in a case where mitigating and aggravating factors have both been found."); id., pp. 1033–34, remarks of Representative Radcliffe ("Representative [Michael J.] Jarjura was asked earlier what outweigh means. It means more than 50 [percent]. It means more probable than not. We are dealing with a criminal case here. Were we dealing with

---

[19] Although the legislative debate regarding the weighing process is often cast in terms of the "preponderance of the evidence" burden of persuasion, we discuss later in this opinion why we think that, when it comes to instructing the jury, it is inapt to require the imposition of a burden of persuasion, which addresses the level of certitude that the jury must have in order to make a particular determination, on the outcome of the weighing process as a matter of constitutional requirement.

a civil case it would mean the preponderance of the evidence. *It simply means there is more on the aggravating side of the scale than on the mitigating side of the scale* and if aggravating factors outweigh by more than 50 [percent], then the ultimate penalty can be imposed. That's clear." [Emphasis added.]); id., p. 1038, remarks of Representative Radcliffe ("*I have no trouble defining what outweigh means and I don't believe the courts would either. Outweigh means more than 50 [percent].* It is a standard charge to a jury that the scales begin at equipoise and when a fact is proven, an aggravating fact is proven, and no factor is proven in mitigation, then that outweighs the mitigating factors. It means more than 50 [percent]. It can be as much as 51 [percent]. *Essentially, it means it tips the scale more than 50 [percent]. That is what outweighs means and there is a clear body of case law to that [e]ffect.*" [Emphasis added.]); see also id., p. 944, remarks of Representative Ellen Scalettar ("[T]here has been mention of a finding by a preponderance of the evidence that the aggravating factors outweigh the mitigating factors and I would like to emphasize for the people in the chamber, that *that standard means a finding by 51 [percent] to 49 [percent] that aggravating factors outweigh mitigating factors.* It is almost a fifty-fifty call in this case and that is the thin line we are talking about in imposing the death penalty." [Emphasis added.]).

Furthermore, the court instructed the jury consistently with this standard. The court stated: "Let's talk a bit about the weighing process. . . . Now I'm going to instruct you on the weighing process that must be undertaken if any one of you determines that a mitigating factor exists. Should any one of you determine that a mitigating factor or factors exist, then all of you must engage in the weighing process. There is no special meaning to be accorded to the word 'weighing.' It is

given its common, everyday meaning. In comparison, you will ask clearly which one is greater, which one is greater." The court also stated: "[Y]ou must weigh the aggravating factor against any and all mitigating factors found to exist and determine which is greater, the aggravating factor or the mitigating factor or factors."[20]

## D

### Our Due Process Clauses and the Weighing Process

Having concluded that our statutory scheme requires that the jury determine that the aggravating factors outweigh the mitigating factors by any amount or degree, we turn to the question of whether the due process clauses of our state constitution require a more demanding standard to measure the balance between the aggravating factors and the mitigating factors. In this connection, we reiterate the distinction between the two different concepts that we discussed previously: (1) the *outcome* of the weighing process by the jury—namely, the measure of the balance between the aggravating factors and the mitigating factors; and (2) the *level of certitude* that the jury must have in arriving at that outcome. The defendant's claim is that our state constitution requires that the jury must be instructed that the outcome of the weighing process must be that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. For the reasons that follow, we reject that claim as a matter of state constitutional

---

[20] The trial court also instructed the jury: "Weighing does not involve the mere comparison of the number of aggravating and mitigating factors or the assigning of numerical weights to each factor. Weighing is the application of your individually reasoned moral judgment to your findings concerning the aggravating factor and the mitigating factors you have found proven. Under our law your individually reasoned moral judgment can and should include your personal beliefs concerning fairness and mercy." Although the defendant challenges the trial court's failure specifically to address the circumstances when the aggravating factors and the mitigating factors are in equipoise, which we consider later in this opinion, he does not take issue with this specific aspect of the definition of the weighing process.

law. Put another way, we conclude that the jury need not be instructed that the aggravating factors must outweigh the mitigating factors by a quantum or degree measured by the phrase, "beyond a reasonable doubt." If the aggravating factors outweigh—in the sense of being greater than—the mitigating factors, that is sufficient under our state constitution.

We first note that it is settled constitutional doctrine that, independently of federal constitutional requirements, our due process clauses, because they prohibit cruel and unusual punishment, impose constitutional limits on the imposition of the death penalty. *State* v. *Ross*, 230 Conn. 183, 245–52, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Specifically, our due process clauses "require, as a constitutional minimum, that a death penalty statute . . . must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably . . . ." Id., 252.

. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 57, 469 A.2d 1201 (1984). *State* v. *Barton*, [219 Conn. 529, 546, 594 A.2d 917 (1991)]. . . . [W]e have frequently relied upon decisions of the United States Supreme Court interpreting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes*,

209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro*, 197 Conn. 219, 235–36, 496 A.2d 498 (1985). . . . *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992)." (Internal quotation marks omitted.) *State* v. *Diaz*, 226 Conn. 514, 530, 628 A.2d 567 (1993).

"[O]ur state constitutional inquiry may proceed independently from the decisions of the United States Supreme Court upholding the constitutionality of the death penalty. We may find greater protection of individual rights under our state constitution than that provided by the federal constitution. . . . Moreover, we have held that in the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . Recognizing that our state constitution is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution. . . . *State* v. *Miller*, 227 Conn. 363, 379–80, 630 A.2d 1315 (1993)." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 247–48.

The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the fed-

eral constitutional minimum is well settled. "In *State* v. *Geisler*, supra, 222 Conn. 684–86, we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." *City Recycling, Inc.* v. *State*, 257 Conn. 429, 444 n.12, 778 A.2d 77 (2001).

Informing our conclusion regarding this question are the functions performed by the burden of persuasion in our legal system. As a foundation for our application of the six *Geisler* factors, therefore, we first focus our discussion on those functions.

In general, the assignment of a particular burden of persuasion to a particular category of cases reflects "a fundamental value determination of our society . . . ." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). Thus, we have stated that "[t]he functions of a burden of proof[21] are twofold: (1) it allocates the risk of error between the litigants; and (2) it indicates the relative importance of the ultimate decision. . . . Both of these functions 'reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations.' [Id., 370] (Harlan, J., concurring)." (Citation omitted.) *Miller* v. *Commissioner of Correction*, 242 Conn. 745,

---

[21] We have often used the terms "burden of proof" and "burden of persuasion" interchangeably. Compare *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 793, 700 A.2d 1108 (1997) (explaining that "[t]he functions of burden of proof are twofold") with *State* v. *Gerardi*, 237 Conn. 348, 356, 677 A.2d 937 (1996) (discussing state's "burden of persuasion" in context of *In re Winship*). We think that the term, "burden of persuasion" is more accurate. Accordingly, we use that term herein.

793, 700 A.2d 1108 (1997). We also have identified a third, intimately related function, namely, that of giving the fact finder guidance regarding the " 'sense of the solemnity of the task' "; *State* v. *Daniels*, supra, 207 Conn. 384; and "regarding the degree of certitude that it must have in order to" reach a certain decision. *State* v. *Cobb*, 251 Conn. 285, 465, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

Indeed, properly understood, this third function is how the first two functions are implemented, because, as Justice Harlan noted in his concurring opinion in *In re Winship*, supra, 397 U.S. 370, "a standard of proof represents an attempt to *instruct the factfinder concerning the degree of confidence our society thinks he should have* in the correctness of factual conclusions for a particular type of adjudication." (Emphasis added.) Thus, it is fair to say that, in our legal system, we employ the applicable burden of persuasion to guide the fact finder, in its process of coming to a decision, regarding the sense of solemnity and the subjective degree of certitude that it must have in order to reach that decision. See id., 371 (referring to fact finder's "intensity of . . . belief" regarding factual determination). That instruction, accordingly, performs the other two functions of the burden of persuasion, namely, (1) to allocate the risk of error between the litigants, and (2) to indicate to our society in general the relative value that we, as a society, place on the ultimate decision governed by the particular burden.

With respect to the allocation of the risk of error, "the greater the social cost of an erroneous outcome in a particular type of litigation, the higher the standard of proof the law applies to that litigation." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 793. With respect to the function of indicating the value we as a society place on the question being decided, "the

more confidence our society requires in the correctness of the factual determinations for a particular type of litigation, the higher the standard of proof the law applies to that litigation." Id. Underlying both of these functions, however, is the notion that the burden of persuasion takes the form of an instruction to the fact finder, whether jury or court, regarding the subjective degree of certitude that it must have in order to render a decision for the party with the burden of persuasion.

"Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases." *Addington* v. *Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). Those three burdens of persuasion are traditionally recognized as: (1) a preponderance of the evidence; (2) beyond a reasonable doubt; and (3) clear and convincing evidence. Id., 423–24; *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 720, 780 A.2d 1 (2001).

Thus, "[a]t one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, [the] plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion." *Addington* v. *Texas*, supra, 441 U.S. 423. Accordingly, because the value we place on the outcome in such cases is relatively low, and because we therefore assign the risk of error almost equally, we require only a modicum of subjective certitude on the part of the fact finder: so long as the fact finder is persuaded that the plaintiff's assertions are probably more true—by no more than a ratio of fifty-one to forty-nine—the plaintiff has met his burden of persuasion.

At the other end of the spectrum is the criminal case. In such a case, "the interests of the defendant are of

such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt." Id., 423–24. Accordingly, because of "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free"; *In re Winship*, supra, 397 U.S. 372; and because in criminal cases we impose almost all of the risk of error on the state, we require the fact finder to have a very high degree of subjective certitude: no reasonable doubt about the defendant's guilt.[22]

---

[22] At a certain point on the spectrum lies a third standard that applies "to protect particularly important individual interests in various civil cases." *Addington* v. *Texas*, supra, 441 U.S. 424. This is the clear and convincing burden of persuasion.

Although this burden ordinarily applies to protect particularly important interests in civil cases, we also have employed it to protect certain important individual interests in criminal cases. "Proof by clear and convincing evidence is an intermediate standard generally used . . . *when particularly important individual rights are involved.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Garcia*, 233 Conn. 44, 86, 658 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996) (burden on state to establish necessity to medicate incompetent defendant in order to render him competent to stand trial); see also *State* v. *Bronson*, 258 Conn. 42, 49–50, 779 A.2d 95 (2001) (burden on state to establish compelling need to exclude defendant from courtroom during videotaping of minor victim's testimony); *State* v. *Johnson*, supra, 253 Conn. 11 n.9 (burden on moving party to establish that defendant not competent to stand trial); *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 794 (burden on habeas corpus petitioner to establish claim of actual innocence); *State* v. *Metz*, 230 Conn. 400, 425, 645 A.2d 965 (1994) (burden on state to establish continued commitment of defendant acquitted on ground of mental disease or defect).

Thus, in cases governed by this burden, because society regards the individual interests involved to be very important, and because society imposes most of the risk of error on the party so burdened, we also require a very high degree of subjective certitude for the burden to be satisfied: the fact finder must be persuaded to a high degree of probability. Neither the

E

## Application of the *Geisler* Factors

With this doctrinal background in mind, we turn next to the question of whether our statutory weighing process satisfies state constitutional standards. This question requires application of the six *Geisler* factors. In performing this task, moreover, we are mindful of "the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . We undertake this search for a constitutionally valid construction when confronted with criminal statutes as well as with civil statutes." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 236.

The first *Geisler* factor we consider is "persuasive relevant federal precedents . . . ." *City Recycling, Inc.* v. *State*, supra, 257 Conn. 444 n.12. This factor favors a determination that our state constitution does not afford greater protection than does the federal constitution, because it is well settled that the federal constitution imposes no specific standard on the weighing process. *Zant* v. *Stephens*, supra, 462 U.S. 875–76 n.13; *Jurek* v. *Texas*, supra, 428 U.S. 270.

We next consider "historical insights into the intent of our constitutional forebears . . . ." *City Recycling, Inc.* v. *State*, supra, 257 Conn. 444 n.12. This factor focuses on any relevant evidence of the intent of the

defendant nor the state claims that this standard applies to the outcome of the weighing process.

framers of our constitution that bears on the particular question before us. This factor is neutral in the present case. Neither the state nor the defendant claims that there is any such evidence.

Another such factor is "the text of the operative constitutional provisions . . . ." Id. In the present case, the operative text consists of the two clauses of article first, §§ 8 and 9, which we have construed to guarantee our citizens due process of law. A textual analysis of these provisions on balance favors the state. The two clauses in the first instance appear neutral because of their general nature. They are inherently "open textured provisions" that "in no way [compromise] our obligation independently to construe" them. *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990). Therefore, the absence of any persuasive language neither precludes nor favors a determination that they impose any burden higher than the federal constitution. In the state's favor is the general textual factor that, "[i]n article first, § 8, and article first, § 19, our state constitution makes repeated textual references to capital offenses and thus expressly sustains the constitutional validity of such a penalty in appropriate circumstances." *State* v. *Ross*, supra, 230 Conn. 249–50. Accordingly, we rejected the defendant's contention in *Ross* that the death penalty was barred by our state constitution on its face. Id.

That holding, however, is not responsive to the defendant's claim in the present case that the measure of the balance between the aggravating factors and the mitigating factors must be governed by the reasonable doubt standard. In the defendant's favor is that, in *Ross*, we have construed these same due process clauses to "require, *as a constitutional minimum*, that a death penalty statute . . . must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably . . . ." (Emphasis added.) Id., 252. Although *Ross*' gloss

on the text of our due process clauses arguably could support the conclusion that, going beyond the minimum referred to in *Ross*, the outcome of the weighing process must be measured by the reasonable doubt standard, we do not adopt that conclusion, because it is a difficult leap from the proposition that *Ross* articulates a minimum constitutional standard of reliability and consistency to the proposition that it therefore supports the imposition of the maximum burden that the law recognizes on the outcome of the weighing process.

The same reasoning applies, moreover, to the use of *Ross* in the fourth *Geisler* factor, namely, "related Connecticut precedents . . . ." *City Recycling, Inc.* v. *State*, supra, 257 Conn. 444 n.12. As a state precedent, *Ross* simply does not support a constitutional requirement that the balance between the aggravating factors and the mitigating factors be measured by the reasonable doubt standard. As we indicate later in this opinion, however, *Ross* does indicate potential constitutional questions applicable to the statutory weighing scheme that prudence suggests be taken into account in construing that scheme.

The fifth factor is "persuasive precedents of other state courts . . . ." Id. This factor favors the state because no other state has imposed the reasonable doubt standard on the outcome of the weighing process, as a matter of state constitutional law. This factor involves an examination of persuasive precedents of other state courts. We first note in this regard that, of the thirty-eight states that impose the death penalty, including Connecticut,[23] twenty-eight states require the

[23] These thirty-eight states are: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington and Wyoming.

sentencing authority to engage in some sort of weighing process.[24] Of those twenty-eight states, six have statutes that expressly incorporate a burden of beyond a reasonable doubt.[25] The manner in which that burden is imposed, however, differs among those states. Two of the states, namely, Ohio and Utah, impose the burden, not on the outcome of the weighing process, but on the level of certitude of the sentencing authority. See, e.g., Ohio Rev. Code Ann. § 2929.03 (D) (1) (West 1997) (*"[t]he prosecution shall have the burden of proving, by proof beyond a reasonable doubt,* that the aggravating circumstances the defendant was guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death" [emphasis added]); Utah Code Ann. § 76-3-207 (5) (b) (Sup. 2002) ("[t]he death penalty shall only be imposed if, after considering the totality of the aggravating and mitigating circumstances, *the jury is persuaded beyond a reasonable*

---

[24] These twenty-eight states are: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Kansas, Maryland, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Utah and Wyoming. The respective statutory weighing provisions of each of these states are: Ala. Code § 13A-5-46 (e) (2) (1994); Ariz. Rev. Stat. § 13-703 (E) (2001); Ark. Code Ann. § 5-4-603 (Michie 1997); Cal. Penal Code § 190.3 (Deering 1985); Colo. Rev. Stat. § 18-1.3-1201 (2) (b) (II) (B) (2002); General Statutes (Rev. to 1997) § 53a-46a (e) and (f); Del. Code Ann. tit. 11, § 4209 (d) (1) (2001); Fla. Stat. c. 921.141 (3) (b) (2002); Idaho Code § 19-2515 (c) (Michie 1997); 720 Ill. Comp. Stat. Ann. 5/9-1 (g) and (h) (West 2002); Ind. Code Ann. § 35-50-2-9 (k) (2) (1998); Kan. Stat. Ann. § 21-4624 (e) (1995); Md. Code Ann., Criminal § 413 (h) (1996); Miss. Code Ann. § 99-19-101 (3) (c) (2000); Mont. Code Ann. § 46-18-305 (2001); Neb. Rev. Stat. § 29-2522 (2) (1995); Nev. Rev. Stat. 175.554 (3) (2001); N.H. Rev. Stat. Ann. § 630:5 (IV) (1996); N.J. Stat. Ann. § 2C:11-3 (c) (3) (a) and (b) (West 1995); N.M. Stat. Ann. § 31-20A-2 (B) (Michie 2000); N.Y. Crim. Proc. Law § 400.27 (11) (a) (McKinney 2003); N.C. Gen. Stat. § 15A-2000 (b) (2) (1999); Ohio Rev. Code Ann. § 2929.03 (D) (1) (West 1997); Okla. Stat. Ann. tit. 21, § 701.11 (West 2002); 42 Pa. Cons. Stat. Ann. § 9711 (c) (1) (iv) (West 1998); Tenn. Code Ann. § 39-13-204 (g) (1) (B) (1997); Utah Code Ann. § 76-3-207 (5) (b) (Sup. 2002); Wyo. Stat. Ann. § 6-2-102 (Lexis Nexis 2003).

[25] These six states are: Arkansas, New Jersey, New York, Ohio, Tennessee and Utah.

*doubt that total aggravation outweighs total mitiga-*
*tion,* and *is further persuaded, beyond a reasonable*
*doubt,* that the imposition of the death penalty is justi-
fied and appropriate in the circumstances" [emphasis
added]). In addition, three of these states, namely,
Arkansas, New Jersey and Tennessee, appear to impose
the burden directly on the outcome of the weighing
process. See Ark. Code Ann. § 5-4-603 (a) (2) (Michie
1993) ("[t]he jury shall impose a sentence of death if
. . . *[a]ggravating circumstances outweigh beyond a*
*reasonable doubt all mitigating circumstances* found
to exist" [emphasis added]); N.J. Stat. Ann. § 2C:11-3
(c) (3) (a) (West 1995) ("[i]f the jury or the court finds
that any aggravating factors exist and that *all of the*
*aggravating factors outweigh beyond a reasonable*
*doubt all of the mitigating factors,* the court shall sen-
tence the defendant to death" [emphasis added]); Tenn.
Code Ann. § 39-13-204 (g) (1) (B) (1997) ("[i]f the jury
unanimously determines that . . . *[s]uch [aggravat-*
*ing] circumstances have been proven by the state to*
*outweigh any mitigating circumstances beyond a rea-*
*sonable doubt*; then the sentence shall be death"
[emphasis added]). New York takes a middle ground
approach, imposing the reasonable doubt standard on
the sentencer's level of certitude, and a different, *sub-*
*stantiality* requirement on the outcome of the weighing
process. See N.Y. Crim. Proc. Law § 400.27 (11) (a)
(McKinney 2003) ("[t]he jury may not direct imposition
of a sentence of death *unless it unanimously finds*
*beyond a reasonable doubt that the aggravating factor*
*or factors substantially outweigh the mitigating factor*
*or factors established,* if any, and unanimously deter-
mines that the penalty of death should be imposed"
[emphasis added]).

Moreover, although nineteen states have addressed
the absence of a burden of persuasion in their weighing
statutes, thirteen of those states have done so only

in the context of a federal constitutional challenge.[26] Because the defendant's claim invokes our state constitution, we focus on the three states that have addressed the issue in the context of their state constitutions.[27] Significantly, none of these three states has imposed the reasonable doubt standard on the outcome of the weighing process.

Under the Colorado weighing statute, "the jurors must return a sentence of death if they find the aggravators and mitigators to weigh equally in the balance." *People* v. *Young*, 814 P.2d 834, 841 (Colo. 1991).[28] The

---

[26] Those thirteen states are: Alabama, Arizona, California, Florida, Idaho, Illinois, Indiana, Kansas, Mississippi, Montana, New Mexico, Oklahoma and Pennsylvania. See, e.g., *Ex parte Waldrop*, 859 So. 2d 1181, 1189 (2002); *State* v. *Ysea*, 191 Ariz. 372, 375, 956 P.2d 499 (1998); *People* v. *Box*, 23 Cal. 4th 1153, 1216, 5 P.3d 130, 99 Cal. Rptr. 2d 69 (2000); *Ford* v. *Strickland*, 696 F.2d 804, 818 (11th Cir.), cert. denied, 464 U.S. 865, 104 S. Ct. 201, 78 L. Ed. 2d 176 (1983) (Florida); *State* v. *Sivak*, 105 Idaho 900, 905, 674 P.2d 396 (1983), cert. denied, 468 U.S. 1220, 104 S. Ct. 3591, 82 L. Ed. 2d 887 (1984); *People* v. *Ballard*, 206 Ill. 2d 151, 794 N.E.2d 788 (2002); *Bivins* v. *State*, 642 N.E.2d 928, 946 (Ind. 1995), cert. denied, 516 U.S. 1077, 116 S. Ct. 783, 133 L. Ed. 2d 734 (1996); *State* v. *Kleypas*, 272 Kan. 894, 1019, 40 P.3d 139 (2001), cert. denied, 537 U.S. 834, 123 S. Ct. 144, 154 L. Ed. 2d 53 (2002); *Wiley* v. *State*, 484 So. 2d 339, 352 (Miss.), cert. denied, 479 U.S. 906, 107 S. Ct. 304, 93 L. Ed. 2d 278 (1986); *State* v. *Smith*, 261 Mont. 419, 863 P.2d 1000 (1993); *State* v. *Clark*, 128 N.M. 119, 141, 990 P.2d 793 (1999); *Murphy* v. *State*, 54 P.3d 556, 566 (Okla. 2002); *Commonwealth* v. *Murphy*, 540 Pa. 318, 335 n.5, 657 A.2d 927 (1995).

The other six states are: Colorado, Delaware, Maryland, New Jersey, North Carolina and Utah.

[27] These three states are: Colorado, Delaware and Maryland.

[28] At the time *Young* was decided, Colorado's capital sentencing statute required the jury to determine: " 'Whether sufficient statutory mitigating factors or other mitigating circumstances exist which outweigh any statutory aggravating factor or factors and other aggravating circumstances.' " *People* v. *Young*, supra, 814 P.2d 841, quoting Colo. Rev. Stat. § 16-11-103 (2) (a) (II) (Sup. 1990). That statute further provided: " 'In the event that the jury finds that at least one statutory aggravating factor has been proved beyond a reasonable doubt, and that there are insufficient statutory mitigating factors or other mitigating circumstances to outweigh any statutory aggravating factor or factors that were proved and any other aggravating circumstances that were proved, the jury shall return a sentence of death.' " *People* v. *Young*, supra, 841, quoting Colo. Rev. Stat. § 16-11-103 (2) (b) (III) (Sup.

Supreme Court of Colorado stated: "Under this formulation, the statute requires that a jury sentence a defendant to death if the mitigators and aggravators are equally balanced. We hold that a sentence to death under those circumstances does not reflect the degree of certainty and reliability that the Colorado Constitution requires to support the imposition of the uniquely severe and irrevocable sentence of death." Id., 839. The court stated further: "The result of a decision that the relevant considerations for and against imposition of the death penalty in a particular case are in equipoise is that the jury *cannot* determine with reliability and certainty that the death sentence is appropriate under the standards established by the legislature. A statute that requires a death penalty to be imposed in such circumstances without the necessity for further deliberations, as does [Colo. Rev. Stat. § 16-11-103 (2) (b) (III) (1986 & Sup. 1990)], is fundamentally at odds with the requirement that the procedure produce a certain and reliable conclusion that the death sentence should be imposed. . . . A jury determination that such factors are in equipoise means nothing more or less than that the moral evaluation of the defendant's character and crime expressed as a process of weighing has yielded inconclusive results. A death sentence imposed in such circumstances violates requirements of certainty and reliability and is arbitrary and capricious in contravention of basic constitutional principles. Accordingly, we conclude that the statute contravenes the prohibition of cruel and unusual punishments under article II, section 20, of the Colorado Constitution, and deprives the

---

1990). The 1990 statute had eliminated an additional step in the weighing process, which previously had been required by the statute, requiring the jury to determine "whether the defendant should be sentenced to death or life imprisonment"; Colo. Rev. Stat. § 16-11-103 (2) (a) (III) (1986); and which the court had interpreted to require the jury to determine whether "death was the appropriate punishment beyond a reasonable doubt." *People* v. *Tenneson,* 788 P.2d 786, 796 (Colo. 1990).

defendant of due process of law under article II, section 25, of that constitution." (Emphasis in original.) Id., 845.

Again, significantly, the Colorado court did not require that the balance between the aggravating factors and the mitigating factors be measured by the reasonable doubt standard. Although the court held that a capital sentencing scheme that allowed the imposition of the death sentence when the jury was in equipoise violated its state constitution, that precedent does not support the conclusion that our state constitution imposes the reasonable doubt standard on the outcome of the weighing process. Furthermore, our statute, unlike that of Colorado, precludes the imposition of the death penalty when the aggravating and mitigating factors are in equipoise.

Standing next to the Colorado decision and its reasoning are the decisions of the highest courts of Maryland and Delaware, under their respective state constitutions. In *Baker* v. *State*, 367 Md. 648, 676, 790 A.2d 629, cert. denied, 535 U.S. 1050, 122 S. Ct. 1814, 152 L. Ed. 2d 817 (2002), the Maryland Court of Appeals reasserted its prior holdings[29] that its weighing statute, "which requires the aggravating circumstances to outweigh the mitigating circumstances by a preponderance of the evidence, is constitutional" under article 24 of the Maryland Declaration of Rights. In *State* v. *Cohen*, 604 A.2d 846, 850–51 (Del. 1992), the Supreme Court of Delaware held that its weighing statute, which requires the death penalty if the aggravating circumstances outweigh the mitigating circumstances, did not violate the Delaware

---

[29] Those prior cases were: *Collins* v. *State*, 318 Md. 269, 296, 568 A.2d 1, cert. denied, 497 U.S. 1032, 110 S. Ct. 3296, 111 L. Ed. 2d 805 (1990); *State* v. *Calhoun*, 306 Md. 692, 739–40, 511 A.2d 461 (1986), cert. denied, 480 U.S. 910, 107 S. Ct. 1339, 94 L. Ed. 2d 528 (1987); *Foster* v. *State*, 304 Md. 439, 477, 499 A.2d 1236 (1985), cert. denied, 478 U.S. 1010, 106 S. Ct. 3310, 92 L. Ed. 2d 723 (1986); *Tichnell* v. *State*, 287 Md. 695, 729–34, 415 A.2d 830 (1980).

constitution. Thus, although neither of these cases contains the type of analysis present in the Colorado decision, they can nonetheless be aligned in the column of cases contrary to the defendant's claim in the present case. There are no cases that support the defendant's claim as a constitutional matter.

The final *Geisler* factor is that of relevant public policies. We conclude that this factor also weighs against the defendant's claim because the reasonable doubt standard focuses on the jury's subjective sense of certitude in arriving at the critical finding or judgment, not on the quantum or degree by which one factor outweighs another. Thus, it would be difficult to conclude that our state constitution requires, as a matter of fundamental constitutional policy, a standard that, in its traditional and uniformly understood formulation, is simply ill equipped to describe the outcome of the statutory weighing process.

In this connection, we note that the defendant's claim is instructional in nature; that is, he claims that our state constitution requires that, in order to render a verdict of death, the jury must be instructed that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. The reasonable doubt standard, however, as an instructional concept, is aimed at conveying to the jury the level or degree of subjective certitude that it must have in order to render a verdict in favor of the party with the burden of persuasion. Thus, in its various traditional formulations regarding guilt or innocence, it requires the jury to determine whether, after considering all of the evidence, it has any reasonable doubt as to the defendant's guilt of the crime charged. Customary reasonable doubt instructions also convey to the jury what is meant, and is not

meant, by a "reasonable doubt."[30] All of these customary instructions, however, focus on the subjective sense of certitude of the jury. Indeed, we have held that it is improper for a trial court to attempt to explain the concept of reasonable doubt by metaphors or analogies that are quantified in nature. See, e.g., *State* v. *DelVecchio*, 191 Conn. 412, 417–19, 464 A.2d 813 (1983) (jury instruction using football field metaphor to explain reasonable doubt standard diluted constitutional standard of proof beyond reasonable doubt).

In our view, therefore, in the absence of some as yet unstated and undefined refinement of what we ordinarily understand as the meaning of the reasonable doubt standard, it is simply inapt to measure the balance between the aggravating factors and the mitigating factors. Put another way, the statutory weighing process requires the jury to determine that, in some measure, degree or amount, the aggravating factor is greater or

[30] For example, our customary reasonable doubt instructions provide: "The meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. It is not a surmise, a guess or mere conjecture. It is not a doubt suggested by counsel which is not warranted by the evidence. It is such a doubt as, in serious affairs that concern you, you would heed; that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt; the law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that, after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion." J. Pellegrino, Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001) § 2.8, p. 38.

more compelling than the mitigating factors. That is simply not a determination that focuses on the subjective level of certitude of the jury. Without some amendment to the ordinary and traditional jury instruction on the meaning of the reasonable doubt standard, it simply does not fit the outcome of the weighing process.

Indeed, the defendant implicitly acknowledged this lack of fit in his instructional request to the trial court. In that request to charge, he stated: "*The reasonable doubt standard here means something different than it does when applied to fact-finding.*" (Emphasis added.) He then went on to propose what it would mean in the weighing process, but that proposal imposed a concept of *substantiality* on the weighing process; see footnote 8 of this opinion; and, beyond that, he spoke in terms of the level of certitude that the jury must have in deciding that the aggravating factors outweighed the mitigating factors: "Weighing is not fact-finding but the exercise of judgment. The beyond a reasonable doubt standard represents the level of confidence you must have in your judgment as to the appropriate sentence. It represents the high degree of certainty that society requires because of the severity and irrevocable nature of the death penalty. It is meant to convey the solemnity of the task before you and the necessity for a high degree of certitude before you may impose the death penalty." Thus, when explaining the outcome of the weighing process, the defendant was required to import into the reasonable doubt standard a new substantiality factor, heretofore unknown to that standard. Application of that concept of substantiality to the measuring of the balance between the aggravating factors and the mitigating factors is not constitutionally required.

The language of New York's weighing statute effectively conveys this conceptual difference between the jury's subjective level of certitude and its determination of the outcome of the weighing process. The New York

statute provides: "The jury may not direct imposition of a sentence of death *unless it unanimously finds beyond a reasonable doubt* that the aggravating factor or factors *substantially outweigh the mitigating factor or factors established*, if any, and unanimously determines that the penalty of death should be imposed." (Emphasis added.) N.Y. Crim. Proc. Law § 400.27 (11) (a) (McKinney 2003). Thus, this statute explicitly acknowledges that the reasonable doubt standard applies to the jury's subjective level of certitude in arriving at its weighing judgment; but that, with respect to the *outcome* of that weighing judgment, the statute requires something different, namely, a determination, not of the absence of reasonable doubt, but of a quantum or degree measured by the word "substantially."

The simple fact that the application of the reasonable doubt standard to the outcome of the weighing process would necessitate a redefinition of that traditional standard precludes the conclusion, sought by the defendant, that our state constitution requires that application. It is difficult to see how public policy compels this conclusion, when the proposed application of that policy would at the same time require a fundamental amendment to the reasonable doubt standard. Put another way, we decline to conclude, on the basis of the sixth *Geisler* factor, that the outcome of the weighing process must be that the aggravating factors outweigh the mitigating factors by a new undefined standard of beyond a reasonable doubt.

To summarize then, we conclude that our state constitution does not require that the jury, in deciding the balance between the aggravating factors and the mitigating factors, determine that that balance be anything other than is described by the terms, "greater than," "weightier than," "more compelling than," or "more significant than," in any degree or amount. The balance constitutionally need not be described as "*substantially*

more than," or as "beyond a reasonable doubt." As we explain in part I F of this opinion, however, the jury's *subjective level of certitude* in reaching the determination that the aggravating factors outweigh the mitigating factors, as described previously, must be that level of certitude defined by the phrase, "beyond a reasonable doubt."

F

The Appropriate Burden of Persuasion on the Weighing Process

Having concluded that there is no state constitutional requirement that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, we are not, however, finished with our task. We further conclude that, despite this constitutional conclusion, without an appropriate burden of persuasion placed on the level of certitude that the jury must have in making its weighing determination, there would be a potentially significant state constitutional question about our capital sentencing scheme. Therefore, without deciding and in order to avoid any such state constitutional question, we conclude[31] that the jury must be instructed that, in arriving at its judgment that the aggravating factors outweigh the mitigating factors by any degree or

---

[31] We note that part I F of our opinion, in which we require an instruction that the jury be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, and that, therefore, the jury be persuaded beyond a reasonable doubt that death is the appropriate penalty, commands the votes of four members of the court, namely, Borden, Norcott, Katz and Palmer, Js. Thus, such an instruction constitutes the governing legal standard in capital cases.

One member of the court, namely, Katz, J., would go farther and also require an instruction in accordance with a more demanding standard, namely, that the aggravating factor outweighs the mitigating factors beyond a reasonable doubt; and three members of the court, namely, Sullivan, C. J., and Vertefeuille and Zarella, Js., would hold that no instructional standard, regarding either the balancing process itself or the jury's degree of certitude in arriving at its outcome, is required.

amount, it must be persuaded that death is the appropriate penalty in the case, and that its level of certitude in arriving at that ultimate weighing judgment must be beyond a reasonable doubt.[32] See *State* v. *Snook*, 210 Conn. 244, 251, 555 A.2d 390 (1989) ("[t]his court should try, whenever possible, to construe statutes to avoid a constitutional infirmity" [internal quotation marks omitted]), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989).

Informing our conclusion regarding the required burden of persuasion for the jury in its performance of the

---

[32] The dissents of Sullivan, C. J., and Zarella, J., suggest that we should have employed a *Geisler* analysis in considering the defendant's second claim, namely, that the jury must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, and further suggest that we have adopted a new, "vague," analytical framework for state constitutional claims in analyzing the defendant's alternate claim. First, as we have already explained, the defendant makes different claims regarding: (1) whether the reasonable doubt standard should apply to the measure of the balance between the aggravating factors and the mitigating factors; and (2) whether the standard should apply to the degree of certitude that the jury must have in arriving at the outcome. The defendant claims that the first interpretation is required by our state constitution, but that, *even if the constitutional claim fails,* the second interpretation should be adopted to fill a gap left by the legislature on the burden of persuasion applicable to the ultimate weighing decision. Thus, the defendant does not claim that the second interpretation is constitutionally required, but that this court should fill the gap in the statute in order to avoid a potential constitutional infirmity. In treating these claims differently, therefore, we are merely responding to the separate claims raised by the defendant.

Second, the dissents' argument ignores the distinction between our decisions that have *identified* a constitutional question and added a judicial gloss to a statute in order to avoid "constitutional jeopardy"; *State* v. *Floyd*, 217 Conn. 73, 89, 584 A.2d 1157 (1991); and our decisions that have *resolved* a constitutional question. See *State* v. *Geisler*, supra, 222 Conn. 684–86. Although a *Geisler* analysis is necessary in order to determine whether our state constitution affords greater protection than the federal constitution, "[e]stablished wisdom counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 89. If we took the approach that the dissents suggest, we would be forced to undertake the antithetical tasks of: (1) construing a statute in order to avoid a potential constitutional infirmity; and (2) resolving the constitutional issue.

weighing process, are three factors, namely: (1) the nature of the death penalty; (2) an overarching need for reliability and consistency in the imposition of the death penalty; and (3) the nature of the jury's determination to render a verdict requiring the penalty. These three factors are directly relevant to an analysis under *In re Winship*, supra, 397 U.S. 370–72, of the appropriate burden of persuasion because they indicate that the decision to sentence a defendant to death is of the highest importance and that a jury cannot be faced with a more solemn task. As a foundation for our conclusion that, in order to avoid potentially significant constitutional questions, there must be a burden of persuasion of beyond a reasonable doubt on the jury's determination to impose the death penalty, we focus first on those three factors.

Death is different. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman* v. *Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring). "[T]he imposition of death by public authority is . . . profoundly different from all other penalties . . . ." *Lockett* v. *Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

Moreover, an overarching principle of both federal and our state constitutional death penalty jurisprudence is that, "[b]ecause of that qualitative difference, there

is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Id. The eighth amendment requires "heightened reliability . . . in the determination whether the death penalty is appropriate . . . ." *Sumner* v. *Shuman*, 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987). Under our prior, nonweighing statute, we held that the finding of an aggravating factor met the federal constitutional "prerequisite of consistency and reliability by guiding the capital sentencer's discretion" at the eligibility phase, and that requiring the death penalty only where no mitigating factor was proven met the federal constitutional "individualization prerequisite by requiring the sentencer to consider any relevant mitigating information so as to enable the sentencer to make the reasoned moral judgment that death is the appropriate punishment in a particular case." *State* v. *Ross*, supra, 230 Conn. 238–39. We have also held that "the due process clauses of our state constitution incorporate the principles underlying a constitutionally permissible death penalty statute that the United States Supreme Court has articulated in cases such as *California* v. *Brown*, [479 U.S. 538, 541, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987)], *Eddings* v. *Oklahoma*, [455 U.S. 104, 110–12, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)], and *Lockett* v. *Ohio*, supra, 438 U.S. 602–605. These principles require, *as a constitutional minimum*, that a death penalty statute . . . must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably . . . ." (Emphasis added.) *State* v. *Ross*, supra, 252. In addition, of course, the death penalty represents the most extreme form of power exercised by the state over the individual.

Furthermore, precisely because of the enormous qualitative difference between death and all other forms of punishment, the nature of the jury's determination

to impose it is different from all other determinations that juries make in our state's legal system. On a strictly procedural level, a capital penalty phase proceeding differs from all other sentencing proceedings in that: (1) it is the only such proceeding in which a jury, rather than the court, may in effect impose the sentence; see *State* v. *Breton*, 235 Conn. 206, 246, 663 A.2d 1026 (1995); (2) it is the only such proceeding in which there must be a full, trial-like, evidentiary hearing; and (3) it is the only such proceeding in which the state must establish the foundation of its case for sentencing—in the sense of establishing the aggravating factor—by proof beyond a reasonable doubt. Furthermore, as a practical matter, in many capital cases the question of whether the defendant should suffer the death penalty, as opposed to whether he or she in fact committed a capital felony, is the principal and overarching question in the case. Indeed, in the present case, it was the *only* question. On a more fundamental level, the " 'task . . . of determining whether a specific human being should die at the hands of the State' "; *State* v. *Ross*, supra, 230 Conn. 241, quoting *Caldwell* v. *Mississippi*, 472 U.S. 320, 329, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); necessarily calls upon the intellectual, moral and emotional resources of the jurors in a way that far exceeds any factual determination of guilt or innocence. It requires the jury to make "a reasoned moral and individualized determination" regarding the imposition of the death penalty. *State* v. *Ross*, supra, 253. It is not hyperbole to say that making "the choice is between life and death"; *Lockett* v. *Ohio*, supra, 438 U.S. 605; is the most serious decision that our legal system requires a jury to make. Indeed, we have described it as an "awesome decision . . . ." *State* v. *Ross*, supra, 253.

With these three factors in mind, therefore, we turn to the difference between the prior, nonweighing statute, and the current weighing statute. We described the

prior statute as a three-tiered pyramid. Id., 236–37. The first tier separated capital felony homicides from other homicides. Id., 237. At the second tier the state was required to prove the aggravating factor beyond a reasonable doubt. Id.; *State* v. *Daniels*, supra, 207 Conn. 384.[33] At the third tier, the defendant was required to prove a mitigating factor by a preponderance of the evidence. *State* v. *Ross*, supra, 230 Conn. 237. As we explained previously, the death penalty could be imposed only if an aggravating factor had been proven at the second tier and no mitigating factor had been proven at the third tier. Id., 237–38.

We then held that this "multitiered pyramid meets the [constitutional] prerequisite of consistency and reliability by guiding the capital sentencer's discretion with clear and objective standards that narrow the class of defendants eligible for the death penalty and by providing a meaningful basis for distinguishing between

---

[33] In *State* v. *Daniels*, supra, 207 Conn. 384, we noted that the statute was silent regarding a burden of persuasion on the finding of an aggravating factor, and imposed the reasonable doubt standard on that finding based, not on any constitutional mandate, but on "the highly significant consequences of erroneous factual determinations in capital cases . . . ." By virtue of a recent trilogy of cases, the United States Supreme Court has now made clear that an aggravating factor that permits the imposition of the death penalty must be proven beyond a reasonable doubt. See *Apprendi* v. *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (due process clause of fourteenth amendment requires that any fact that increases penalty for crime beyond statutory maximum, except for prior conviction, must be found by jury beyond reasonable doubt); *Ring* v. *Arizona*, 536 U.S. 584, 607–609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) (*Apprendi* applies to death penalty finding of aggravating circumstances); see also *Sattazahn* v. *Pennsylvania*, 537 U.S. 101, 111, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003) ("Our decision in *Apprendi* v. *New Jersey*, [supra, 466], clarified what constitutes an 'element' of an offense for purposes of the Sixth Amendment's jury-trial guarantee. Put simply, if the existence of any fact [other than a prior conviction] increases the maximum punishment that may be imposed on a defendant, that fact—no matter how the State labels it—constitutes an element, and must be found by a jury beyond a reasonable doubt. Id., [482–84, 490].")); see also *In re Winship*, supra, 397 U.S. 364 (due process requires that element of criminal offense be proven beyond reasonable doubt).

those cases in which the death penalty is imposed and those in which it is not. The third tier in the pyramid meets the individualization prerequisite by requiring the sentencer to consider any relevant mitigating information so as to enable the sentencer to make the reasoned moral judgment that death is the appropriate punishment in a particular case." Id., 238–39. Thus, in *Ross*, we recognized that, under the nonweighing statute, the second tier, at which the state had to prove the aggravating factor beyond a reasonable doubt, adequately met the constitutional requirement of consistency and reliability by narrowing the class of defendants eligible for the death penalty; and the third tier, at which the jury was required to consider any relevant mitigating circumstance, adequately met the requisite individualization requirement. In the parlance of federal death penalty jurisprudence, the second tier was known as the "eligibility phase," and the third tier was known as the "selection phase." See, e.g., *Tuilaepa* v. *California*, 512 U.S. 967, 971, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994). Under our prior, nonweighing statute, therefore, the state was required to carry its ultimate burden of persuasion in support of the imposition of the death penalty by the standard of beyond a reasonable doubt, because that was the burden of persuasion for the aggravating factor and, in the absence of proof of a mitigating factor by the lesser burden of persuasion of a preponderance of the evidence, the death penalty was required.

Under the current statute, by contrast, there is now a fourth tier, namely, the weighing tier. In other words, under the current statute, once the state has proved at least one aggravating factor (the second tier) and the defendant has proved at least one mitigating factor (the third tier), the jury must then weigh the one against the other (the fourth tier). This change in our capital sentencing scheme has effectively expanded the selection phase to include, in addition to the determination

of whether the defendant has established mitigation, the weighing of the aggravating factors against the mitigating factors. It has also resulted in a significant gap in the sentencing scheme—namely, unlike our former, nonweighing statute, the current sentencing statute does not require the jury to make its ultimate determination—that the aggravating factors outweigh the mitigating factors, and that, therefore, death is the appropriate sentence—by a level of certitude beyond a reasonable doubt. Indeed, because the legislature was silent as to the required level of certitude imposed on the jury's weighing determination, there is a statutory lacuna, which, we are persuaded, should be filled.

We recognize that, in effect, by imposing the reasonable doubt standard on the jury's level of certitude in order to fill the gap in the weighing statute, we are channeling juror discretion during the selection phase. The United States Supreme Court has accorded "differing constitutional treatment" to the eligibility and selection phases; *Buchanan* v. *Angelone*, 522 U.S. 269, 275, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998); emphasizing the need to channel sentencer discretion during the eligibility phase rather than the selection phase. See, e.g., id., 275–76; *Tuilaepa* v. *California*, supra, 512 U.S. 971–73.

In our case law, we have, in fact, recognized this development in the *Lockett-Eddings* line of cases. See *State* v. *Cobb*, supra, 251 Conn. 483–85, quoting *Buchanan* v. *Angelone*, supra, 522 U.S. 275–77. In *Ross*, however, when we alluded to the federal standard in the context of our discussion of the defendant's state constitutional claims, we specifically stated that the federal standards set a state "constitutional minimum . . . ." *State* v. *Ross*, supra, 230 Conn. 252. Indeed, we acknowledged, in regard to the individualization requirement, at the selection phase, that "[a]lthough this [requirement] demands that the sentencer must

be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime . . . *the federal constitution does not require unfettered sentencing discretion . . . . States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 234. This, at least implicitly, left open the question whether, under other circumstances, such as the present case, our state constitution would require channeling jury discretion during the selection phase.

Furthermore, in *Ross*, we recognized the dual constitutional requirements addressed by federal death penalty jurisprudence, namely, "on the one hand, [channeling sentencer discretion] so as to assure that the death penalty is being imposed *consistently and reliably* and, on the other hand, [permitting the sentencer] to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense." (Emphasis added.) Id., 252. In explaining the two requirements, we stated that the first requirement "requires death penalty statutes to be structured so that the death penalty is imposed in a *consistent and reliable* manner. In deciding to authorize capital punishment, a state has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty [including] defin[ing] the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion." (Emphasis added; internal quotation marks omitted.) Id., 231–32. In regard to the second requirement, we stated that the sentencer must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original; internal quotation marks omitted.) Id., 233. Thus, in our analysis of the second requirement, we emphasized the constitutional necessity of limiting "a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." (Emphasis in original; internal quotation marks omitted.) Id., 233–34.

Put another way, *Ross* may be read as standing for the proposition that, under our state constitution, our overarching concern for *consistency and reliability* in the imposition of the death penalty extends to the ultimate decision of whether to impose or to decline to impose that penalty. Therefore, because the issue in the present case directly involves the decision of whether to impose or to decline to impose the death penalty, *Ross'* requirement of reliability raises the potential state constitutional question of whether the sentencer's ultimate weighing decision, which may result in the imposition of the death penalty, must be channeled by a sufficiently high burden of persuasion.

Therefore, in light of and in order to avoid this significant potential state constitutional question, and in light of the three factors discussed previously—namely, (1) the unique and irrevocable nature of the death penalty, (2) the overarching need for reliability and consistency in the imposition of the death penalty, and (3) the awesome and wrenching nature of the jury's determination to render a verdict requiring the death penalty—we conclude that the highest burden of persuasion should be imposed on the jury's weighing process. Requiring a high degree of persuasion on the weighing process would convincingly avoid any potential state constitutional question. It would also give due deference to the unique and irrevocable nature of the death penalty, and to the consequently overarching need for reliability in

the imposition of such a penalty, and it would give due deference to the awesome and wrenching nature of the jury's task in arriving at its moral and reasoned judgment that the death penalty should be imposed.[34] We further conclude, therefore, that the most appropriate burden of persuasion for that process is that of beyond a reasonable doubt. If a jury is required to conclude beyond a reasonable doubt that a defendant is guilty of a capital offense, and to conclude that an aggravating factor has been established, it should also be required to conclude by the same high burden of persuasion that the death penalty is the appropriate penalty in the case. Thus, just as we did in *State* v. *Daniels*, supra, 207 Conn. 374, where we filled gaps left by the legislature in defining the burdens of persuasion on the proof of an aggravating factor and mitigating factor, we fill the gap left by the legislature in defining the burden of persuasion on the weighing process by imposing, on the most important question that our legal system entrusts to the jury, namely, whether the defendant shall live or die, the highest burden of persuasion that our legal system recognizes.

In this respect we are also persuaded by the reasoning of the Supreme Court of Utah in construing that state's death penalty scheme in light of its state constitution. In *State* v. *Wood*, 648 P.2d 71, 80 (Utah 1981), cert. denied, 459 U.S. 988, 103 S. Ct. 341, 74 L. Ed. 2d 383

---

[34] The dissent of Sullivan, C. J., infers, based on our consideration, in determining the appropriate burden of persuasion, of the awesome nature of the jury's task, that we express a lack of confidence in our juries. We do not imply, however, that capital sentencers are unaware of the gravity of their task, nor do we suggest that they will not act accordingly. On the contrary, we are confident that juries will recognize the seriousness of their task. We merely recognize that one of the factors that must inform our analysis of the appropriate burden of persuasion is the *nature* of the jury's determination, which is directly relevant to two of the three functions of a burden of persuasion that we discussed in part I D of this opinion, namely, indicating the relative importance of the ultimate decision, and giving the fact finder guidance regarding the sense of the solemnity of the task.

(1982), the court considered the burden of persuasion required under its statute, which it previously had interpreted to require "that the totality of evidence of aggravating circumstances must . . . outweigh the totality of mitigating circumstances." (Internal quotation marks omitted.) The court in *Wood* for the first time specifically addressed the requisite standard of certitude required under the statute, which was linguistically silent on the matter.[35] Id., 79–80. Given the court's traditional rule of "constru[ing] statutes, if possible, to avoid the risk of running afoul of constitutional prohibitions"; id., 82; given the fundamental respect for humanity as a procedural limitation on the imposition of the death penalty; id., 80–81; and given "the gravity of the decision to be made and the constitutional environment in which [it] must be made"; id., 83; the court interpreted its state's weighing statute to require "the decision to impose the death penalty [to be] made on the basis of the reasonable doubt standard." Id. Thus, the court held, "[t]he sentencing body, in making the judgment that aggravating factors 'outweigh,' or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty is justified and appropriate after considering all the circumstances." Id., 83–84. Thus, to the extent that the Utah court imposed the beyond the reasonable doubt standard on the weighing process, it did so, not as to the outcome of the process,

---

[35] Utah's death penalty sentencing statute in effect at the time that *Wood* was decided; Utah Code Ann. § 76-3-207 (1953); merely directed the sentencing authority to "consider the penalty." In response to *Wood*, the Utah legislature amended the statute to incorporate the reasonable doubt standard. Thus, the statute's weighing provision presently provides in relevant part: "The death penalty shall only be imposed if, after considering the totality of the aggravating and mitigating circumstances, the jury is persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and is further persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances. . . ." Utah Code Ann. § 76-3-207 (5) (b) (Sup. 2002).

but as to the level of certitude required of the sentencer in determining that the aggravating factors outweighed the mitigating factors by some degree or amount.

Similarly, given our traditional rule of "constru[ing] statutes, if possible, to avoid the risk of running afoul of constitutional prohibitions"; id., 82; given our fundamental respect for humanity as a procedural limitation on the imposition of the death penalty; id., 80–81; and given our recognition of "the gravity of the decision to be made and the constitutional environment in which [it] must be made"; id., 83; we interpret our weighing statute to require "the decision to impose the death penalty [to be] made on the basis of the reasonable doubt standard." Id. Thus, the jury, "in making the judgment that aggravating factors 'outweigh,' or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion," and, therefore, "that the death penalty is . . . [the] appropriate" penalty in the case. Id., 84.[36]

Imposing the reasonable doubt standard on the weighing process, moreover, fulfills all of the functions of burdens of persuasion. By instructing the jury that its level of certitude in arriving at the outcome of the weighing process must meet the demanding standard of beyond a reasonable doubt, we minimize the risk of error, and we communicate both to the jury and to society at large the importance that we place on the awesome decision of whether a convicted capital felon shall live or die.

---

[36] We also note that the Wyoming Supreme Court recently has interpreted its weighing statute; Wyo. Stat. Ann. § 6-2-102 (Lexis Nexis 2003); which, although it contains no express weighing provision, has been interpreted by the court to require balancing of the aggravating and mitigating factors, to require that "the burden of negating [the] mitigating evidence by proof beyond a reasonable doubt remains with the State." *Olsen* v. *State*, 67 P.3d 536, 590 (Wyo. 2003). This appears to impose the reasonable doubt standard as a level of certitude on the outcome of the weighing process.

The state contends that there is no constitutionally required burden of persuasion on the weighing process because, in the state's view, there simply is no risk of error involved in that weighing process. Underlying this contention is the premise that the weighing process is by its very nature different from the fact-finding process and that, therefore, the jury, having made its weighing decision pursuant to proper instructions, simply cannot be "wrong" in a factual sense. Thus, under this argument, there is no constitutional need for a heightened burden of persuasion to be applied to the weighing process because such burdens normally apply to fact-finding, and not to the unique, reasoned moral decision involved in determining whether the defendant shall live or die. We disagree.

First, we reject the assertion that there can be no risk of error in the decision of whether the aggravating factors outweigh the mitigating factors and that, therefore, the death penalty must be imposed. We acknowledge that there is not a risk of error in such a decision in the usual sense of that term, namely, the risk of being wrong in determining the historical facts, such as who did what to whom. That does not mean, however, that there cannot be a risk of error in a more practical sense, namely, the risk that, in making the determination that the aggravating factors outweigh the mitigating factors and that the defendant shall therefore die, the jury may weigh the factors improperly, and may arrive at a decision of death that is simply wrong. Indeed, the reality that, once the jury has arrived at such a decision pursuant to proper instructions, that decision would be, for all practical purposes, unreviewable on appeal save for evidentiary insufficiency of the aggravating factor, argues for some constitutional floor based on the need for reliability and certainty in the ultimate decision-making process itself.

Second, the state's contention ignores the other two equally important functions of the burden of persuasion: (1) to indicate to our society in general the value we place on the decision; and (2) to guide the jury regarding the sense of solemnity and the subjective degree of certitude that it must have in making its decision. Both of these functions apply to the decision of whether to impose the death penalty and, as we have discussed previously, both point strongly to the need for a demanding burden of persuasion. Indeed, in other legal contexts, we implicitly have recognized the importance of these two functions by employing a traditional fact-finding burden of persuasion in nonfact-finding situations. For example, we have stated that the burden on a party challenging the constitutionality of a statute is to establish its unconstitutionality beyond a reasonable doubt. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 504, 811 A.2d 667 (2002); see also *State* v. *Dehaney*, 261 Conn. 336, 355 n.12, 803 A.2d 267 (2002) (burden of persuasion on state to establish harmlessness of constitutional error is beyond reasonable doubt), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003); *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001) (burden of persuasion on defendant to establish harmlessness of nonconstitutional error is that error was more likely than not to have affected verdict). Thus, in such cases, by applying these burdens of persuasion to these judicial decisions on questions of law, our legal system recognizes the relative importance that our society places on those decisions, and the degree of solemnity and subjective certitude that our courts must have in making those decisions, despite the fact that the decisions do not involve strictly historical factual determinations.[37]

---

[37] We disagree with the dissent of Sullivan, C. J., suggesting that, because the jury's determination is a moral judgment, it is somehow inconsistent to assign a burden of persuasion to that determination. The dissent's contention relies on its understanding of the reasonable doubt standard as a quantitative evaluation of the evidence. We have already explained in this opinion that

Third, under the death penalty statute and its case law, we already require the jury in the penalty phase to apply a traditionally factual burden of persuasion to a nonfactual decision that is functionally similar, albeit not identical, to its decision in the weighing process. General Statutes (Rev. to 1997) § 53a-46a (c) provides that "[t]he burden of establishing any mitigating factor shall be on the defendant." This requires the defendant to establish "by a preponderance of the evidence . . . both the underlying factual basis of a mitigating factor *and its mitigating nature.*" (Citations omitted; emphasis added.) *State* v. *Cobb,* supra, 251 Conn. 460. The latter aspect of a mitigating factor, namely its mitigating nature, requires the defendant to convince the jury "that the factor is mitigating in nature, considering all the facts and circumstances of the case, such that in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence of less than death. General Statutes § 53a-46a (d)." (Internal quotation marks omitted.) *State* v. *Cobb,* supra, 465. This decision "involves the exercise of the reasoned moral judgment of the sentencer." Id. Similarly, the ultimate decision following the weighing process, resulting in the determination of whether the defendant shall live or die, requires the jury to "make a reasoned moral and individualized determination" that "death is the appropriate punishment" in the case. *State*

the traditional meaning of the reasonable doubt standard focuses, not on a quantification of the evidence, but on the degree of certainty of the fact finder or, in this case, the sentencer. Therefore, the nature of the jury's determination as a moral judgment does not render the application of the reasonable doubt standard to that determination inconsistent or confusing. On the contrary, it makes sense, and, indeed, is quite common, when making a moral determination, to assign a degree of certainty to that judgment. Put another way, the notion of a particular level of certainty is not inconsistent with the process of arriving at a moral judgment; our conclusion simply assigns the law's most demanding level of certainty to the jury's most demanding and irrevocable moral judgment.

v. *Ross*, supra, 230 Conn. 240. Thus, our statutes recognize the propriety of assigning to the jury's reasoned and moral judgment that death is the appropriate penalty in the case a burden of persuasion traditionally assigned only to historical fact-finding.

Fourth, although concededly there are significant differences between the guilt and penalty phases of a capital felony trial, there are also significant similarities. The differences are that, in the guilt phase, the jury is charged only with the task of making the factual determination of whether the state has proved beyond a reasonable doubt that the defendant committed a capital felony. This involves the traditional fact-finding function. In the penalty phase, by contrast, the jury is charged with both fact-finding and nonfact-finding tasks. Its fact-finding task involves whether the state has established the aggravant beyond a reasonable doubt and whether the defendant has established *the facts* of a mitigant by a preponderance of the evidence. Its nonfact-finding tasks involve its reasoned and moral judgments regarding whether: (1) the *factually* established mitigant is "mitigating in nature"; and (2) the aggravant outweighs the mitigant.

We previously have recognized, however, that there are important similarities between the jury's functions in the two phases. First, "[e]ach jury receives evidence at an adversarial hearing where the chief engine of truth-seeking, the power to cross-examine witnesses, is fully present. At the close of the evidence, each jury is instructed on the law by the court. Finally, in returning a verdict, each jury has the power to 'acquit': in the guilt phase, of criminal liability, and in the penalty phase, of the death sentence." *State* v. *Daniels*, supra, 207 Conn. 388. Second, just as the normal criminal burden of persuasion ensures the reliability of the verdict in the guilt phase, in the penalty phase the need for "ensuring reliable and informed judgments . . . [requires] that the

'reliability' of death sentences depends on adhering to guided procedures that promote a reasoned judgment by the trier of fact." (Citations omitted.) Id., 389. These similarities further support the conclusion that a high burden of persuasion is required in the weighing process. They demonstrate the similarities between the jury's decisions on guilt or innocence and life or death, and they indicate that, in order for the jury to make its life or death decision pursuant to guided procedures that promote reasoned judgment, it should be instructed that it reach that judgment by a level of certitude of beyond a reasonable doubt.

In order to render our holding in the present case fully effective, it is necessary that the jury be properly instructed under it. Without attempting in advance to craft any particular set of jury instructions, we hold that such instructions must impart to the jury that, in deciding that the aggravating factors outweigh the mitigating factors by any amount or degree, it is in effect deciding that death is the appropriate punishment in the case, and that it is persuaded of this beyond a reasonable doubt.[38] As we stated in *Ross*, "the capital

[38] This does not mean, however, that the jury must be given two separate and different questions to answer, namely, whether (1) the aggravating factors outweigh the mitigating factors, and (2) death is the appropriate penalty in the case. The second question is simply part of the first, and no separate jury interrogatory is required for the second. Neither § 53a-46a nor our state constitution requires such a separate question. See *State* v. *Cobb*, supra, 251 Conn. 452–56. We already require, however, as a matter of our supervisory role over the administration of criminal justice, that the jury be specifically instructed that its verdict on the weighing process will determine whether the defendant lives or dies. See *State* v. *Breton*, supra, 235 Conn. 249. Implicit in that instruction is that the jury must determine that death is the appropriate penalty. Thus, by imparting that consideration to the jury in its instructions, we merely make explicit what is already implicit.

In order to avoid any state constitutional question, therefore, and in order fully to meet the concerns regarding the reliability of the ultimate decision of life or death, we deem it appropriate for the jury to be reminded of the ultimate nature of its decision, namely, that, where the aggravating factors outweigh the mitigating factors, it is in effect deciding that death is the appropriate penalty in the case. Indeed, the trial court in the present case

sentencer must make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment"; *State* v. *Ross*, supra, 230 Conn. 240; and "has come to this unanimous determination by engaging in a full, individualized consideration as to whether death is the appropriate penalty for [the] defendant." Id., 241.

Consequently, the jury must be instructed that it must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that, therefore, it is persuaded beyond a reasonable doubt that death is the appropriate punishment in the case.[39] In this regard, the meaning of the "beyond a reasonable doubt" standard, as describing a level of certitude, is no different from that usually given in connection with the questions of guilt or innocence and proof of the aggravating factor.

gave a form of such an instruction to the jury. The trial court stated: *"What must emerge from this penalty hearing is a decision by you. One such decision would be whether or not the state has demonstrated that the death penalty is appropriate in this matter,* on the evidence, not passion not prejudice, nothing other than the facts. Consider the mitigating factors as presented to you, as you said that you would, openly, fairly and according to the legal standards this court has instructed." (Emphasis added.)

[39] Because we reverse the defendant's sentence and because we hold that the jury must be instructed that it must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that, therefore, it is persuaded beyond a reasonable doubt that death is the appropriate punishment in the case, it is unnecessary for us to address the defendant's claim that the trial court's instructions misstated the law on multiple occasions, transposing "mitigating factors" and "aggravating factors" in the weighing process, and that the trial court improperly failed to give a curative instruction or to give the jury an equipoise instruction. We take this opportunity, however, to clarify that, in the future, trial courts should instruct the jury that if it finds that the aggravating factors and the mitigating factors are equally in balance, then the aggravating factors do not outweigh the mitigating factors, and the result will be a life sentence. Further, in order to avoid an equipoise problem, the jury must not be instructed that if the mitigating factors do not outweigh the aggravating factors, the sentence will be death.

The trial court's instructions in the present case did not conform to this demanding standard. We are constrained, therefore, to reverse the judgment of death and to remand the case for a new penalty phase hearing.

## II

## THE STATE'S CLOSING ARGUMENT

The defendant also claims that the state's closing argument constituted prosecutorial misconduct amounting to a deprivation of his right to due process of law under the fourteenth amendment to the United States constitution.[40] The state claims, to the contrary, that none of the defendant's claims of misconduct have merit. We agree with the defendant.

Before analyzing the defendant's claim, we explain why, having concluded in part I F of this opinion that a new trial is required, we nonetheless address this claim. We conclude that the state's attorney's final rebuttal argument[41] "so infected the trial with unfairness as to make the resulting [imposition of the death penalty] a denial of due process." (Internal quotation marks

[40] The defendant has not specifically identified his claim as falling under either the federal or state constitution. Because he does not claim that the state constitution provides greater protection in this regard than does the federal constitution, and because he has not presented a separate and adequate analysis under the state constitution; see, e.g., *State* v. *Brown*, 256 Conn. 291, 297 n.7, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); we regard his claim as being presented under the federal due process clause as applied to the state through the due process clause of the fourteenth amendment.

[41] In this connection, we reject the defendant's claim that there were also constitutional improprieties in the initial final argument presented by the assistant state's attorney at the trial. For the most part, however, the defendant made no such claims at trial, and with respect to this aspect of the state's final argument, he seeks to prevail on appeal pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We have fully examined that argument, however, and, with one minor exception; see footnote 58 of this opinion; we can find nothing therein that was improper in any way. We therefore focus our analysis on the final rebuttal argument presented by the state's attorney.

omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161, 836 A.2d 224 (2003). This conclusion constitutes a ground for reversal of the judgment independent of and in addition to the requirement of instructing the jury as to the burden of persuasion on the statutory weighing process. Thus, we are constrained to address the improper aspects of the state's attorney's argument lest they recur on the retrial.

This claim arose in the following procedural context. After the completion of the evidence, the state presented its initial final argument by the assistant state's attorney contending that the state had proved the existence of the aggravating factor. Then the defense counsel presented argument contending that: (1) the state had not proven the existence of the aggravating factor; (2) the defendant had proved the existence of one or more mitigating factors; and (3) even if the aggravating factor had been proven, it did not outweigh the mitigating factors. Then the state's attorney presented the state's final rebuttal argument contending that: (1) the state had proved the aggravating factor; (2) the defendant had not proven the existence of any mitigating factor; and (3) even if any mitigating factor had been proven, the aggravating factor outweighed it. At the conclusion of the state's rebuttal argument, the defendant moved for a mistrial on the ground of prosecutorial misconduct in the state's final rebuttal argument. In this connection, the defendant raised seventeen separate grounds of such misconduct.[42] The state then

[42] More specifically, the defendant claimed that the state's attorney's argument had improperly: (1) misstated the law and the defendant's argument regarding the nature of the mitigating factors; (2) misstated the law and the defendant's argument regarding who was to blame for the victim's death; (3) violated a particular ruling by the trial court regarding the timing of the defendant's guilty plea; (4) violated the defendant's right against self-incrimination; (5) misstated the evidence regarding the proof of the aggravating factor; (6) misstated the law and used inappropriate language regarding the mitigating factor of the defendant's age; (7) misstated the defendant's argument as constituting a plea for sympathy; (8) misstated the defendant's claimed mitigating factor regarding the hazing and sexual harassment inci-

responded, and the trial court denied the motion, indicating that it would instruct the jury "to meet the concerns of counsel . . . and if counsel feels more is warranted, I will invite those, as well." In its instructions to the jury, although the court addressed several of the topics raised by the defendant in general terms, discussed in more detail later in this opinion, the court did not specifically address any of those grounds. At the conclusion of the court's instructions, the defendant took exception to the court's failure to give any specific curative instructions regarding the claims of misconduct he had raised.[43] The court took no further action.

"Before addressing the merits of the defendant's claim, we first review the principles that govern our resolution of claims of prosecutorial misconduct. [T]he touchstone of due process analysis in cases of alleged

dent, and implied that the defendant had lied to his attorney; (9) mounted a personal attack on the defendant's attorney; (10) misstated the law and mounted a personal attack on the defendant's attorney in statements regarding the oaths taken by the state's attorney, the court and the jurors; (11) gave his personal opinion regarding the propriety of the imposition of the death penalty on the defendant; (12) compared the autopsy slides to certain photographs of the defendant's family, and improperly gave victim impact evidence; (13) demeaned and diminished the jury's penalty determination; (14) misstated the law and misled the jury by telling it to balance the victim's life against that of the defendant; (15) misstated the law regarding fairness and mercy as mitigating factors; (16) violated the court's rulings and the defendant's right against self-incrimination, and permitted the jury to draw a negative inference from an unspecified missing witness regarding the defendant's lack of remorse; and (17) asked the jury to speculate about whether the victim had felt pain, about whether the defendant had kept evidence from the jury regarding his service in the Marine Corps, and about whether parts of a videotape of the defendant's household had been hidden from the jury.

[43] Defense counsel stated: "[W]hen Your Honor denied the motion for mistrial, Your Honor indicated that [the court] would be giving a curative instruction. . . . [T]he only curative instruction I heard was a general instruction about arguments of counsel, objections are not evidence and . . . the standard type of instruction. We claim that was inadequate. That the court needs to make specific instructions concerning the claims the defense made."

prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 161–62.

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments." Id., 162. In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Citations omitted; internal quotation marks omitted.) Id. This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. "He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the inno-

cent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, 96 Conn. 160, 168–69, 113 A. 452 (1921).

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. *Viereck* v. *United States*, 318 U.S. 236, 253, 63 S. Ct. 561, 87 L. Ed. 734 (1942) (Black, J., dissenting). In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions; *State* v. *Ferrone*, supra, [96 Conn.] 163; and those which are flagrant and therefore deny the accused a fair trial. *State* v. *Chapman*, 103

Conn. 453, 477, 130 A. 899 (1925)." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538, 529 A.2d 653 (1987). Thus, prosecutorial misconduct occurring in final argument may be "so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Internal quotation marks omitted.) Id., 539.

Furthermore, "the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . A prosecutor also may not appeal to the emotions, passions and prejudices of the jurors; e.g., *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000); or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 163–64.

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of

the state's case." (Citations omitted; internal quotation marks omitted.) Id., 164.

"Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks." Id., 165. Thus, just as the failure of defense counsel to object may indicate that he or she did not perceive the remarks in the prejudicial light claimed on appeal; id.; the timely objection by the defense counsel to the claimed improper remarks strengthens the claim that the jury may have also perceived them in that prejudicial light.

Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified "we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial." (Internal quotation marks omitted.) Id., 215 n.183. Thus, the question in the present case is whether "the sum total of [the state's attorney's] improprieties rendered the defendant's penalty phase hearing fundamentally unfair in violation of his right to due process." Id., 214–15. The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. See *State* v. *Singh*, 259 Conn. 693, 725, 793 A.2d 226 (2002) ("In the absence of any independent evidence to corroborate the identity of the defendant as the arsonist, we cannot conclude that, had the jury not been exposed to these improper remarks, it would have concluded that the evidence proved beyond a reasonable doubt that the defendant had committed the arson. Accordingly, the defendant was deprived of a fair trial.").

With these principles in mind, we turn to an analysis of the state's final rebuttal argument. Although the

defendant has raised a number of specific challenges to the state's attorney's argument, we discuss only those remarks that we conclude were clearly improper and, taken in their totality, require a reversal of the judgment. They fall into the following general categories: (1) an improper violation of a prior order of the court regarding the timing of the defendant's plea of guilty; (2) improper appeals to the passions and emotions of the jurors, based on an egregious misstatement of the applicable law; (3) improper expressions of the state's attorney's personal feelings about the merits of the defendant's contentions, based on misstatements of those contentions;[44] and (4) improper comment on the defendant's failure to testify.

### A

### Improper Violation of a Prior Order of the Court Regarding the Timing of the Defendant's Plea of Guilty

The state's attorney may not, in final argument, seek to have the jury draw impermissible inferences in disre-

---

[44] The defendant also claims that certain of the statements of the state's attorney constituted an improper victim impact statement. The defendant concedes that, although there is no eighth amendment prohibition against victim impact argument; compare *Payne* v. *Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) with *South Carolina* v. *Gathers*, 490 U.S. 805, 109 S. Ct. 2207, 104 L. Ed. 2d 876 (1989); whether Connecticut permits it is a question of our own state law, which has not yet been decided. In this connection, the defendant notes that, subsequent to the trial in the present case, Public Acts 2000, No. 00-200, now codified at General Statutes § 53a-46d, was enacted. General Statutes § 53a-46d provides: "A victim impact statement prepared by a victim advocate to be placed in court files in accordance with subdivision (2) of [General Statutes §] 54-220 may be read in court prior to the imposition of sentence upon a defendant found guilty of a crime punishable by death." General Statutes § 54-220 provides in relevant part: "(a) Victim advocates shall have the following responsibilities and duties . . . (2) to prepare victim impact statements to be placed in court files . . . ." The state responds that victim impact argument is permissible on the question of whether the claimed mitigating evidence is mitigating in nature, considering the facts and circumstances of the case.

We decline to consider this question in the present case, and leave it to further consideration on the retrial. Whether such argument by the state's

gard of a prior ruling of the trial court. *State* v. *Ubaldi*, 190 Conn. 559, 567, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *State* v. *Whipper*, 258 Conn. 229, 268–69, 780 A.2d 53 (2001); *State* v. *Binet*, 192 Conn. 618, 629, 473 A.2d 1200 (1984). Indeed, in *Ubaldi* we stated: "Where a prosecutor in . . . argument interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi*, supra, 575. In addition, we have stated that it "may be prudential for the trial court to have a bench conference to ascertain whether [a] witness refrained from speaking under the advice of defense counsel, for in such a case examination on the issue of the witness' postconsultation silence would be improper and could well result in a mistrial." (Internal quotation marks omitted.) *State* v. *Bryant*, 202 Conn. 676, 705–706, 523 A.2d 451 (1987). The same prudence is even more compelling in order to protect a defendant's right to explain conduct of his that was likely to have been the result of the advice of his counsel. The state's attorney violated these precepts in his final argument.

The facts underlying this claim are as follows. At the conclusion of his evidence, the defendant requested that the court take judicial notice of his guilty plea entered on March 29, 1999. The court did so, mentioning that the jury had already heard the reading of the information, the guilty plea and its date. The state then requested the court to take judicial notice of the defen-

attorney is permitted may, or may not, be affected by the meaning and reach of § 54-220. For example, it is not clear whether, on remand, that statute will apply to the proceedings in this case and, if so, to what extent, if any, it would preclude by implication victim impact argument by the state. That thorny issue has not been fully briefed in the present appeal.

dant's initial not guilty plea entered on November 5, 1997, and to inform the jury of those facts. The obvious import of this was to lay a foundation for the state to argue, in opposition to the defendant's claim of mitigation based on his guilty plea, that he did not plead guilty until sixteen months after his not guilty plea. The defendant's counsel objected, contending that the November 5, 1997 date was "right after . . . the conclusion of the probable cause hearing," that it would have been malpractice to advise the defendant at that point to plead guilty without having had the opportunity fully to investigate the case so as to give the defendant competent advice, and that, were the court to grant the state's request, the defendant would seek to present surrebuttal testimony in order to explain to the jury that the delay was based on advice of counsel. The court denied the state's request to take judicial notice of the date of the defendant's original not guilty plea, ruling that it was "not relevant [to] any mitigating factor and information presented by the state and not to be considered by the jury, by judicial notice at any rate." The state then asked if, rather than by way of judicial notice, it would be allowed to introduce documentary evidence of the entering of the not guilty plea by way of a copy of the relevant docket sheet. The court denied that request, on the ground that it would invite further rebuttal by the defendant. The state then presented its evidence in rebuttal of the defendant's evidence in mitigation.

We can only read this record as establishing that the core of the trial court's rulings was to preclude the state from arguing, based on the timing of the defendant's guilty plea, that his delay in doing so undermined his contention that he took responsibility for his conduct by pleading guilty. Moreover, it is clear from this record that the principal bases of this ruling were that it was irrelevant to the question of mitigation and, what is

more important, if the state were permitted to make such an argument, the defendant would necessarily be entitled, before the evidentiary portion of the proceedings had ended, to present to the jury surrebuttal testimony—perhaps even from the defendant's own counsel—explaining why, on the basis of advice of counsel, it would not have been expected or feasible for him to plead guilty at such an early stage of the proceedings.

In his final argument, the defendant argued in mitigation that he "took personal and legal responsibility when he pleaded guilty, March 29, 1997."[45] In response, the state's attorney argued: "[Defense counsel] said—*I'm sure he misspoke*—he said he pled guilty in March of 1997. He didn't plead guilty in March of 1997. He pled guilty the end of March 1999. *You heard he was arrested and arraigned October 2, 1997.*[46] It's not like [the defendant] ran into this courtroom and said I committed a terrible crime. I'm pleading guilty. It was just prior to the selection of this jury. Some of you jurors were picked for this panel way back in early April."[47] (Emphasis added.)

---

[45] The reference to March 29, 1997, rather than March 29, 1999, as the date of the defendant's guilty plea was obviously an inadvertent misstatement, because the jury already had been told that the defendant pleaded guilty to the information on March 29, 1999. Furthermore, the jury also knew that the murder had not taken place until September 30, 1997. Therefore, the jury could not have been misled by this misstatement. Indeed, in his final argument the state's attorney conceded that this had simply been a mistake.

[46] There had been testimony from Sergeant Coyle that, after arresting the defendant on the evening of October 1, 1997, "[t]he following morning myself, Sergeant Pelosi and Sergeant Nardozzi transported [the defendant] from the police station to the courthouse."

[47] In his motion for mistrial, the defendant specifically objected to this argument, contending that the state's argument regarding the timing of the guilty plea implicated matters between counsel and his client, put a wedge between them because the guilty plea would necessarily be after advice of his counsel, constituted an impermissible comment on the defendant's silence, and created a situation that invited an explanation by his counsel, forcing his counsel to become a witness in the case.

This argument constituted prosecutorial misconduct because it disregarded, and was in violation of, the trial court's rulings regarding the timing of the defendant's guilty plea. Furthermore, it was presented in such a way that it severely prejudiced the defendant by depriving him of the opportunity to present necessary surrebuttal evidence in order to explain the lapse of time between the date of the arraignment and the date of his guilty plea.

Although, unlike the specific date of the defendant's original not guilty plea, the date of his arraignment *was* in evidence; see footnote 45 of this opinion; the reason for the court's exclusion of the date of the not guilty plea was even more applicable to the date of the defendant's initial arraignment in court. If prohibiting the state from disputing the significance of the defendant's guilty plea as mitigating in nature, based on its timing, namely, after a long delay from his initial plea of not guilty, was grounded on irrelevance and on avoiding the necessity of explanatory evidence by the defendant's counsel, a fortiori the state should not have been permitted to argue that the defendant's guilty plea should be disregarded because of its long delay from the date of his original arraignment. That date preceded the date of his original not guilty plea by more than one month, was even more irrelevant to the question of mitigation than the date of the not guilty plea, and was equally, if not more, prejudicial to the defendant. No one familiar with our legal system could conceivably expect competent counsel for a defendant charged with a capital felony to permit him to plead guilty at his initial arraignment, on the day after his arrest, without proper investigation, discovery and discussion with the client. Indeed, it is difficult to imagine an arraignment court even permitting such a plea at that time. The state's attorney's argument nonetheless invited the jury to infer that, because the defendant did not plead guilty at his arraign-

ment on the day after his arrest, the jury should disregard the fact that he ultimately pleaded guilty to the underlying capital felony. The state's attorney urged the jury to draw this inference in contradiction to the trial court's ruling and, therefore, without the benefit of any explanation that it would have been, for all practical purposes, unheard of to expect a guilty plea at that initial court appearance. The stark and startling disingenuousness of this argument is matched only by its audacious disregard of the gist of the trial court's ruling, and by the trial court's failure to take any specific measure to counter it.

## B

### Improper Appeals to Passions and Emotions

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. *United States* v. *Modica*, [663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982)]; *State* v. *Couture*, [194 Conn. 530, 564, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985)]; *State* v. *Carr*, 172 Conn. 458, 470, 374 A.2d 1107 (1977); *State* v. *Ferrone*, [supra, 96 Conn. 164]; [1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 3, standard 3-5.8 (c)]. We have stated that such appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. *State* v. *Couture*, supra, 562. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. See *State* v. *Couture*, supra [562]; [1 A.B.A., Standards for Criminal Justice, supra, standard] 3-5.8 (c), commentary. No trial—civil or criminal—should be decided upon the basis of the jurors' emotions. *United States* v. *Modica*, supra, 1180." (Citations

omitted; internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 545–46. This principle is particularly important in death penalty proceedings. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

The most egregious impropriety committed by the state's attorney in this regard occurred in the following section of his rebuttal argument. After arguing that the state had proved the aggravating factor and the defendant had not proven a mitigating factor, the state's attorney addressed the weighing process. "But if you do find the mitigant, maybe you find that [the defendant] did make good brownies, then you have to go and weigh. And what you have to weigh is this kind of stuff, [the defendant] growing up, [the defendant's] family album. So you weigh it. You put this kind of stuff, his life, his history, put that on one side of the scale. And then on the other side of the scale you put [the victim]. Gee, [the defendant's] family album. [The victim's] family album. This is what the [the victim's] family, this is what this community is going to remember about [the victim]. This is [the victim's] equivalent of defendant's exhibit A. That's their equivalent. And as [the assistant state's attorney] said, these pictures are not pleasant. I didn't create these pictures. [Malka] Shah [the medical examiner who performed the autopsy] didn't create these pictures. Kaynor Tech High School didn't create them. [Joyce] Moffatt [the defendant's mother], Brandon Rizzo [the defendant's brother], Chelsea Rizzo [the defendant's sister], Reverend Abernathy, Fun Stuff Video, Faces of Death video, Texas Chain Saw Massacre, United States Marine Corps, they didn't create these. They didn't create the image of [the victim] that

are in these [thirty-one] slides. He did. The defendant did.

"So weigh [the defendant] against the slides. Then on your *little scale* put state's exhibit [twenty-three], the confession, right, put the hammer and weigh it. Weigh it. Who wins? What side is the heavier? I'm just not talking literally. I'm not talking literally. *Balance [the defendant] against what he did, his life against [the victim]. That's the balancing test.*" (Emphasis added.)

Defendant's exhibit A, to which the state's attorney referred as "[the defendant's] family album," was a series of twelve photographs of the defendant alone and with his siblings, mounted on a plasterboard, showing the defendant at various stages of his life, from infancy to his teenage years. What the state's attorney referred to as "[the victim's] family album" was the series of thirty-one slides of the autopsy of the victim, which constituted state's exhibits fifty through seventy-five.

There are several aspects of this argument by the state's attorney that constituted improper appeals to the jurors' passions and emotions. The first is the reference to the autopsy slides of the victim as "[the victim's] family album. This is what [the victim's] family, this is what this community is going to remember about [the victim]." In *State* v. *Reynolds*, supra, 264 Conn. 175–76, we addressed a similar argument by the state in the penalty phase of that capital felony conviction. We stated that characterizing the autopsy photographs of the victim as "the [victim's family] album exceeded the bounds of appropriate argument . . . [and] constituted an improper appeal to the emotions of the jury." (Internal quotation marks omitted.) Id., 175. We also stated that referring to those photographs as "the [victim's family] album . . . cannot be defended as mere

rhetorical flourish." (Internal quotation marks omitted.) Id. In addition, by telling the jury to perform its weighing task on "your little scale," the state's attorney impermissibly and sarcastically denigrated the awesome weighing task facing the jury.

Finally, the state's attorney set up a metaphorical scale with the life of the defendant on one side and the life of the victim on the other. He stated: "[W]eigh [the defendant] against the slides. . . . Balance [the defendant] against what he did, *his life against [the victim]. That's the balancing test.*" (Emphasis added.) Although it is *possible* to read this final peroration as merely asking the jury to weigh the defendant's mitigating factors ("weigh [the defendant]") against the proof of the aggravating factor ("against the slides," which proved the nature of the injuries, along with "the confession," and "the hammer"), as the state contends, we must read the language in its context and consider it as the jury was likely to have heard it. That context includes the final peroration of the passage. Taken in this context, we conclude that it is more likely that the jurors heard this entire final passage as an appeal to weigh one life against another—the life of the defendant, who had committed a horrendous murder, against the life of an innocent, thirteen year old victim. This was an improper appeal to the jurors' emotions of anger and revenge—to persuade the jury to avenge the defendant's taking of the life of the innocent victim by mandating the death of the guilty defendant.

This improper appeal to emotion was exacerbated by the fact that it was a blatant misstatement of the statutory weighing test. That test required the jury to weigh the aggravating factor proven against any mitigating factor or factors proven. It did not permit the jury to weigh the life of the defendant against the life of the victim.

Another aspect of the state's final argument that improperly appealed to the passions and emotions of the jury, in a different way, was the repeated use of the word, "bull," in arguing against certain of the defense counsel's contentions. In response to the defense counsel's argument that, based on certain aspects of the medical examiner's testimony, the state had not proven that the victim was conscious after the first blow, the state's attorney argued as follows: "[The victim] was unconscious. [The victim] didn't feel anything. So it makes us all feel good. *Bull*, he didn't feel anything. That little kid felt everything. He was alive." (Emphasis added.) The defense counsel had also contended that the defendant's age of eighteen should be considered as evidence of a mitigating factor. In response, the state's attorney argued that the law permits the execution of an eighteen year old, that the defendant was almost nineteen, that he was old enough to drink, to join the Marine Corps, to fight and die for his country, to vote, and to sit as a juror and pass judgment on other people. He then concluded: "So this eighteen year old stuff is *bull*." (Emphasis added.) The defense counsel had also argued, as a basis of mitigation, that the defendant had maintained a steady history of employment until his arrest. In response, the state's attorney argued: "[The defendant] maintained a steady history of employment until the time of his arrest. *Bull*. He got kicked out of the Marine Corps. You tell me being in the military is not a job." (Emphasis added.)

We would be socially and linguistically naive if we did not read these uses of the term "bull" as a shorthand for the slang expletive "bullshit," and if we did not conclude that the jury likely heard them in the same sense.[48] Indeed, it is clear that both the defendant's

---

[48] See, e.g., Random House Historical Dictionary of American Slang (1994); The Oxford Dictionary of Modern Slang (1992); R. A. Spears, Slang and Euphemism (1981); A Dictionary of Slang and Unconventional English (8th Ed. 1984); New Dictionary of American Slang (1986). Although "bull," when used as a characterization of speech or argument, may also carry a more

counsel and the trial court heard them in that sense because, when the defendant's counsel registered his objection to the word, the court agreed with the defense counsel that the state's attorney "could have used a more pleasant word," and the state's attorney did not defend his use of the word in his response to the defendant's objections. Furthermore, on appeal, the defendant cites the state's attorney's "gratuitous use of the term 'bull' [as] clearly shorthand for the expletive 'bull ' "; (expletive deleted in original); as an example of the "use [of] inflammatory language to raise the passions of the jury against the defendant . . . ." The state does not take issue, either in its brief or at oral argument in this court, with the defendant's assertion of that shorthand meaning.

The use by the state's attorney of this expletive in final argument in a death penalty proceeding was not only unworthy of his high office; it had more sinister effects. It appealed to the jurors' emotion of disdain, by conveying to them the state's attorney's own feeling of disdain for the defendant's arguments. It was most likely heard by the jurors as if he had said, in longhand rather than shorthand: "The defendant's arguments are bullshit."

Furthermore, by arguing to the jury in this vulgar fashion, the state's attorney in effect invited them to do the same when they convened to decide the defendant's fate. As we have said, the state's attorney "is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 162–63. Thus,

---

benign sense of "[e]mpty, foolish talk"; The American Heritage Dictionary of the English Language; the state has not asserted, either here or in the trial court, that it was used by the state's attorney solely in that benign sense.

"[b]y reason of his office, he usually exercises great influence upon jurors." (Internal quotation marks omitted.) Id., 163. Consequently, when the jurors heard the state's attorney argue for the death of the defendant in vulgar, barnyard terms, and particularly when they did not hear any specific condemnation of that fashion of argument from the trial court, the message to them was that such a form of argument was permissible for them as well. That was directly contrary, however, to their grave task of exercising their reasoned and moral judgment in deciding whether the death penalty should be imposed on the defendant.

The final aspect of the state's attorney's appeal to the passions and emotions of the jurors was his repeated and excessive use of sarcasm. See *Gore* v. *State*, 719 So. 2d 1197, 1201 (Fla. 1998) ("needless sarcasm" inconsistent with state's attorney's professional responsibility, and contributed to reversal of death penalty based on prosecutorial misconduct). Although we only have the transcript of the final argument, and a tone of sarcasm would be more clear on an audible reproduction, the transcript at several places discloses what could only have been said in sarcastic tones. We emphasize that we do not determine whether any of these sarcastic remarks taken in isolation would have been improper. Rather, we are mindful of the likely cumulative effect that the prosecutor's repeated and excessive use of sarcasm had on the jury.

On several occasions, the state's attorney used "please" in a sarcastic tone. The defendant had offered evidence in mitigation based on his parents' lack of significant interest and involvement in his life. In responding to his contention, the state's attorney argued: "We talked about the mother. Let's blame the father. I remember the father saying I was a bad father. Now I'm admitting it because my son's on trial for his life. I'll admit to you, ladies and gentlemen of the jury,

I was a lousy father because once I promised to take him to Disney World and I didn't. And I think [defense counsel] said you think that had an effect on [the defendant]? *Please. Please.* Of all the kids in the world who were told they were going to Disney World and their parents ended up not taking them, do you know how many people that would be? Probably hundreds of thousands if not millions. Promise to take your kids someplace. That's an excuse?[49] That's a justification? That's a reason you shouldn't be executed? That's a reason you shouldn't be held accountable for the crime you committed? *Please.*" (Emphasis added.) Later, in responding to the defendant's argument in mitigation that he cooperated with the police, the state's attorney stated: "[W]e talked about his cooperation with the police. *Please.* That's an insult to the men and women who worked on this case and solved this case." (Emphasis added.) In responding to the defendant's evidence and argument in mitigation that he had been the subject

[49] By implying that the defendant's proposed mitigating circumstances were not mitigating in nature because they were not excuses, the state's attorney repeatedly implied that mitigating circumstances are excuses. This was a blatant misrepresentation of the definition of mitigating circumstances set forth in § 53a-46a (d), which expressly states that mitigating circumstances are not excuses. The state's attorney correctly stated at the beginning of his argument that mitigating circumstances are not excuses, but that does not render his later, contradictory misstatements of the law any less misleading. The prosecutor similarly misrepresented the nature of mitigating circumstances by repeatedly referring to the defendant's proposed mitigating circumstances as an attempt to "blame" others for his conduct. Again, the state's attorney initially stated the law correctly, commenting that mitigating factors tend to reduce the degree of a defendant's culpability or blame for the offense. See General Statutes (Rev. to 1997) § 53a-46a (d). In the course of his discussion of the particular mitigating factors, however, he mischaracterized the proffered mitigating circumstances as the defendant's attempt to shift the blame to other parties. "This is the blame game. Let's blame someone. Let's blame mom. Let's blame dad. Let's blame the church. Let's blame the school. Let's blame the teachers. Let's blame the neighbors. Let's blame the videotapes. Let's blame the books. Let's blame the cats. Let's blame the dirty housekeeping. Let's blame the senior boys who picked on [the] poor [defendant]. Let's blame the bullies at Westside Middle School. Let's blame the kid that called him Howdy Doody."

of sexual assault and harassment while at Kaynor, the state's attorney stated: "You heard this whole thing about the locker room. Rumor around the school [the defendant] was raped. *Please*." (Emphasis added.)

In addition, on two occasions the state's attorney sarcastically referred to the defendant as "the Todd Squad."[50] In arguing that the state had proved its aggravating factor, including psychological pain suffered by the victim, the state's attorney stated: "The intentional infliction of psychological pain. It's what's going through somebody's head. Here's [the victim] going to look for snakes with his friend Todd. *'Todd Squad.' The 'Todd Squad' is in town.*" (Emphasis added.) In responding to the defendant's mitigating evidence that he had been small for his age and the subject of hazing in middle school, the state's attorney stated: "How big was [the victim]? I'll tell you one thing. He wasn't big enough to defend himself from the *'Todd Squad.'* He wasn't big enough to convince [the defendant] to stop bludgeoning him." (Emphasis added.)

A final example of sarcasm came in the state's attorney's response to the defendant's claim that he took responsibility for the crime by cooperating with the police investigation. The state's attorney stated: "He took responsibility only after the cops found the blood in the trunk of his car. *Wow, let's give a hand for [the defendant].*" (Emphasis added.)

Like the use of a shorthand for "bullshit," discussed previously, the use of needless sarcasm by the state's attorney called upon the jurors' feelings of disdain, and likely sent them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method

---

[50] The only evidentiary reference to this phrase came in the testimony of Boisvert, the defendant's friend. She testified that the defendant would often play with her two small children, would bring them candy bars, and that "my little one used to call him the 'Todd Squad.' "

of argument was permissible and appropriate for them to use. Neither this court nor the trial court can, of course, control how jurors talk to each other in the confines of the jury deliberation room. We can, however, control the models of argument that they are given. We recognize that cases such as the present one necessarily call up strong feelings in those who are called upon to prosecute them, and that on occasion those feelings may come to the surface in the course of final argument. It is the responsibility of the state's attorney, however, in the exercise of his high office, to attempt to avoid expressing those feelings in needless and inappropriate ways. That responsibility was not met when the state's attorney engaged in excessive sarcasm in his final argument to the jury to persuade it to impose the death penalty.

C

Improper Expressions of the State's Attorney's
Personal Feelings about the Merits of the
Defendant's Contentions, Based
on Misstatements of Those
Contentions

The state's attorney may not express his personal opinions and feelings about the ultimate determination that the jury must make. See *State* v. *Reynolds*, supra, 264 Conn. 163; *State* v. *Williams*, supra, 204 Conn. 541. "Such expressions of personal opinion are a form of unsworn and unchecked testimony." *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002); *State* v. *Williams*, supra, 541. By doing so, the state's attorney may increase "the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background circumstances of the case, and the influence of his official position." *United States* v. *Morris*, 568 F.2d 396, 401 (5th Cir. 1978). In sum, his "personal opinions are irrele-

vant to [the] sentencing jury's consideration." *Johnson* v. *Wainwright*, 778 F.2d 623, 631 (11th Cir. 1985), cert. denied sub nom. *Johnson* v. *Dugger*, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987).

The facts regarding this issue are as follows. In his argument in favor of mitigation, the defendant's counsel began by expressing his agreement that anyone would feel outrage at the defendant's crime.[51] In the course of his argument, he had also contended that the defendant, as well as the victim, was "the victim" of "an exploitive culture that glorifies violence with books and movies that were inappropriate for his age."[52]

At the conclusion of his argument, the defense counsel stated his expectation that the state's attorney would forcefully express his own outrage at the defendant's crime.[53] In his final argument, the state's attorney stated

[51] Specifically, the defendant's counsel stated: "I know the outrage people feel. It's understandable. It's justifiable. This was a horrible, horrible crime. There's no getting around that. [The defendant] should pay severely for this crime. There's no question. He will pay severely for this crime. He should never ever, ever leave the prison that he's in. Also, as a parent I'm angered at the total lack of concern that [the defendant's] parents showed to him and his [brother] and [sister]."

[52] The full context of this part of the defendant's argument was as follows: "We talked about the home, the conditions of the home. His parents were physically and emotionally absent from him during his formative years and provided little or no guidance, supervision or discipline. They were on their own. He raised himself without the benefit of positive role models. He had no role models. Any role models he developed were from the videos he was watching. Without appropriate supervision and guidance he was easily influenced by an exploitive culture that glorifies violence with books and movies that were inappropriate for his age. No question about it. It's happening around the country. It happened here in Waterbury on September 30, 1997. And unfortunately [the victim] was the victim of it. [The defendant] is the victim of it, as well. And I remind you, if you have any doubts about the disinterest of these parents, their selfishness, their excuses, for whatever the reasons, just look at the video." This last reference was apparently to the video, entered into evidence, of the defendant's home conditions.

[53] Specifically, the defense counsel stated: "Now, during the course of the trial you have heard [the state's attorney], when he wants to make a point, will raise his voice. You've heard me raise my voice earlier today. That's part of argument. And there's nothing wrong with that. I expect that [the

to the jury that he was "outraged" by the defense counsel having "told you [the defendant] was a victim in this case. [The defendant] is not the victim in this case. Here's the victim in this case. Stanley Edwards. Stanley Edwards. That's the victim, not him." In addition, in response to the defendant's claim that he had taken responsibility for his crime by pleading guilty, the state's attorney stated: "He accepted responsibility. I'm outraged about that. Accepted responsibility." Furthermore, in response to the defendant's claim in his final argument that the evidence did not support a finding of the aggravating factor because the victim may have been unconscious after the first blow, the state's attorney stated: "I'll tell you another thing I'm outraged about. [The victim] didn't suffer because Dr. Shah could not say when [the victim] lost consciousness."

The state's attorney's expressions of personal outrage constituted improper expressions of his own personal opinions and feelings about the tasks facing the jury, namely, the identification of the aggravating factor, the identification of mitigating factors, and the weighing of one against the other. Although the argument of the defense counsel may be reasonably read as having invited the state's attorney to express his outrage at the defendant's crime, that did not justify his expressions of outrage at the defense counsel's arguments in his client's cause. Furthermore, his personal outrage at those arguments was irrelevant to the jury's task. In addition, in the course of expressing that outrage, he misrepresented the argument of the defense counsel to which he took such personal outrage. That argument was not, as he characterized it, that the defendant was the victim in the case; it was, instead, that in mitigation of the

state's attorney] will express his outrage at this horrible, horrible crime. I understand that he has a right to do that. We all have a right to express our outrage. I don't like the killing of an innocent thirteen year old. No one does."

defendant's conduct the jury should consider that he was a victim of his parents' disinterest in protecting him from the exploitive aspects of our popular culture that glorified violence. It was certainly within the permissible bounds of robust argument for the state's attorney to counter that argument. It was not, however, within those bounds to do so by expressing his personal outrage at it.

Another way in which the state's attorney improperly expressed his personal opinions on the task facing the jury was to state his personal distaste for and reluctance regarding his task of seeking the death penalty. This was done, moreover, in a way that invited the jurors to infer that they, he and the court, but not the defense counsel, were bound up in a common enterprise that required the imposition of the death penalty. He stated: "What you have before you is an awesome task. As a prosecutor—gee, [John] Connelly seems to enjoy this. Well, believe me, as a prosecutor, as a human being, the most difficult thing I've ever had to do in my entire life is to stand up in front of a jury, people from my community, and argue to them that they should kill another human being. It's awesome. I don't do it easily. I don't do it with pleasure. You may see me trying to kid around, get a little laughter out of the witnesses, maybe to break the tension because this is an awesome task. It's awesome for you. It's awesome for me. It's awesome for the court. It's awesome for Judge Holden. The reason we do it is because we all took an oath. I took an oath. You took an oath. The court took an oath to uphold and enforce the law."

The personal feelings of the state's attorney in seeking the death penalty were simply irrelevant to the jury's task. This argument, however, invited the jury to infer that, in the state's attorney's opinion, it must be appropriate to impose it; otherwise, the state's attorney would not have undertaken "the most difficult thing [he had]

ever had to do in [his] entire life . . . ." Furthermore, as the defendant specifically pointed out in his motion for mistrial, by linking the state's attorney's oath, the jurors' oath and the court's oath together, to "enforce the law," to the implied exclusion of a similar oath taken by defense counsel to support the constitutions of the United States and the state of Connecticut,[54] the state's attorney urged the jury to infer that this common oath required the imposition of the death penalty.[55]

## D

### Improper Comment on the Defendant's Failure to Testify

"We recently have reiterated the legal principles relevant to our review of [a claim of a prosecutor's improper

[54] General Statutes § 1-25 sets out the attorney's oath: "You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do nothing dishonest, and will not knowingly allow anything dishonest to be done in court, and that you will inform the court of any dishonesty of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is false or unlawful; that you will not obstruct any cause of action for personal gain or malice; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or upon penalty of perjury."

In addition, any attorney admitted to the bar in Connecticut must, as a commissioner of the Superior Court, take the oath of a judicial officer, set out as follows: "You do solemnly swear (or affirm, as the case may be) that you will support the Constitution of the United States, and the Constitution of the state of Connecticut so long as you continue a citizen thereof; and that you will faithfully discharge, according to law, the duties of the office of . . . to the best of your abilities; so help you God." General Statutes § 1-25.

[55] In *State* v. *Reynolds*, supra, 264 Conn. 183, we recognized that "it generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from its duty of deciding the case on the basis of the evidence and the applicable law." We further noted that "[a] prosecutor is not justified . . . in suggesting, by reference to his oath, that it is his sworn duty to seek the death penalty." Id., 184. In that case, however, "the reference of the state's attorney to his oath of office was a fleeting one, and he did not repeat or otherwise emphasize it." Id. Therefore, we concluded that the comments by the state's attorney in that case did not require a new penalty hearing. By contrast, in the present case, examining the statements in the context

comment on a defendant's decision not to testify]. It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). . . . Our legislature has given statutory recognition to this right by virtue of its enactment of . . . [General Statutes] § 54-84. In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 292–93, 811 A.2d 705 (2003). "Even an indirect remark by the prosecuting attorney may violate a defendant's privilege against self-incrimination if it draws the jury's attention to the failure of the accused to testify." *State* v. *Correa*, 241 Conn. 322, 359, 696 A.2d 944 (1997). Furthermore, "[i]n determining the effect of the state's words on the jury, we may consider the effect they had on defense

of the whole argument leads to the opposite conclusion. Specifically, in the present case, the state's attorney did not merely imply that the jury's oath obligated them to return a particular verdict. He also improperly linked his oath to his personal feelings regarding the imposition of the death penalty, thus inviting the jurors to view their oaths also as somehow properly and inextricably linked to their personal feelings about the imposition of the death penalty. Such an invitation constitutes egregious misconduct.

counsel." (Internal quotation marks omitted.) *State* v. *Parrott*, supra, 293.

In response to the defendant's argument in mitigation that he took responsibility for his conduct, the state's attorney stated: "And then on top of all this [defense counsel] comes up and says well, one of the things you [have] got to take into consideration here, one of the mitigating factors we've proven is [the defendant's] taking responsibility. *I didn't hear him take responsibility once.* I didn't hear one person from that witness stand say [the defendant] took responsibility for anything in life. Not one person said he took responsibility for anything, not this murder." (Emphasis added.)

Although it is possible to read these statements in context so as to conclude that the state's attorney's statement, "I didn't hear him take responsibility once," meant only that none of the defendant's witnesses testified to his having taken responsibility for his crime,[56] we conclude that it is more likely that the jury heard the statement in its more literal sense—the defendant did not tell you that he took responsibility for his crime. The more likely interpretation by the jury of the entire context of the state's attorney's argument, we conclude, was that *neither* the defendant *nor* any of his witnesses testified that he took responsibility. Thus, the statement was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify.

E

Deprivation of Due Process of Law

We further conclude that these numerous instances of prosecutorial misconduct in rebuttal argument

---

[56] Indeed, it is true that the defendant did not take explicit exception to this argument by the state's attorney. Instead, he argued to the trial court that, when "the state's attorney argued that no one ever came here and said that [the defendant] was remorseful . . . that's a violation of my client's fifth amendment right to remain silent." Nonetheless, we are constrained

deprived the defendant of due process of law. See *State* v. *Reynolds*, supra, 264 Conn. 1; *State* v. *Williams*, supra, 204 Conn. 523. We first note that, for the most part, the defendant objected to the claimed improprieties and brought them to the court's attention. Compare *State* v. *Reynolds*, supra, 160 (defense counsel did not object explicitly to state's attorney's arguments).

Except to the minor extent noted previously, the remarks were not invited by the conduct or argument of the defendant or his counsel. Although the remarks were certainly in response to the defendant's arguments that had immediately preceded them, the wrongful aspects of the state's attorney's argument cannot be fairly characterized as prompted in any way by those arguments.

In addition, they were severe in their wrongfulness. This is particularly true of the first three categories of misconduct described previously, namely, the improper violation of the court's prior rulings, the improper appeals to the jurors' passions and emotions, and the expressions of personal opinions and feelings by the state's attorney.

Furthermore, they were frequent, considering that the state's attorney's entire final argument takes up only twenty-four pages of transcript. The multiple instances of misconduct that we have identified satisfy the frequency prong of the due process test.

Moreover, all of these instances of misconduct were central to the critical issues in the case. The *only* issues for the jury were whether the state had proved the aggravating factor, whether the defendant had proved any mitigating factors, and whether the aggravating factor proven outweighed the mitigating factors proven

---

to conclude that the jury was likely to have heard the statement, "I didn't hear him take responsibility once," in the manner that we have described.

and, therefore, whether the death penalty should be imposed.

The curative measure adopted by the trial court was inadequate to the task of alleviating the effects of the misconduct. This is particularly true because the trial court did not fulfill its representation that it would take appropriate curative measures. The only measure that the record discloses was that the court delivered the traditional and customary instructions to the effect that the arguments of the attorneys did not constitute evidence; that the jury was to accept the law as given to it by the court without regard to the claims of counsel; that the jury was the sole judge of the facts; and that the jury was not to draw any unfavorable inferences from the defendant's failure to testify. Those general instructions, however, were insufficient. Specifically, the court's instructions made no attempt to cure the harm caused by the state's attorney's violation of the court's order, his improper appeal to the passions of the jury, and his improper expressions of his personal opinion regarding the merits of the defendant's contentions. Nor did the trial court specifically address the state's attorney's blatant and egregious misstatements of the law. In a case such as this one, where the state's attorney's improper remarks were repeated and egregious, more than general instructions were required.

Finally, although the state's case for its aggravating factor was very strong, the jury also found that the defendant had proved mitigating factors. Thus, we cannot say that, when it came to the ultimate weighing process, the state's case was so strong that it is not likely that the ultimate verdict of death would have nonetheless been the same absent the misconduct of the state's attorney. This is particularly true because, as we have concluded in part I of this opinion, the jury was not instructed that it was required to be persuaded

beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors.

Although we have concluded in parts I and II of this opinion that the judgment must be reversed and a new penalty hearing held, we address certain of the defendant's other claims that are likely to arise in that proceeding. Accordingly, we now turn to those claims.

## III

### ISSUES REGARDING THE DEFENDANT'S ALLEGED LACK OF REMORSE

The defendant raises several claims challenging the admission of the testimony of his minister regarding the defendant's alleged lack of remorse and the trial court's jury instructions regarding that testimony. Specifically, the defendant contends that: (1) because the defendant had not presented remorse as a mitigating factor, it was improper for the trial court to allow the state to present any testimony regarding his lack of remorse; (2) it was improper for the trial court to admit the lack of remorse testimony because it was based on unreliable observation; (3) the trial court improperly overruled the defendant's objection that the testimony violated his clergy-penitent privilege; (4) the trial court improperly overruled the defendant's objection that the cross-examination improperly went beyond the scope of direct examination; and (5) the trial court improperly instructed the jury that it could infer that the defendant had the requisite intent to satisfy the aggravating factor based on the testimony regarding his lack of remorse. We conclude that, although the state's cross-examination concerning the lack of remorse testimony went beyond the scope of the direct examination, it was within the trial court's discretion to admit it.

We first set forth the factual background for the defendant's claims. During the sentencing proceeding,

the defendant offered the testimony of Abernathy, his minister, regarding the defendant's church activities. In its cross-examination of Abernathy, the state elicited testimony regarding his visit to the defendant in jail on the night that he was arrested. The defendant's objection to this line of questioning, on the ground that it was beyond the scope of the direct examination, was overruled.[57] The state then asked Abernathy whether he spoke to the defendant that evening, and also asked him to describe the defendant's demeanor during the visit. The court again overruled the defendant's objections. Abernathy answered that he did speak to the defendant, who appeared "sheepish." The state then asked Abernathy whether the defendant appeared remorseful. The defendant's objection, based on "priest-penitent" privilege and on his fifth amendment privilege against self-incrimination, was overruled. The minister then answered that the defendant did not appear remorseful. In its closing argument, the state relied on the lack of remorse testimony during its discussion of the intent element of the aggravating factor.[58] Finally,

[57] The only defense objection that the trial court sustained during this part of the cross-examination occurred when the state's attorney asked Abernathy how long his visit with the defendant lasted. The defendant's objection to this question was that it was irrelevant and beyond the scope of the direct examination. It is unclear from the record on which basis the court sustained the objection.

[58] Specifically, the assistant state's attorney stated: "Reverend Abernathy saw [the defendant] after [the murder] in the police station October 1, after he had given his confession. And Reverend Abernathy told you he showed no remorse."

In the context of her discussion of the defendant's lack of remorse, the assistant state's attorney also referred to testimony of Sergeant Coyle regarding the defendant's demeanor when he was arrested. "Sergeant Coyle was with [the defendant] at his house, during that ride, during the confession. Stoic. Described it matter of factly." During Coyle's testimony, the state's attorney, immediately after receiving that description of the defendant's demeanor, had asked Coyle whether the defendant showed remorse, to which Coyle answered no. The trial court, however, had then sustained the defendant's objection to Coyle's testimony regarding lack of remorse and had then stricken the answer. Subsequently, in moving for a mistrial, the defendant argued that the assistant state's attorney's discussion of Coyle's

in its instructions to the jury, the trial court informed the jury that it could infer that the defendant intended to inflict suffering on the victim from his lack of remorse.

The state argues that the defendant's lack of remorse claims are unpreserved evidentiary claims and therefore not properly before the court. The defendant claims that he preserved the issues. Regardless of whether the issues have been preserved, we address them because they are likely to arise on remand.

### A

### Permissible Purposes of Lack of Remorse Evidence

The defendant claims that because he did not claim remorse as a mitigating factor, the state was not permitted to introduce any evidence regarding the defendant's lack of remorse. We disagree. We conclude, to the contrary, that evidence of a defendant's lack of remorse is relevant for at least two purposes in a capital sentencing hearing: generally to rebut the defendant's mitigating circumstances; and to establish that the defendant had the requisite intent necessary to establish the aggravating factor of cruelty.

We first clarify what is *not* at issue in any of the defendant's claims regarding the use of lack of remorse testimony in this case. The defendant does not now claim that the lack of remorse testimony violated his fifth amendment rights. Nor does he claim that the state or the trial court misled the jury into believing that lack of remorse was a nonstatutory aggravating factor.

In order to evaluate the defendant's claim, we must first determine for what purpose, if at all, a defendant's

testimony in the context of her discussion of lack of remorse was inappropriate because it referred to the stricken testimony. Thus, the assistant state's attorney should not have been permitted to refer, even indirectly, to this stricken testimony in her final argument, and the trial court should have given a specific curative instruction regarding that argument.

lack of remorse is relevant to a jury's determination that death is the appropriate penalty. Because lack of remorse is not listed as a statutory aggravating factor under § 53a-46a (i), it may not be relied upon as an aggravating factor in a death penalty case. A defendant, of course, is free to assert remorse as a nonstatutory mitigating factor pursuant to § 53a-46a (d). We do not believe, however, that evidence of the defendant's lack of remorse is relevant *only* when a defendant has elected to assert remorse as a specific mitigating factor. Section 53a-46a (d) defines mitigating factors as such that "in fairness and *mercy*, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." (Emphasis added.) Because mitigating factors call upon the jury to elect whether to exercise mercy, a defendant's lack of remorse will always be relevant generally to rebut the defendant's claimed mitigating factors.[59]

By contrast, in the present case the state did not rely on the lack of remorse testimony to rebut the defendant's mitigating factors. Instead, it relied on Abernathy's testimony regarding the defendant's lack of remorse solely to establish the requisite intent necessary to prove the aggravating factor, that the defendant committed the offense in an especially heinous, cruel or depraved manner. We must determine, therefore, whether evidence of the defendant's lack of remorse is relevant to establish the requisite intent for the aggravating factor of cruelty. As we explained in part I A of this opinion, in order to establish this aggravating factor, the state must show "that the defendant engaged

---

[59] Because we conclude that the admissibility of lack of remorse evidence is not conditioned on the defendant's assertion of remorse as a specific mitigating factor, it is unnecessary to reach the state's claim that the defendant, by claiming as a mitigating factor his acceptance of responsibility for his actions, asserted remorse as a mitigating factor.

in intentional conduct that inflicted extreme physical or psychological pain [suffering] or torture on the victim above and beyond that necessarily accompanying the underlying killing, *and* that the defendant specifically intended to inflict such extreme pain [suffering or] torture . . . or . . . the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 545.

In discussing the permissible scope of evidence offered in support of an aggravating factor, the United States Supreme Court cited with approval *Fair* v. *State*, 245 Ga. 868, 873, 268 S.E.2d 316 (1980), for the proposition that "[a]ny lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation, subject to the notice provisions of the statute . . . ." (Internal quotation marks omitted.) *Zant* v. *Stephens*, supra, 462 U.S. 886 n.22. This court also has addressed this issue in *Ross*, where, in the context of determining whether the evidence was sufficient to support the jury's finding of the aggravating factor of cruelty, we stated that "the jury reasonably could have found that the defendant's lack of remorse substantiated a finding that his infliction of suffering upon his victims was intentional. Such findings have probative force even though they are based on inferences rather than on direct evidence . . . and even though the jury might have drawn contrary inferences." (Citations omitted.) *State* v. *Ross*, supra, 230 Conn. 263. This conclusion is consistent with our case law holding that the state may satisfy the mens rea element of the aggravating factor of cruelty *either* by showing that "(1) the defendant intended to . . . inflict extreme physical or psychological pain, suffering

or torture on the victim; *or* (2) the defendant was *callous or indifferent* to the extreme physical or psychological pain, suffering or torture that his intentional conduct . . . inflicted on the victim." (Emphasis added.) *State v. Cobb*, supra, 251 Conn. 445. It is reasonable for a jury to infer, based on a defendant's subsequent lack of remorse, that the defendant was callous or indifferent to the victim's suffering at the time of the offense. We conclude, therefore, that evidence of the defendant's lack of remorse is relevant to the jury's determination of whether the state has established that the defendant had the requisite intent to satisfy the aggravating factor of cruelty.

The defendant's argument, that lack of remorse is not relevant to the defendant's intent because lack of remorse necessarily occurs after the murder has been accomplished, is unpersuasive. Although it is true that remorse or lack of remorse can only occur after a crime has been committed, it is not irrelevant to the defendant's state of mind at the time of the crime. The most apt definition of remorse is "a gnawing distress arising from a sense of guilt for *past* wrongs (as injuries done to others) . . . ." (Emphasis added.) Webster's Third New International Dictionary. Thus, remorse, or lack thereof, is an emotion that looks back to the past, and, although it cannot reflect the *identical* emotions that the defendant experienced at the time that he committed the murders, by its very nature lack of remorse is *relevant* to the jury's reasonable inference of the defendant's state of mind at the time of the offense.

B

Whether Lack of Remorse Testimony Based on
a Witness' Observations of a Defendant's
Appearance and Demeanor Is
too Unreliable

The defendant claims that testimony that concludes, based merely on the defendant's appearance and

demeanor, that the defendant lacks remorse for his actions is inadmissible in a capital sentencing proceeding because it is too "speculative and unreliable." Additionally, the defendant contends that the testimony was inadmissible because it was unduly inflammatory and prejudicial. We disagree with both of these contentions.

The question, even in a capital sentencing proceeding, is whether the inference was a reasonable one for the witness to have made. "It is well settled that a nonexpert witness may testify as to his [or her] *impression* of another's mental or emotional state if that opinion is reliable and based on the [witness'] observations. *State* v. *Spigarolo*, 210 Conn. 359, 371, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989)." (Emphasis added; internal quotation marks omitted.) *State* v. *Calonico*, 256 Conn. 135, 158 n.32, 770 A.2d 454 (2001).

Our case law discussing the permissible inferences that a *sentencer* may draw regarding lack of remorse is instructive. We have addressed the issue, in a noncapital setting, of whether a sentencer may infer lack of remorse based on the defendant's appearance and demeanor. In *State* v. *Anderson*, 212 Conn. 31, 46 and n.8, 561 A.2d 897 (1989), the defendant claimed his right to due process was violated by the trial court's conclusion, based on the court's observations of the defendant's demeanor in the courtroom during the sentencing hearing, that the defendant lacked remorse. Specifically, the trial court remarked: "I've had a lot of opportunity to observe [the defendant] in this courtroom, his demeanor, his actions and if there's one thing that strikes me that's been especially impressed upon me is his complete lack of concern, his complete lack of remorse for what transpired in this particular incident." (Internal quotation marks omitted.) Id., 46 n.8. In determining that the trial court's remarks were not improper, we noted that "[d]ue process requires . . .

that information be considered [by the sentencer] only if it has some minimal indicium of reliability." (Internal quotation marks omitted.) Id., 47. We further noted, however, that "[a]mong the factors that may be considered by a court at a sentencing hearing are the defendant's demeanor and his lack of veracity and remorse as observed by the court during the course of the trial on the merits." Id.

Furthermore, although we have not directly addressed the issue in a capital sentencing proceeding, our statement in *Ross*, that the jury could reasonably infer the aggravating factor of cruelty from the defendant's lack of remorse, is consistent with the principle that the defendant's lack of remorse is generally admissible. *State* v. *Ross*, supra, 230 Conn. 263. Indeed, *Ross* supports the conclusion that this principle applies regardless of whether the sentencer is the court or a jury. Id. Additionally, similar evidence is routinely presented to juries at trial. See, e.g., *State* v. *Cobb*, supra, 251 Conn. 309 (facts found by trial court included that defendant manifested calm demeanor during questioning by detectives); *State* v. *Bova*, 240 Conn. 210, 220–21, 690 A.2d 1370 (1997) (evidence introduced at trial included testimony regarding defendant's absence of emotion upon viewing victim's body); *State* v. *Chance*, 236 Conn. 31, 62, 671 A.2d 323 (1996) (trial court could draw its own conclusions as to whether defendant appeared to be suffering from mental illness based on defendant's testimony and demeanor). Moreover, although evidence of a defendant's lack of remorse will always be prejudicial to the defendant, we do not agree that, in the present case, the probative value of that evidence was outweighed by its prejudicial impact.

Moreover, except in cases where courts have found that evidence or closing argument regarding a defendant's lack of remorse constituted either a comment

on a defendant's failure to testify; see, e.g., *People* v. *Mulero*, 176 Ill. 2d 444, 459–63, 680 N.E.2d 1329 (1997); or an attempt by the state to rely on lack of remorse as a nonstatutory aggravating factor; see, e.g., *Bellmore* v. *State*, 602 N.E.2d 111, 129 (Ind. 1992); courts have held that evidence regarding a defendant's lack of remorse is generally admissible. See, e.g., *Smith* v. *State*, 838 So. 2d 413, 458–59 (Ala. Crim. App.), cert. denied, 537 U.S. 1090, 123 S. Ct. 695, 154 L. Ed. 2d 635 (2002); *People* v. *Crittenden*, 9 Cal. 4th 83, 147, 885 P.2d 887, 36 Cal. Rptr. 2d 474 (1994), cert. denied, 516 U.S. 849, 116 S. Ct. 144, 133 L. Ed. 2d 90 (1995); *Carr* v. *State*, 267 Ga. 547, 558–59, 480 S.E.2d 583, cert. denied, 522 U.S. 921, 118 S. Ct. 313, 139 L. Ed. 2d 242 (1997); *People* v. *Barrow*, 133 Ill. 2d 226, 281, 549 N.E.2d 240 (1989), cert. denied, 497 U.S. 1011, 110 S. Ct. 3257, 111 L. Ed. 2d 767 (1990); *Bellmore* v. *State*, supra, 602 N.E.2d 129; *Bruce* v. *State*, 328 Md. 594, 631, 616 A.2d 392 (1992), cert. denied, 508 U.S. 963, 113 S. Ct. 2936, 124 L. Ed. 2d 686 (1993); *Dawson* v. *State*, 301 Mont. 135, 152–53, 10 P.3d 49 (2000), cert. denied, 532 U.S. 928, 121 S. Ct. 1372, 149 L. Ed. 2d 299 (2001); *State* v. *Robinson*, 336 N.C. 78, 130–31, 443 S.E.2d 306 (1994), cert. denied, 513 U.S. 1089, 115 S. Ct. 750, 130 L. Ed. 2d 650 (1995); *Pickens* v. *State*, 850 P.2d 328, 337 (Okla. Crim. App. 1993); *Commonwealth* v. *Travaglia*, 502 Pa. 474, 499, 467 A.2d 288 (1983), cert. denied, 467 U.S. 1256, 104 S. Ct. 3547, 82 L. Ed. 2d 850 (1984); *State* v. *Lafferty*, 20 P.3d 342, 370–71 (Utah), cert. denied, 534 U.S. 1018, 122 S. Ct. 542, 151 L. Ed. 2d 420 (2001); *Frye* v. *Commonwealth*, 231 Va. 370, 393, 345 S.E.2d 267 (1986); but see *Pope* v. *State*, 441 So. 2d 1073, 1078 (Fla. 1983).

Florida is the only jurisdiction that has held that, because lack of remorse must be inferred from "negative evidence," it cannot be relied upon to support an aggravating factor. *Pope* v. *State*, supra, 441 So. 2d 1078. It is important to note, however, that even Florida does

not completely prohibit the presentation of evidence of a defendant's lack of remorse. If a defendant asserts remorse as a mitigating factor, then the state may present evidence regarding the defendant's lack of remorse to rebut that mitigating factor. *Walton* v. *State*, 547 So. 2d 622, 625 (Fla. 1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 759, 107 L. Ed. 2d 775 (1990). The other two states that have consistently barred testimony or comments regarding a defendant's lack of remorse have grounded their decisions on their conclusion that such testimony or comments always constitutes a comment on the defendant's postarrest silence or his failure to testify. See *State* v. *Diddlemeyer*, 296 S.C. 235, 239–40, 371 S.E.2d 793 (1988), overruled on other grounds, *State* v. *Torrence*, 305 S.C. 45, 69 n.13, 406 S.E.2d 315 (1991); *Dinkins* v. *State*, 894 S.W.2d 330, 356 (Tex. Crim. App.), cert. denied, 516 U.S. 832, 116 S. Ct. 106, 133 L. Ed. 2d 59 (1995). We decline to adopt a per se rule that evidence regarding a defendant's lack of remorse always constitutes a comment on his postarrest silence or his failure to testify. We conclude that such a determination is more appropriately made on a case-by-case basis. Indeed, in the present case, the defendant has stated that he does not claim on appeal that the lack of remorse testimony constituted an improper comment on his postarrest silence pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 98 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

The defendant has not presented any specific claim that Abernathy's testimony regarding the defendant's emotional state, namely, that he lacked remorse, was unreliable, other than to argue that *any* witness testimony regarding this particular emotional state is unreliable. Under the same logic, a witness would not be able to testify that a defendant was not angry, not sad or merely that the defendant was calm. We find this argument unpersuasive. Testimony regarding a defendant's

apparent lack of remorse, based on the observation of a witness, therefore, is generally admissible.

## C

### The Privilege under General Statutes § 52-146b

The defendant further claims that Abernathy's testimony was inadmissible because it was admitted in violation of General Statutes § 52-146b, which provides: "A clergyman, priest, minister, rabbi or practitioner of any religious denomination accredited by the religious body to which he belongs who is settled in the work of the ministry shall not disclose confidential communications made to him in his professional capacity in any civil or criminal case or proceedings preliminary thereto, or in any legislative or administrative proceeding, unless the person making the confidential communication waives such privilege herein provided." In order to establish a foundation for a privilege claim under § 52-146b, a defendant must show that: (1) there was a communication; (2) the communication was privileged; (3) it was made to a clergyman within the meaning of the statute; (4) the communication was made to the clergyman in his professional capacity; (5) the disclosure was sought as part of a criminal or civil case; and (6) the defendant did not waive the privilege. This issue cannot be resolved on the current record because it is unclear whether the defendant had established a foundation for his privilege claim. Specifically, it is not clear whether Abernathy was there in his professional capacity. It is also unclear precisely what formed the basis of Abernathy's conclusion. The defendant maintains that it was based on communications that he made to Abernathy. Therefore, we do not reach the issue of whether the testimony violated the defendant's privilege under § 52-146b.

D

### Whether the State's Questions Regarding the Defendant's Lack of Remorse Impermissibly Went Beyond the Scope of Direct Examination

The defendant also claims that the state's questions regarding Abernathy's visit to him in jail on the night of October 1, 1997, went beyond the scope of the defendant's direct examination of the witness, and, therefore, that his objections to the entire line of questioning should have been sustained. The state responds that the rules of evidence did not apply because the cross-examination of Abernathy took place during the defendant's case in mitigation.[60] We agree with the defendant that the rules of evidence applied, but we conclude that the trial court's ruling was not an abuse of discretion.

We have held that, under § 53a-46a (c),[61] the rules of evidence do not apply to the state's ability to rebut mitigating evidence, but the state must follow the ordinary rules of evidence when proving aggravating factors. *State* v. *Ross*, 251 Conn. 579, 587, 742 A.2d 312 (1999). It is evident from the record that the state relied on Abernathy's testimony solely for the purpose of establishing the aggravating factor. Specifically, in its closing argument, the state referred to Abernathy's testimony regarding the defendant's lack of remorse only

---

[60] The state suggests that, because the rules of evidence do not apply to its ability to rebut mitigating evidence, the trial court would not be able to exclude evidence that is unreliable or prejudicial. That argument is contrary to our holding in *State* v. *Ross*, 251 Conn. 579, 587–88, 742 A.2d 312 (1999), and the eighth amendment's heightened reliability requirement.

[61] General Statutes (Rev. to 1997) § 53a-46a (c) provides in relevant part: "Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. . . ."

once, in support of its argument that it had established one of the elements necessary to prove that the defendant had the requisite intent necessary to satisfy the aggravating factor, namely, that he intended to inflict extreme suffering.[62] Although the state claims on appeal that evidence regarding the defendant's lack of remorse is admissible to rebut mitigating evidence, it does not claim that it elicited the lack of remorse testimony at trial for that purpose, nor does the record support such a conclusion. Therefore, we conclude that the rules of evidence applied to the entire line of questioning seeking to elicit testimony from Abernathy regarding the defendant's lack of remorse.

Because the rules of evidence applied, we review the defendant's claim under the abuse of discretion standard. "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State v. Ramos*, 261 Conn. 156, 175, 801 A.2d 788 (2002). "In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." Id. The Connecticut Code of Evidence also establishes that it is within the trial court's discretion to determine whether to allow a cross-examination to

---

[62] In support of its claim that it had established the mens rea element, the state argued: "What was the defendant's intent in inflicting that [physical suffering] on [the victim]? The defendant's conduct was intended to inflict extreme physical or psychological pain on his victim. And this again we must turn to circumstantial evidence to see what the defendant's intent is. . . .

"Reverend Abernathy saw [the defendant] after in the police station October 1, after he had given his confession. And Reverend Abernathy told you he showed no remorse. . . . That ladies and gentlemen, is the defendant's intent."

go beyond the scope of a direct examination. Specifically, § 6-8 (a) of the Connecticut Code of Evidence provides that "[c]ross-examination and subsequent examinations shall be limited to the subject matter of the preceding examination and matters affecting the credibility of the witness, *except in the discretion of the court.*" (Emphasis added.)

The entire line of questioning regarding Abernathy's visit to the defendant on the night in question went beyond the scope of direct examination. During direct examination of the witness, the defendant made no mention at all of the visit. Instead, the direct examination focused exclusively on establishing the defendant's claimed mitigating factor that he was involved in church activities. Because evidence of the defendant's lack of remorse was relevant to the jury's ultimate determination of the aggravating factor of cruelty, however, it was within the trial court's discretion to permit the state to go beyond the scope of the direct examination to inquire as to Abernathy's observations of the defendant's appearance and demeanor during his visit.

## E

### The Trial Court's Instruction Regarding the Inference of the Aggravating Factor from the Defendant's Lack of Remorse

The defendant claims that it was improper for the trial court to instruct the jury that it could infer, based on the defendant's lack of remorse, that he had the requisite intent to satisfy the aggravating factor of cruelty.[63]

---

[63] The trial court instructed the jury as follows: "The defendant's intent, of course, must be explained through the use of circumstantial evidence, as I have explained that term to you. For example, if you find that the defendant engaged in intentional conduct that directly inflicted extreme physical or psychological pain or suffering on the victim, you may infer that the defendant intended to cause the victim's suffering. You may also infer that the infliction of suffering was intentional from factors such as the defendant's indifference or callousness to the victim's suffering or *lack of remorse* if you find that to be." (Emphasis added.)

As we stated in part III A of this opinion, such an inference is a permissible one. Therefore, it was not improper for the court to give the instruction.

## F

## The Letter

The state claims[64] that the trial court improperly refused to admit a letter written by the defendant, shortly after his arrest, and sent, along with a newspaper clipping about the murder, to a friend with whom he had served in the Marine Corps, Lance Corporal John Fleischer.[65] We agree.

[64] The state has presented this claim pursuant to Practice Book § 63-4 (a) (1) (B), as an adverse ruling that should be considered on appeal in the event the defendant is awarded a new trial. Ordinarily, therefore, we would reserve our consideration of this claim until we had disposed of all of the defendant's claims. We address it here, however, because it is logically connected to the defendant's claims regarding remorse or the lack thereof.

[65] The relevant portion of the letter reads as follows:

"Oct. 10, 1997

"Dear Fleischer,

"Well lets just say, you might be reading about me one day. Just add me on to your long list of famous killers, like Jeffery Dahmer, John Gacy, Henry Lucas, and soon.

"Yes, from the news article inclosed youll learned, I've been arrested for murdering a 13 yr old boy. I beat the backside of his skull in with a sledgehammer in my backyard and dropped his body on a side road w/ his head wrapped in a plastic bag. So way back in July, when me you Jones and Sims talked about the truth if we could actually kill another person? Well I did. That knocks off number two on my goal list!

"I probably wont go to trial until early 99 maybe late 98. But I will keep you informed if you continue to write me. I suppose you can let everyone know, theres no secret. If I can get my hands on a better article, I'll mail it to you. You shouldve seen it, I was on the entire front page of my paper and on many others papers and all over the news! I am sorry for what I've done, because my life is now over, Im either facing life in prison with no parroll or the death sentence, which in CT is lethal injection. Anyway, now that my life is through, hows your doing? . . ."

Fleischer testified that Jones and Sims were Fleischer's roommates in the Marine Corps, and that the defendant's "goal list," referred to in the letter, was the list that the defendant wrote and posted on the mirror in the washroom. See part I A of this opinion. Fleischer also testified that the second item on the defendant's goal list was to kill another person.

The following facts and procedure are relevant to our resolution of this claim. In anticipation that the state would offer the letter as part of its case-in-chief to prove the aggravating factor, the defendant made a motion in limine seeking to exclude the letter on the basis that the letter was irrelevant and that the resulting prejudice would outweigh the letter's probative value. The defendant further argued to the court that the letter was inadmissible because it was not relevant to rebut any of the defendant's mitigating factors, and was inadmissible to show the defendant's lack of remorse. Outside the presence of the jury, the court heard the state's offer of proof through Fleischer, who testified that he became acquainted with the defendant while the two had served in the Marine Corps together, and that he had received the letter in October, 1997.[66] Arguing in opposition to the defendant's motion, the state claimed that the letter was relevant to show the defendant's character, as a rebuttal of the defendant's mitigating evidence. Specifically, the state argued that the letter was admissible to show the defendant's lack of remorse. Based on our reading of the transcript, the trial court appears to have concluded that the letter was not admissible because it was relevant only to establish the fact that the defendant had killed the victim, a question that was no longer at issue in light of the defendant's guilty plea.[67]

We review the trial court's ruling under the abuse of discretion standard. As we noted in part III D of this opinion, the trial court has broad discretion to determine the relevance of evidence. "Every reasonable pre-

[66] To the trial court, the defendant claimed that the letter had not been properly authenticated by the witness, but he does not now raise that claim on appeal.

[67] Although the trial court did not articulate precisely the basis of its ruling, it did state that the fact that the defendant had committed the murder was no longer an issue. Therefore, the court appears to have concluded that the letter was relevant only to establish the defendant's guilt.

sumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 59. Moreover, although the rules of evidence do not apply either to the defendant's presentation of mitigating evidence or to the state's rebuttal of that evidence; see part III D of this opinion; and "although relevance [is] the proper point of departure for determining statutory admissibility, a trial court . . . continue[s] to have the authority to preserve the integrity of the proceeding before it. That authority necessarily encompasses the duty to exclude evidence that, although relevant, is . . . too prejudicial to be admissible . . . ." *State* v. *Ross*, supra, 251 Conn. 587.

We conclude that it was an abuse of discretion for the trial court to exclude the letter. It was relevant to rebut the defendant's mitigating factors.[68] Specifically, we do not see how the defendant's callous bragging about his deed was irrelevant to the jury's determination of whether death was the appropriate penalty for his crime. This is particularly true in light of our conclusion in part I of this opinion that the state must persuade the jury beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, and in light of our conclusion in part III A of this opinion that evidence of the defendant's lack of remorse is relevant generally to rebut the mitigating factors. Furthermore, although the letter was clearly prejudicial to the defendant, its prejudicial nature did not outweigh its probative value.

---

[68] Because we conclude that the letter was relevant generally to rebut the defendant's mitigating factors, we need not address the state's claims that it was relevant to rebut specific mitigating factors proposed by the defendant.

The defendant argues that the letter was inadmissible because exposing the jury to such "unduly prejudicial information" violated the heightened reliability requirement of the eighth amendment. The defendant does not dispute, however, that the applicable inquiry, even under eighth amendment scrutiny, is whether the prejudicial nature of the evidence *outweighs* its probative value. In light of the high probative value of the letter on the callousness and indifference of the defendant to the victim's suffering, its prejudicial nature did not justify its exclusion from evidence. The trial court's ruling excluding the letter was improper.

## IV

## OTHER CONSTITUTIONAL CLAIMS

### A

### The Constitutionality of "Facts and Circumstances" in § 53a-46a (d)

The defendant claims that the language of § 53a-46a (d); see footnote 4 of this opinion; is unconstitutional on its face, and as applied to the facts of this case through the instructions of the trial court, in violation of the defendant's eighth amendment rights and his due process rights under the federal and state constitutions, because it prevents the jury from giving effect to mitigating evidence during the weighing process.[69] Specifically,

---

[69] The state claims that the defendant has failed to brief both his federal and state due process claims and, therefore, that he has waived those claims. The federal case law to which the defendant cites and which forms the basis of his claims, however, implicates both his eighth and fourteenth amendment rights. Therefore, we consider his claims under both the eighth amendment and the fourteenth amendment. We note, however, that the analysis of those rights, in the context of the defendant's right to have the sentencer consider and give effect to mitigating evidence, is identical. The defendant has not, however, provided a separate analysis under the state constitution for his state due process claim. Therefore, we decline to address it. See *State* v. *Crafts*, 226 Conn. 237, 243 n.3, 627 A.2d 877 (1993); *State* v. *Adams*, 225 Conn. 270, 275 n.3, 623 A.2d 42 (1993).

the defendant contends that the requirement that the jury, in deciding whether proposed mitigating evidence is mitigating in nature, must make its determination "considering all the facts and circumstances of the case"; General Statutes (Rev. to 1997) § 53a-46a (d); renders the statute invalid, both facially and as applied, because subsection (d): (1) screens out mitigating evidence from the weighing process; (2) allows the jury to refuse to consider constitutionally relevant mitigating evidence in the weighing process; and (3) allows the jury to conclude incorrectly that there must be a nexus between the mitigating evidence and the offense committed by the defendant. We disagree.

We first reiterate the burden the defendant bears in challenging the constitutionality of a statute. "[B]ecause a validly enacted statute carries with it a strong presumption of constitutionality, those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . In construing a statute, moreover, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *McCahill*, supra, 261 Conn. 504.

The United States Supreme Court has made clear that "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (Citation omitted.) *Woodson* v. *North Carolina*, supra, 428 U.S. 304. Under both the eighth and fourteenth amendments, a sentencer may not "be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than

death." (Emphasis in original.) *Lockett* v. *Ohio,* supra, 438 U.S. 604. A sentencer also may not "refuse to consider, *as a matter of law,* any relevant mitigating evidence." (Emphasis in original.) *Eddings* v. *Oklahoma,* supra, 455 U.S. 114. "[I]t does not follow from *Lockett* and its progeny that a State is precluded from specifying *how* mitigating circumstances are to be proved." (Emphasis added.) *Walton* v. *Arizona,* 497 U.S. 639, 649, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), overruled in part on other grounds, *Ring* v. *Arizona,* 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). The United States Supreme Court has "never . . . held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Buchanan* v. *Angelone,* supra, 522 U.S. 276–77. Nor has the court ever "suggested that jury consideration of mitigating evidence must be undirected and unfocused . . . [or] concluded that States cannot channel jury discretion in capital sentencing in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin* v. *Lynaugh,* 487 U.S. 164, 181, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988).

The first two of the defendant's claims are based on the structure of the death penalty statute. He claims that, because § 53a-46a (d) requires the sentencer to consider the facts and circumstances of the case in making its determination of whether the proposed mitigating evidence is mitigating in nature, the mitigating evidence is offset by the aggravating evidence at that stage in the deliberation process. Although the defendant concedes that this determination does not involve a weighing process, he contends that there are "some balancing aspects" to the requirement that the jury make its finding of mitigation within the context of the facts and circumstances of the case, and he claims that we acknowledged this in *State* v. *Cobb,* supra, 251 Conn. 485. Specifically, the defendant claims that the more

substantial the aggravating evidence, the less likely the jury will be to determine that the proposed mitigating evidence is mitigating in nature, resulting in the screening out of "substantial, important and compelling" mitigating evidence.[70] Subsequently, in the final step of the deliberative process, the sentencer weighs the "remaining" mitigating factors against the aggravating factors. The defendant argues that, because this structure of the deliberative process "screens out" mitigating evidence during the earlier determination of whether the proposed mitigating evidence was actually mitigating in nature, the statute prevents otherwise relevant mitigating evidence from being considered during the weighing process.

We have twice rejected constitutional challenges to § 53a-46a (d), concluding that requiring the sentencer to determine whether the proposed mitigating evidence is mitigating in nature "considering all the facts and circumstances of the case" does not involve a weighing of aggravating and mitigating circumstances.[71] In *State v. Ross*, supra, 230 Conn. 282–83, we considered the defendant's claim that the facts and circumstances language could not be given retroactive effect because it effected a substantive change in the law by adding "some sort of weighing or balancing process to our statutory scheme and [that this] place[d] substantive

---

[70] As an illustration, the defendant contends that § 53a-46a (d) would allow the sentencer, in a case involving a particularly heinous offense, to refuse to consider a defendant's mental retardation as a mitigating circumstance. This result, however, is not possible, because mental retardation is a statutory mitigating circumstance under § 53a-46a (h) (2). If the defendant established the factual basis of such a claim, he could not be sentenced to death. See footnote 5 of this opinion.

[71] Although the defendant now characterizes the process primarily as "screening" rather than "balancing" or "weighing," his argument is similar to that made by the defendants in *State v. Cobb*, supra, 251 Conn. 485, and *State v. Ross*, supra, 230 Conn. 282–83, namely, that § 53a-46a (d) requires the sentencer to consider evidence in aggravation in its determination of whether the defendant has established mitigation.

limitations on the definition of a nonstatutory mitigating factor"; (internal quotation marks omitted) id., 282; and that "subsection (d) sets up a dichotomy between mitigants and aggravants." Id., 283 n.52. In rejecting that claim, we stated that § 53a-46a (d) "merely codifie[d] the definition for mitigating factors utilized in capital cases prior to the enactment of Public Acts 1985, No. 85-366, § 1." Id., 283. Moreover, we noted that "[a] jury that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum." Id., 284.

We again considered the validity of § 53a-46a (d) in *State* v. *Cobb*, supra, 251 Conn. 482–96, in the context of the defendant's claims that: (1) subsection (d) violated the eighth amendment's proscription against vagueness;[72] id., 482–86; and (2) the sentencing panel arbitrarily and erroneously failed to find mitigation. Id., 486–96. Specifically, in *Cobb*, the defendant claimed that "the provision in subsection (d) of § 53a-46a directing the capital sentencer to consider 'all the facts and circumstances of the case' in determining the existence of mitigation authorizes the capital sentencer to reject evidence regarding mitigation on irrelevant and improper grounds." Id., 482–83.

Contrary to the defendant's assertion in the present case, we did not acknowledge in *Cobb* that § 53a-46a (d) has "some balancing aspects . . . ." Instead, we expressly rejected the defendant's contention that "permitting a capital sentencer to determine whether proof

---

[72] The defendant, for the first time in his reply brief, raises a vagueness challenge to § 53a-46a (d), claiming that the phrase "facts and circumstances" is unduly vague because it allows the sentencer to consider anything negative as comprising part of the facts and circumstances of the case. We have already held, however, in *State* v. *Cobb*, supra, 251 Conn. 482–86, that the phrase " 'facts and circumstances' " does not violate the eighth amendment's proscription against vagueness, and that the due process fair notice principle does not apply in this context.

of something positive about a defendant constitutes mitigation under 'all the facts and circumstances of the case' improperly allows the sentencer to balance aggravation against mitigation." Id., 494. We stated that "the sentencer, in determining whether a proposed, factually proven mitigating factor is actually mitigating in nature, in light of all the facts and circumstances of the case, must make a value judgment about that factor in light of those facts and circumstances. That is not the same, however, as *balancing* a factor proven to be mitigating against the aggravating factor or factors that have been proven." (Emphasis in original.) Id., 495. Furthermore, we noted that "we [could] discern nothing inconsistent between the statutory provision that directs a capital sentencer *to consider* all of the facts and circumstances of the case in determining whether a particular factor is in fact mitigating in nature . . . and the statutory requirement that, once a particular factor has been found to be mitigating in nature, the capital sentencer may not balance that mitigating factor against the proven aggravants, but instead must impose a sentence of life without [the] possibility of release." (Citations omitted; emphasis in original.) Id., 486 n.101.

In rejecting the defendant's claim that the sentencing panel improperly failed to find mitigation, we stated that the mere establishment of the factual bases of mitigating evidence does not compel a conclusion, as a matter of law, that a defendant has proved the existence of mitigation. Id., 492–93. Indeed, the interpretation suggested by the defendant in *Cobb* would have "effectively read out of § 53a-46a (d) the requirement that the sentencer determine 'whether the factor is mitigating in nature,' " rendering that language in the statute superfluous. Id., 494–95. We concluded that "§ 53a-46a does not require a capital sentencer to give mitigating force to any particular proven factor solely because

that factor establishes 'something good' about the defendant." Id., 495–96.

Despite the defendant's attempt in the present case to distinguish *Cobb* and *Ross,* because both of those decisions addressed the effect of the phrase "considering all the facts and circumstances of the case" in a nonweighing context, the addition of the weighing provision to § 53a-46a does not alter our analysis of the impact of the facts and circumstances language on the capital sentencing process. The addition of the weighing provision does not change the nature of the jury's determination of mitigation—it merely changes what happens *after* the jury finds mitigation. Under the pre-1995 death penalty scheme, a jury finding of mitigation required the imposition of a life sentence; now such a finding triggers the weighing process. This change in § 53a-46a (d) does not affect the requirement that the sentencer determine whether a proposed mitigating factor is mitigating in nature "considering all the facts and circumstances of the case," which merely defines the phrase "mitigating in nature" and provides the jury with guidance in making its determination of the existence of mitigation. Rather than impermissibly limiting *what* the sentencer may consider as mitigating circumstances, the phrase "considering all the facts and circumstances of the case" in § 53a-46a (d) simply specifies "*how* mitigating circumstances are to be proved." (Emphasis added.) *Walton* v. *Arizona,* supra, 497 U.S. 649.

The defendant's suggested interpretation of the statute, which would allow any evidence that establishes "something good" about the defendant to be considered a mitigating factor and therefore to be considered in the weighing process, confuses *proposed* mitigating evidence with *established* mitigating factors. That is, he assumes that, once he has proved the factual basis for proposed mitigating evidence, he has also established

that the evidence is mitigating in nature. This supposition is inconsistent with the requirement that the defendant must not only establish the factual bases of proposed mitigating evidence, but also must show that the proposed evidence is mitigating in nature. This two step process contemplates the possibility that not all proposed mitigating evidence is mitigating in nature. The process necessarily results in some "screening out" of proposed mitigating evidence, regardless of whether the determination that the proposed evidence is mitigating in nature is made "considering all the facts and circumstances of the case." Therefore, just as in *Cobb*, the defendant's interpretation would read out the requirement that the sentencer determine " 'whether that factor is mitigating in nature,' " rendering that language in § 53a-46a (d) superfluous. *State* v. *Cobb*, supra, 251 Conn. 494–95.

For the same reasons, we reject the defendant's challenge to the trial court's instructions to the jury that "[i]n determining whether the factor is mitigating, you must consider it in the context of all the facts and circumstances of the case, including the nature of the capital felony itself and all the surrounding circumstances." The defendant claims that this instruction represented an "extreme form" of the facts and circumstances language because the court specifically mentioned that the jurors could consider the nature of the capital felony in determining whether the proposed mitigating evidence was mitigating in nature.

We conclude to the contrary, namely, that the instruction correctly reflected the requirement of § 53a-46a (d), that the jury make its determination of whether the proposed mitigating evidence was mitigating in nature considering all the facts and circumstances of the case. Indeed, the United States Supreme Court has stated that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer, and an

instruction to consider the circumstances is neither vague *nor otherwise improper* under our Eighth Amendment jurisprudence." (Emphasis added.) *Tuilaepa* v. *California*, supra, 512 U.S. 976. The mere fact that the instruction mentioned the nature of the capital felony as one of the circumstances of the case that the jury should consider in arriving at its determination of mitigation was not likely to mislead the jury. By contrast, the defendant's requested instruction, which stated: "It is important that you understand, however, that in considering whether a particular fact or set of facts are mitigating in nature, *you may not consider the aggravating factor you may have found or the fact of the capital felony conviction itself*"; (emphasis added); was an inaccurate statement of the law. The established aggravating factor and the fact of the capital felony conviction were part of the facts and circumstances of the case, and, thus, the jury was required to consider them in arriving at its mitigation decision. The trial court properly refused to give the requested instruction.

The defendant also claims that § 53a-46a (d), particularly as instructed by the court in the present case, allowed the jury to conclude incorrectly that it could find that a factor was mitigating in nature *only if* it had some nexus to the offense. The language of the statute, however, is not as restrictive as the defendant implies. Section 53a-46a (d) merely provides that the jury must make its determination of whether the proposed mitigating evidence is mitigating in nature *considering* all the facts and circumstances *of the case*. Nowhere does the statute require that mitigating evidence have some nexus to the offense. It merely provides that the jury consider the totality of the evidence, including the nature of the offense. Likewise, the court's instructions on this issue were proper. The court instructed the jury that "[i]n determining whether the factor is mitigating,

you must consider it in the context of all the facts and circumstances of the case, *including the nature of the capital felony itself and all the surrounding circumstances.*" (Emphasis added.) The court correctly instructed the jury to consider the nature of the offense as one part of the context in which the jury was required to make its determination of whether the proposed mitigating evidence was mitigating in nature. Nothing in the instruction required a nexus to the offense.

B

The Purported Vagueness of § 53a-46a (i) (4)

The defendant next seeks to prevail, under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), on his claim that the "especially heinous, cruel or depraved" aggravating factor of § 53a-46a (i) (4) is unconstitutionally vague because the term " 'extreme pain' " is too subjective a standard and, thus, too vague a standard to guide the sentencer's discretion, and because the definition does not contain an objective standard that the cruel acts must be separate and distinct from the acts constituting the murder. The defendant's claim does present a question of constitutional magnitude and the record is adequate for review. We already have rejected this claim, however, in our prior case law. See *State* v. *Ross,* supra, 230 Conn. 242; *State* v. *Breton,* supra, 212 Conn. 270–71. Further elaboration is unnecessary. Therefore, the defendant's claim fails.

C

The Defendant's Burden to Establish Mitigating Factors by a Preponderance of the Evidence

The defendant claims that placing the burden of proof on a defendant to show by a preponderance of the evidence the existence of mitigating factors compels the defendant to bear the ultimate burden of proving that death is not the appropriate penalty. We disagree.

This claim misrepresents the nature of our capital sentencing scheme. As we explained in part I F of this opinion, our death penalty scheme is a four-tiered system. The defendant's burden to prove the existence of mitigating factors by a preponderance of the evidence arises in the third tier, *only if* the state has established beyond a reasonable doubt that at least one aggravating factor exists. If the defendant meets that burden, the state then bears the burden of proving beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, which we have said is a decision that necessarily entails the determination that death is the appropriate penalty. See part I F of this opinion. We fail to see how this system in any way places the ultimate burden on a defendant to show that death is not the appropriate penalty. Instead, the defendant attempts to recast the same argument that we rejected in *State* v. *Ross*, supra, 230 Conn. 241, namely, once the state has satisfied its burden to show the existence of an aggravating factor, the statute embodies a presumption of death. We stated in *Ross* that the defendant's claim was foreclosed by the decision of the United States Supreme Court in *Walton* v. *Arizona*, supra, 497 U.S. 649–52.

D

The Mandatory Imposition of the Death Penalty
When the Sentencer Has Found Aggravating
Factors to Exist, but No Mitigating Factors

The defendant claims that Connecticut's capital sentencing scheme is unconstitutional because it mandates the imposition of the death penalty in cases where the sentencer has found an aggravating factor, but no mitigating factor. Therefore, the defendant argues, because the death penalty scheme does not allow the sentencer to exercise its discretion to decline to impose the death penalty, it precludes the sentencer in those cases from

making the required individualized determination that death is the appropriate penalty for the defendant. We rejected this precise contention in *State* v. *Cobb*, supra, 251 Conn. 476–81. In *Cobb*, we stated that "[t]he requirement that the sentencer make a reasoned moral and individualized determination regarding whether the death penalty should be imposed in a given case is satisfied by the statutory role played by the mitigating factors." Id., 478. We further noted in *Cobb*: *"The sentencer makes the required moral and individualized determination, under our statute, because it must consider a nonexclusive list of mitigating factors as well as a catchall category consisting of any other mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime.* General Statutes § 53a-46a (b); and see [General Statutes] § 53a-46a (f). The catchall category of mitigating factors includes those factors which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death. General Statutes § 53a-46a (d). *The ability to consider an unrestricted set of mitigating factors satisfies federal constitutional requirements for a moral and individualized decision."* (Emphasis in original; internal quotation marks omitted.) *State* v. *Cobb*, supra, 479–80.

Although we decided *Cobb* under the nonweighing statute, the weighing statute does not change our analysis. Essentially, the defendant would have us conclude that a jury's failure to find the existence of a mitigating factor means that the defendant did not receive the individualized consideration required by the eighth amendment. The defendant confuses *consideration* of mitigating factors with *prevailing* on those factors. A finding of no mitigation does not mean that the jury did not make the individualized determination whether

death was the appropriate penalty in the case. Instead, it means that the jury *did* make that determination and concluded that death was the appropriate penalty. Moreover, the defendant's interpretation of the statutory scheme would yield the bizarre result that our death penalty statute could constitutionally mandate the imposition of the death penalty in a case where the defendant has proved mitigating factors, but they are outweighed by the aggravating factors, but could not constitutionally mandate the imposition of the death penalty in a case where the jury has found *no* mitigating factors. Therefore, we reject the defendant's contention that the jury must make an additional determination that death is the appropriate sentence in cases where the jury finds an aggravating factor but no mitigating factors.

## V

## EVIDENTIARY CHALLENGES

The defendant raises several evidentiary claims, all of which we review under the abuse of discretion standard. "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *Hayes* v. *Decker*, 263 Conn. 677, 683, 822 A.2d 228 (2003); *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

## A

### Certain Testimony of the Medical Examiner

The defendant claims that it was improper for the trial court to allow Shah, the medical examiner who performed the autopsy on the victim, also to testify as an expert regarding the specific source of marks observed on the victim's back, when such opinion testimony entailed a technical or scientific expertise that she did not have. Specifically, the defendant contends that Shah was not an expert in comparing footwear with footprints and that the trial court abused its discretion in admitting her testimony on the subject. We disagree.

At the penalty hearing, Shah, a pathologist, testified that she believed, on the basis of her visual comparison of photographs of the defendant's boots and photographs of the victim's body, that the marks on the victim's back right shoulder area were consistent with the sole of the kind of boot worn by the defendant. On direct examination by the state, Shah testified that, at the request of the Waterbury police, she had examined the defendant's boots and had photographed them. She had later made a visual comparison between the photographs of the defendant's boots and the autopsy photographs. The defendant's objection to Shah's testimony is based on the claim that she was not qualified as an expert to testify that the marks on the victim's back were caused by the defendant's boots because she did not have special knowledge or skill in the area of boot prints.[73] The trial court overruled the defendant's objection.

We conclude that the trial court's ruling was not an abuse of discretion. Shah was qualified as an expert

---

[73] The defendant also had raised this issue through a motion in limine prior to Shah's testimony. The trial court did not, however, rule on the motion in limine.

in the area of pathology. She testified that she had performed more than 4000 autopsies, over a period of eighteen to nineteen years. Furthermore, her expertise as a medical examiner was directly applicable to the source of the marks on the victim's body. Although she testified that she previously had performed only three comparisons of footwear and body marks, she also testified that it was autopsy protocol in cases involving blunt force trauma for the examiner to compare suspected weapons with marks on the victim's body. Given this testimony, the trial court's ruling that the testimony was admissible was well within its permissible discretion.

### B

### The Defendant's Statement

The defendant next claims that the trial court improperly refused to redact his statement in order to remove from the statement references to his interest in serial killings, specifically his reference to Jeffrey Dahmer.[74] The defendant argues that this portion of the statement should have been redacted because the information was irrelevant and inflammatory. The defendant also claims that the admission of these portions of his statement violated his rights under the first and fourteenth amendments. We disagree.

Before the start of evidence for the penalty hearing, the defendant moved to exclude portions of his statement, claiming that those portions of the statement

---

[74] The relevant portion of the defendant's statement, as typed by Sergeant Coyle, reads: "I have been really interested in serial killings. I have read about them and seen videos. My favorite book was the one about [Jeffrey] Dahmer. I have it in my bedroom. I even have the two books that his father wrote after he was killed in prison. [They're] also in my room with a bunch of [videotapes] about the subject."

In his motion to the trial court, the defendant also sought to have excluded the portions of his statement that related to the disposition of the victim's body and items that were evidence of the murder. The defendant does not pursue this challenge on appeal.

were not relevant to the alleged aggravating factor. The court denied the defendant's motion and admitted the statement in its entirety, based on its conclusion that the portions sought to be excluded were relevant and that the probative value of the evidence was not outweighed by its prejudicial effect. Consistent with this ruling, the court later overruled the defendant's objection to Sergeant Coyle's testimony regarding the defendant's statements about Jeffrey Dahmer. Subsequently, in his motion for a new penalty hearing, the defendant claimed, as one of the bases justifying a new hearing, that the trial court improperly denied his motion to exclude the purportedly irrelevant portions of the statement.

The trial court's ruling was not an abuse of discretion. The challenged portion of the defendant's statement was clearly relevant to the aggravating factor because it was probative of his state of mind at the time of the murder. The state was required, in order to establish the aggravating factor, to prove that the defendant intended to inflict extreme physical or psychological pain, suffering or torture on the victim. See *State* v. *Courchesne*, supra, 262 Conn. 545. His admiration and fascination with Jeffrey Dahmer and other serial killers supported the state's argument that the defendant had the requisite intent to satisfy the aggravating factor, that is, it supported the reasonable inference that, when he killed the victim, he intended to accomplish more than the victim's death; he intended to cause the victim psychological or physical pain, suffering or torture. In the context of the entire statement, the defendant's interest in serial killers was relevant to his state of mind at the time of the murder. Specifically, immediately after the defendant expressed his interest in serial killers, he stated: "After I found out that no one knew where he was I decided I wanted to try and kill him for no good reason and get away with it. It was like a sort of urge

I guess."[75] This context indicates that the defendant himself saw a connection between his fascination with serial killers and the nature of his intent in committing the murder. Thus the evidence was relevant to the state's proof of the aggravating factor. Furthermore, the trial court properly determined that the probative value of the evidence was not outweighed by its prejudicial nature.

Moreover, contrary to the defendant's claim, the admission of the statement was not a violation of his first and fourteenth amendment rights. In making this claim, the defendant contends that the relevant portion of his statement constituted protected speech, and he relies on *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992), to argue that it was admitted in violation of his first and fourteenth amendment rights. *Dawson*, however, is distinguishable from the present case. In *Dawson*, the issue presented was "whether the [f]irst and [f]ourteenth [a]mendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, *where the evidence has no relevance to the issues being decided in the proceeding.*" (Emphasis added.) Id., 160. The court specifically rejected the defendant's broad contention in *Dawson* that "the [c]onstitution forbids the consideration in sentencing of any evidence concerning beliefs or activities that are protected under the [f]irst [a]mendment." Id., 164. Instead, the court concluded

[75] The defendant suggests in his brief that, because the trial transcript sets out this section in a separate paragraph from the immediately preceding section, in which he discussed his interest in serial killers, and because the statement as typed by Coyle presents the two sections in one paragraph, it was Coyle, rather than the defendant, who determined how and in what sequence the statement appeared. This is not even a reasonable inference. The transcript merely reflects the recording of the statement as read into the record by the court clerk. The fact that the transcript begins a new paragraph where the original statement did not is insignificant.

that "the [c]onstitution does not erect a per se barrier
to the admission of evidence concerning one's beliefs
and associations at sentencing simply because those
beliefs and associations are protected by the [f]irst
[a]mendment." Id., 165. Indeed, the court noted that it
had in the past "upheld the consideration, in a capital
sentencing proceeding, of evidence of racial intolerance
and subversive advocacy *where such evidence was rele-
vant to the issues involved."* (Emphasis added.) Id.,
164. Thus, because we already have determined that
the evidence in question was relevant, we need not
determine whether the defendant's statement consti-
tuted protected speech. Even if it did, the statement
was still admissible because it was relevant to the state's
proof of the aggravating factor.

C

Photographs of the Victim's Body

The defendant next claims that the trial court improp-
erly allowed into evidence testimony and photographs
that depicted the victim's body in the location where
it was discovered. The defendant claims that, because
evidence of the location and condition of the victim's
body was relevant only to show what happened to the
victim after his death, such evidence was irrelevant to
establish the existence of the aggravating factor. The
defendant further argues that the evidence should have
been excluded because it was unduly prejudicial. We
disagree.

The defendant objected repeatedly to the admission
of any evidence regarding the location and condition
of the victim's body where it was discovered. In addi-
tion, in his motion for a new penalty hearing, the defen-
dant claimed that the trial court's admission of this
evidence was improper. The court denied the motion.

The trial court did not abuse its discretion in admit-
ting this evidence. The location and condition of the

body was relevant to the defendant's state of mind at the time of the murder. The trial court correctly determined that it was probative as to whether the defendant intended to inflict extreme physical or psychological pain, suffering or torture on the victim. See *State* v. *Courchesne*, supra, 262 Conn. 545. Furthermore, the trial court was within its discretion in determining that the probative value of the evidence was not outweighed by its prejudicial effect.

## VI

### INSTRUCTIONAL ISSUES

#### A

#### Trial Court's Instruction Regarding Infliction of Severe Pain

The defendant claims that the trial court improperly refused to instruct the jury that consciousness on the part of the victim at the time of the alleged infliction of extreme pain is an essential element of the "heinous, cruel or depraved" aggravating factor of § 53a-46a (i) (4) that the state must prove beyond a reasonable doubt. We disagree.

The defendant's request to charge on the aggravating factor included the following language: "To experience extreme physical or psychological pain or torture one must, of course, be conscious. Acts done on the victim when he was not conscious cannot prove this element. The state must prove beyond a reasonable doubt that the victim was conscious when the additional acts were done to him." The actual charge given by the court did not contain a specific instruction that the jury had to find beyond a reasonable doubt that the victim was conscious at the time that the additional acts were done to him, but did instruct the jury that "[w]ith respect to this aggravating factor, the state must prove beyond a reasonable doubt . . . that the victim experienced

such pain or torture." Additionally, the court instructed the jury that "[t]here must be actual and objective proof that the victim suffered extreme pain. Unless the state's proof convinces you beyond a reasonable doubt that the extreme pain was inflicted, you must find the aggravating factor did not exist."

The jury charges must be examined in the context of the evidence. The defendant cross-examined Shah extensively regarding whether the victim was conscious during the attack. On redirect, the state questioned her further on this same issue, asking whether a person who was unconscious could say "stop hitting me." Given this factual context, it is not likely that the jury was misled by the trial court's instruction. It was clear that, in order for the jury to find that the state had proved the aggravating factor beyond a reasonable doubt, the jury was instructed and understood that it had to find that the victim experienced extreme pain and that, in order for the victim to experience extreme pain, he had to be conscious. Therefore, we conclude that it was not improper for the trial court to refuse to give the more specific instruction requested by the defendant.

## B

### Whether the Trial Court's Instructions on the Aggravating Factor Rendered It Unconstitutional

The defendant next claims that the trial court improperly instructed the jury in such a way on callousness and indifference that it had the effect of substituting a general intent for a specific intent as to the "especially heinous, cruel or depraved" aggravating factor of § 53a-46a (i) (4), rendering the aggravating factor unconstitutional because it no longer distinguishes in a principled way between those defendants who are eligible for the death penalty and those who are not. We disagree.

The trial court instructed the jury that "[y]ou may also infer that the infliction of suffering was intentional from factors such as the defendant's indifference or callousness to the victim's suffering . . . ." We addressed this precise issue in *State* v. *Cobb*, supra, 251 Conn. 442–45, where we rejected the defendant's claim that in *Ross*, by stating that evidence of the defendant's callousness or indifference to his victims' suffering would substantiate a finding that the intent element of the aggravating factor of cruelty had been satisfied, we had "substituted a general intent for a specific intent requirement in the application of the aggravating factor of cruelty . . . ." Id., 442. Thus, *Cobb* forecloses the defendant's claim.

## VII

## THE SPECIAL VERDICT FORM

The defendant next claims that the trial court improperly refused to provide the jurors a special verdict form as requested by the defendant that would show the jury's factual findings, their mitigating judgments for each claimed nonstatutory mitigating factor, as well as their weighing decision. The defendant claims that, in the absence of such a special verdict form, this court cannot meaningfully review the jury's determinations in regard to the claimed mitigating factors, resulting in a level of uncertainty and unreliability that cannot be tolerated in the death penalty setting. We disagree.

The special verdict form proposed by the defendant first addressed the aggravating factor and proposed the use of a form that would be individually signed by the jurors indicating whether each juror had found that the state had proven the existence of the aggravating factor. It next gave a description of the two step process in determining mitigation, with a two page form for the jury to report its findings, again by individually signing, on each step of the mitigating consideration for each

of the defendant's proposed mitigating factors. The last page of the form addressed the weighing process, and, again, provided for each juror to sign individually indicating his or her decision.[76]

The special verdict form that the court used asked the jury to indicate whether they unanimously agreed that the state had proven beyond a reasonable doubt the existence of the aggravating factor, with space for all jurors to sign below. As to the mitigating factors, the form asked, "Do any of you find the existence of any mitigating factor concerning the character, background, or history of the defendant . . . or the nature and circumstances of the offense to have been proven by a preponderance of the evidence?" If the jury checked "yes" in response to the question, there was no further request for individual jurors to sign indicating that they had found mitigation. Nor did the special verdict form provide for an individual answer to be given for *each* of the defendant's proposed mitigating factors. Finally, the special verdict form asked the jury whether the aggravating factor outweighed any mitigating factor or factors found to exist, and it provided signature lines for the jurors to sign their names individually.

We rejected a virtually identical claim in *State* v. *Cobb*, supra, 251 Conn. 426, where the defendant argued, in addition to his claim that the special verdict form in that case did not comply with the requirements of Practice Book, 1991, § 4059, now § 64-1, that " 'both as a matter of constitutional capital jurisprudence, and as a matter of [our] supervisory authority over the procedures of the trial court,' " we should have required the special verdict form to " 'contain a detailed and complete statement of the court's findings of fact and legal conclusions

---

[76] The defendant's proposed special verdict form also contained a final page that asked jurors who had found an aggravating factor, but no mitigating factor, to indicate whether they nevertheless believed that death was the appropriate penalty.

with regard to aggravating factors . . . .' " Id., 426–27. The defendant in *Cobb* argued that, without such a detailed special verdict form, we could not provide meaningful appellate review. Id., 427. In rejecting the defendant's claim, we stated: "The defendant offers no authority, and we know of none, that requires a sentencing court to issue a detailed factual statement justifying its imposition of a sentence of death that is otherwise valid under the statutory scheme. The constitutional requirement is that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence . . . . The panel's special verdict, stating its factual findings, viewed in conjunction with the complete evidentiary record of the penalty phase hearing, discloses to this court the considerations that supported the death sentence, and provides an ample basis for our meaningful appellate review of that sentence. We decline categorically to impose any more exacting requirement under our supervisory power." (Citation omitted; internal quotation marks omitted.) Id., 431–32. Although the defendant's claim in the present case focuses on seeking a more detailed statement of the jury's findings in mitigation, the same principles that we articulated in *Cobb* lead us to reject the defendant's claim. Our ability to review the defendant's sentence has not been impaired by the less specific verdict form, because we have been able to examine the evidence on which the jury reasonably could have relied in arriving at its decision.

## VIII

## RACIAL DISPARITIES

Lastly, the defendant claims that the trial court improperly denied his motion for a continuance so that at a hearing it could later be properly determined whether racial disparities in the administration of the death penalty in Connecticut violated the defendant's

rights under the constitution of Connecticut and the statutory requirement that the death penalty not be administered or imposed in an arbitrary fashion. We addressed this identical claim in *State* v. *Reynolds*, supra, 264 Conn. 232. For the same reasons we articulated in that case, we believe that the proper course is not to require the trial court on remand to conduct a preliminary evidentiary hearing "but, rather, to afford the defendant an opportunity to renew his claim by way of a habeas corpus petition. . . . As long as the defendant has such recourse, he will not be prejudiced in any way by the denial of an evidentiary hearing in the trial court." (Citation omitted.) Id.

The judgment is reversed and the case is remanded to the trial court for a new penalty phase hearing.

In this opinion NORCOTT and PALMER, Js., concurred, KATZ, J., concurred in part with respect to part I F[77] and concurred with respect to part II, VERTEFEU-ILLE and ZARELLA, Js., concurred with respect to part I A through E and parts II through VIII, and SULLIVAN, C. J., concurred with respect to part I E and parts III through VIII.

NORCOTT, J., concurring. In accordance with my ongoing position in cases regarding the resolution of issues that implicate the death penalty, but do not result directly in its imposition; see *State* v. *Courchesne*, 262 Conn. 537, 583–84, 816 A.2d 562 (2003) (*Norcott, J.,* concurring); I fully concur and join in the analysis of the majority opinion. Indeed, I particularly agree with the majority's conclusion that "the jury must be instructed that, in arriving at its judgment that the aggravating factors outweigh the mitigating factors by any degree or amount, it must be persuaded that death is

---

[77] See footnote 31 of this opinion and footnote 3 of Justice Katz' concurring and dissenting opinion.

the appropriate penalty in the case, and that its level of certitude in arriving at that ultimate weighing judgment must be beyond a reasonable doubt." Thus, although "I [will] continue to dissent from decisions of this court that ultimately conclude that the death penalty can be administered in accordance with the principles of fundamental fairness set forth in our state's constitution"; *State* v. *Breton*, 264 Conn. 327, 447, 824 A.2d 778 (2003) (*Norcott, J.*, dissenting); until this state joins those jurisdictions that have abolished or imposed moratoria upon the imposition of the death penalty; id., 448–49 (*Norcott, J.*, dissenting); I also support procedural safeguards that reflect the nature of this ultimate penalty, the need for reliability and consistency in its imposition, and the nature of the requisite jury verdict. I agree, therefore, with the majority's analysis and will address, together with the other justices of this court, "the defendant's more general challenges to the imposition of the death penalty after the penalty phase hearing, if and when such challenges are brought." *State* v. *Courchesne*, supra, 584 (*Norcott, J.*, concurring).

KATZ, J., concurring and dissenting. I maintain my belief that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. See Conn. Const., art. I, §§ 8 and 9. Nevertheless, I address the issue pertaining to the burden of persuasion for the imposition of the death penalty because, as I have stated previously, "I have an obligation, consistent with my oath and responsibilities as a justice of this court, to decide the issue before the court . . . ." *State* v. *Courchesne*, 262 Conn. 537, 584, 816 A.2d 562 (2003) (*Katz, J.*, concurring and dissenting).

In this case, by exercising my obligation, I express my agreement with the majority that, in order to prevail at the penalty phase hearing, the state must establish by

a heightened burden of persuasion that any aggravating factor upon which the jury unanimously has agreed outweighs any mitigating factor.[1] The majority has engaged in a well reasoned analysis leading to its conclusion that the highest burden of persuasion—beyond a reasonable doubt—must be imposed on the weighing process in light of "(1) the unique and irrevocable nature of the death penalty, (2) the overarching need for reliability and consistency in the imposition of the death penalty, and (3) the awesome and wrenching nature of the jury's determination to render a verdict requiring the death penalty . . . ." In my view, anything short of the highest standard fails to comport with due process. This is because the decision of whether the defendant should suffer the ultimate penalty that the judicial system can impose—death—is the most crucial decision made in any stage of the proceedings, requiring jurors to make their most reasoned and judicious moral determination. Demanding that this final determination be made pursuant to the highest standard of proof properly conveys the seriousness of the task and the importance of the highest degree of certainty in the outcome. We, as a society, must have confidence that, should the penalty of death be imposed, it is a decision about which no reasonable person could differ. To allow jurors to make that judgment guided by a procedure that

---

[1] I recognize that by this decision, I help to enable the state to retry the defendant for capital felony. I appreciate the tension that exists between my view of the constitutionality of the death penalty and my resolution of the issue on appeal. "I am mindful, however, that because of the unique posture of this case, other challenges by the defendant to the application of the death penalty may arise and, accordingly, can be addressed at another time, if and when those issues become pertinent." *State* v. *Courchesne*, supra, 262 Conn. 584–85 (*Katz, J.*, concurring and dissenting). Accordingly, by engaging in this judicial technique, I do not mean to suggest that my position on the ultimate issue has changed. See id. (*Katz, J.*, concurring and dissenting); *State* v. *Reynolds*, 264 Conn. 1, 254–55, 824 A.2d 611 (2003) (*Katz, J.*, dissenting); *State* v. *Webb*, 252 Conn. 128, 147–48, 750 A.2d 448 (*Katz, J.*, dissenting), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000).

demands less than the highest level of certainty is, to me, inconceivable.

Additionally, I agree that the court must fill a "statutory lacuna" regarding the level of certitude required of the jury's weighing determination in order to fulfill the constitutional requirements of consistency and reliability in the imposition of the death penalty. *State* v. *Ross*, 230 Conn. 183, 252, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Accordingly, the court is obligated in this instance to fill the void in General Statutes (Rev. to 1997) § 53a-46a to enable it to survive the particular challenge at issue. See *Roth* v. *Weston*, 259 Conn. 202, 234, 789 A.2d 431 (2002) (judiciary may " 'delineate a procedural scheme for the protection of constitutional rights where statutory protections fall short or are nonexistent' "); *Sassone* v. *Lepore*, 226 Conn. 773, 785, 629 A.2d 357 (1993) ("[i]f literal construction of a statute raises serious constitutional questions, we are obligated to search for a construction that will accomplish the legislature's purpose without risking the statute's invalidity"). "When the Legislature has not specified the requisite standard of persuasion or certitude necessary in an adjudication, it is the duty of the Court to fill such a gap by weighing the relative interests of the State and the defendant in light of potential constitutional considerations and legislative intent to determine what the degree of persuasion ought to be." *State* v. *Wood*, 648 P.2d 71, 83 (Utah 1981), cert. denied, 459 U.S. 988, 103 S. Ct. 341, 74 L. Ed. 2d 383 (1982).

Where the majority and I part company, however, is with regard to part I E of the majority opinion. In my view, the majority goes halfway by applying the standard only to the jury's degree of certitude in its outcome, and incorrectly stops short of applying the highest standard, or indeed, *any* heightened burden to the weighing process itself. The majority concludes that "because

the reasonable doubt standard focuses on the jury's subjective sense of certitude in arriving at the critical finding or judgment, not on the quantum or degree by which one factor outweighs another," we should reject the application of that standard in capital felony cases. Therefore, the majority concludes that, by requiring the jury to be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence, the statute meets constitutional muster. I disagree. Any rule that fails to require the jury to be convinced that the aggravating factors *outweigh* the mitigating factors *beyond a reasonable doubt* is deficient. Because the majority does not require the jury to determine beyond a reasonable doubt that the aggravating factors justify a sentence of death, and I conclude that the "[f]undamental fairness of a system that generates life and death decisions" requires just that; *State* v. *Biegenwald,* 106 N.J. 13, 66, 524 A.2d 130 (1987); I dissent.

The majority provides several reasons for its determination that, in deciding the balance between the aggravating factors and the mitigating factors, the jury must apply only the preponderance of the evidence standard. First, although it acknowledges the judicial gloss on the text of our due process clause provided in *State* v. *Ross,* supra, 230 Conn. 252, to "require, as a constitutional minimum, that a death penalty statute . . . must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably," the majority nevertheless contends that, when the constitution imposes the minimum, "it is a difficult leap" to state, as a matter of constitutional mandate, that the maximum legal standard should be imposed. Second, the majority notes that no state "has imposed the reasonable doubt standard on the outcome of the weighing process, as a matter of state constitutional law." Third, the majority finds the

reasonable doubt standard in this context to be "simply ill equipped . . . ." I disagree with the majority's rationale for the reasons that follow, and I would impose the highest standard, beyond a reasonable doubt, on the outcome of the weighing process.

First, I acknowledge that, when the constitution imposes the minimum, we generally do not, as a matter of constitutional mandate, impose the maximum legal standard. Although I recognize these concerns as a general matter, the present case requires us to acknowledge that the weighing of mitigating factors against aggravating factors under § 53a-46a (e) is a somewhat anomalous exercise within the criminal justice system. Accordingly, the general rules should not necessarily dictate. Jurors asked to weigh, for example, as a mitigating factor that the defendant was an abused youth against some aggravating factor in order to determine whether the defendant should live or die are making a moral judgment. Recognizing that this exercise is beyond what we generally call upon jurors to do, we should impose a standard that conveys to them "the concept that the values upon which the criminal justice system is built do not permit the ultimate sanction to be imposed unless the conclusion is free of substantial doubt of any kind. That standard would . . . take into account the tolerable frailties of human beings. It is, after all, in deference to those frailties that the jury is required to consider mitigating circumstances." *State v. Brown*, 607 P.2d 261, 275 (Utah 1980) (Stewart, J., concurring). The majority's premise that we generally do not, as a matter of constitutional mandate, require the maximum legal standard, does not pay proper homage to the concept that "the imposition of death by public authority is so profoundly different from all other penalties . . . ." *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality opinion).

A difference of this magnitude, therefore, calls for different measures.

The second basis for the majority opinion is the fact that no state requires the reasonable doubt standard as a matter of constitutional law. As the majority notes, however, three states, namely, New Jersey, Arkansas and Tennessee, appear to impose the reasonable doubt burden directly on the outcome of the weighing process as a matter of legislation. See N.J. Stat. Ann. § 2C:11-3 (c) (3) (a) (West 1995) ("[i]f the jury or the court finds that any aggravating factors exist and that *all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors*, the court shall sentence the defendant to death" [emphasis added]); Ark. Code Ann. § 5-4-603 (a) (Michie 1997) ("[t]he jury shall impose a sentence of death if . . . (2) *[a]ggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances* found to exist" [emphasis added]); Tenn. Code Ann. § 39-13-204 (g) (1) (1997) ("[i]f the jury unanimously determines that . . . [B] *[any aggravating circumstances] have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt*; then the sentence shall be death" [emphasis added]).[2] Therefore, although perhaps an anomaly as a matter of constitutional jurisprudence, the concept is not alien.

Of these jurisdictions, New Jersey provides the most guidance because, before that state's legislature changed the statutory language expressly to incorpo-

---

[2] New York takes a middle ground approach, imposing the reasonable doubt standard on the sentencer's level of certitude, and a different, *substantiality* requirement on the outcome of the weighing process. See N.Y. Crim. Proc. Law § 400.27 (11) (a) (McKinney 2003) ("[t]he jury may not direct imposition of a sentence of death *unless it unanimously finds beyond a reasonable doubt that the aggravating factor or factors substantially outweigh the mitigating factor or factors established,* if any, and unanimously determines that the penalty of death should be imposed" [emphasis added]).

rate the reasonable doubt standard in the weighing process, the New Jersey Supreme Court had interpreted its statute to incorporate the reasonable doubt standard. *State* v. *Biegenwald,* supra, 106 N.J. 53. In 1983, the time of the trial in *Biegenwald,* § 2C:11-3 (c) (3) (a) of the New Jersey Statutes Annotated merely provided that "[i]f the jury or the court finds that any aggravating factor exists and is not outweighed by one or more mitigating factors, the court shall sentence the defendant to death." See *State* v. *Biegenwald,* supra, 58. In *Biegenwald,* the New Jersey Supreme Court held, sua sponte, that the trial court's instruction to the jury on the weighing provision, which was based on the plain language of the statute, was improper for two reasons. Id., 53. First, the trial court's instructions did not require that the state bear its burden of proving that the aggravating factors outweighed the mitigating factors *beyond a reasonable doubt,* a burden that the New Jersey Supreme Court concluded the prosecution should bear "as a matter of fundamental fairness . . . ." Id. Second, because the trial court's instructions required that the mitigating factors outweigh the aggravating factors in order for the defendant to be spared the death sentence, the defendant could have been sentenced to death even if the factors were in equipoise. Id., 60–61.

As to the proper burden of proof, the New Jersey Supreme Court emphasized that the issue was one of requiring certainty before the imposition of the death sentence. Id., 60. Noting that New Jersey's requirement of proof beyond a reasonable doubt in criminal prosecutions predated "any suggestion that the [federal] Constitution compels that burden," the court approached the issue in the context of the "long-standing practice in the criminal law of this state . . . ." Id., 59. The court considered the statute's requirement—that the state prove the existence of aggravating circumstances beyond a reasonable doubt—to be an indication of the

understanding that death is " 'profoundly different,' " and "of [the legislature's] probable intention to impose the same burden on the weighing process itself." Id., 60. Finally, although the court recognized that some judicial determinations of "great import" are not governed by the reasonable doubt standard, it concluded that "in New Jersey, where the jury is charged with making that value judgment, a determination of death despite reasonable doubt as to its justness would be unthinkable. We can think of no judgment of any jury in this state in any case that has as strong a claim to the requirement of certainty as does this one." Id. In my view, this reasoning is indicative of a constitutional imperative.

As to the third reason for the majority's rejection of the application of the reasonable doubt standard to the outcome of the weighing process, it asserts that the weighing process itself "is simply not a determination that focuses on the subjective level of certitude of the jury." The majority relies heavily on the fact that the reasonable doubt standard is *traditionally* employed as a standard for fact-finding and that the weighing that is conducted pursuant to the statute is not addressed to fact-finding but, rather, pertains to the exercise of judgment. This statement oversimplifies, and indeed obfuscates, the issue.

The weighing process ultimately leads to the crucial determination of life or death, and the fact that this judgment is made after a two step, as opposed to a one step, process should not dictate the result. Although aggravating factors and mitigating factors are weighed, not to prove a factual proposition, but to determine a punishment, regardless of the characterization of this ultimate determination, whether factual or moral, the level of confidence in this resolve should be the same. The proposal by the majority does not suffice because it does not apply the same level of certitude in arriving

at the outcome of the weighing process as it does to the degree by which one factor outweighs another. What the majority proposes, in essence, is to ask the jury if it is convinced beyond a reasonable doubt that the aggravating factor outweighs the mitigating factor by a preponderance of the evidence. By measuring the balance by 51 percent, the court does not ask the jury to determine beyond a reasonable doubt the outcome of the weighing process, which directly informs the court whether the defendant should be put to death. Therefore, it does not ask the jury to determine beyond a reasonable doubt that the aggravating factors *justify* a sentence of death, a judgment I believe is mandated by fundamental fairness.

I also part company with the majority on the perceived difficulties of administering the heightened burden. The majority is critical of the "lack of fit" in this approach. As Arkansas, New Jersey and Tennessee have recognized, linguistics should not control the analysis in this regard. Nor do I envision any problems conveying this burden of persuasion to a jury. The majority's approach distinguishes one part of the penalty phase, the state's burden of proving an aggravating factor beyond a reasonable doubt, from its burden of proof in another part of the penalty phase, its burden of proving that the aggravating factor outweighs the mitigating factor. By contrast, by requiring the state to prove that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, we would impose a uniform burden of proof on the state throughout the proceedings, a burden that the jury will, no doubt, be very familiar with by this final stage of the process.

Just as the reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error"; *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); it is indispensable at this stage of the proceedings because it impresses

on the jurors the need to reach a subjective state of certitude about their ultimate and irreversible decision. The standard reflects the degree of confidence that a civilized society thinks each juror should have in the correctness of his or her ultimate disposition of the life of another human being. In my view, the standard should be high enough that, when death is determined to be the appropriate sentence, we are convinced that this decision is one in which virtually no reasonable person could differ. Therefore, independent of the issue of legislative intent, fundamental fairness dictates that the highest standard be applied to both the weighing process *and* to the jury's level of certitude in arriving at the outcome of that weighing process. *State* v. *Biegenwald*, supra, 106 N.J. 53.

Accordingly, I respectfully dissent as to part I E of the majority opinion.[3]

VERTEFEUILLE, J., concurring and dissenting. I agree with and join parts I A through E, II, III, IV, V, VI, VII and VIII of the majority opinion. I do not join part I F of the majority opinion because I do not agree with the majority's construction of General Statutes (Rev. to 1997) § 53a-46a as requiring that "the jury must be instructed that it must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors . . . ." Accordingly, I join part I

---

[3] As I previously have indicated herein, I strenuously disagree with the majority's determination in part I E of its opinion that the beyond a reasonable doubt standard should not be applied to the weighing of the aggravating and mitigating factors. Nonetheless, I concur with that part of part I F of the majority opinion, as summarized in footnote 31, which applies the beyond a reasonable doubt standard to the degree of the jury's certitude in performing the weighing process, and that, therefore, the jury must be persuaded beyond a reasonable doubt that death is the appropriate penalty. I also concur with part II of the majority opinion reversing the trial court's judgment with respect to the imposition of the death penalty on the basis of the state's improper closing argument.

of Chief Justice Sullivan's dissent, which would affirm the trial court's judgment in this regard.

I do not join part II of the Chief Justice's dissent, however, because I agree with the majority that there was prosecutorial misconduct in this case and that this misconduct "so infected the trial with unfairness as to make the resulting [imposition of the death penalty] a denial of due process." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161, 836 A. 2d 224 (2003). Accordingly, I would remand the case for a new penalty hearing because of that prosecutorial misconduct.

ZARELLA, J., concurring in part and dissenting in part. I agree with and join the majority opinion except for part I F, with respect to which I join part I of Chief Justice Sullivan's dissenting opinion.[1] I emphasize that I find particularly troubling the majority's failure to perform an analysis, under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), of the defendant's state constitutional claim that there is a gap in General Statutes (Rev. to 1997) § 53a-46a (f) that must be filled by a requirement that the trial court instruct the jury that it must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors in order to impose the death penalty. The majority performs such an analysis in connection with the defendant's alternative claim that § 53a-46a (f) violates the state constitution inasmuch as it does not require the aggravating factors to outweigh the mitigating factors beyond a reasonable doubt. Accordingly, it is clear that the majority recognizes that *Geisler* is applicable in death penalty cases. I must presume, therefore, that the majority abandons that analysis when considering the claim pertaining to the purported constitutional gap

---

[1] I also join footnote 1 of the Chief Justice's dissenting opinion. I do not join part II of the Chief Justice's dissenting opinion, however.

in the statute and, instead, relies on a vague standard that focuses on the special nature of the death penalty because it recognizes that that claim also would fail under *Geisler.*

Citing *State* v. *Floyd,* 217 Conn. 73, 89, 584 A.2d 1157 (1991), the majority asserts that a *Geisler* analysis is not required because the majority is merely identifying, rather than resolving, a constitutional question. See footnote 32 of the majority opinion. In my view, *Floyd* does not support this argument. In *Floyd,* this court concluded that General Statutes (Rev. to 1991) § 53a-167b was capable of a narrow construction that passed constitutional muster and, therefore, declined to *decide* whether a broader reading of that provision would render it constitutionally infirm. *State* v. *Floyd,* supra, 89– 95. The court reached that conclusion, however, only after engaging in a thorough analysis of the defendant's constitutional claims that provided context for the court's conclusion that a broader reading would place the statute in constitutional jeopardy. See id., 79;[2] see also *Roth* v. *Weston,* 259 Conn. 202, 232–33, 789 A.2d 431 (2002) (concluding after lengthy constitutional analysis that literal construction of statute would raise serious constitutional questions); *State* v. *Metz,* 230 Conn. 400, 424, 645 A.2d 965 (1994) (same). In all of these cases, this court declined to *decide* whether a broad reading of the statute under review would render the statute unconstitutional. It did not, however, decline to engage

---

[2] In *Floyd,* this court stated that it would "consider in turn the factors that may constitute a seizure under the fourth amendment or a deprivation of privacy or liberty without due process of law under the fourteenth amendment, and we examine the balancing tests that must be applied to determine whether a violation of constitutional norms has occurred. We then turn to [General Statutes (Rev. to 1991)] § 53a-167b to determine whether it can be construed to incorporate the relevant constitutional commands." *State* v. *Floyd,* supra, 217 Conn. 79. Thus, the court clearly identified the relevant constitutional demands before determining whether the statute was questionable in light of those demands.

in a constitutional analysis to determine whether such a reading would raise constitutional questions.

The majority concedes that "a *Geisler* analysis is necessary in order to determine whether our state constitution affords greater protection than the federal constitution . . . ." Footnote 32 of the majority opinion. That is precisely what the majority does, however, when it states that, "under our state constitution, our overarching concern for *consistency and reliability* in the imposition of the death penalty extends to the ultimate decision of whether to impose or to decline to impose that penalty." (Emphasis in original.) Part I F of the majority opinion. The fact that the majority refrains from deciding whether § 53a-46a (f) is unconstitutional in the absence of the instructional requirement that it nevertheless superimposes on the statute does not, in my view, excuse it from providing, in the first instance, a justification for the imposition of that requirement in accordance with *Geisler*.

SULLIVAN, C. J., dissenting and concurring. The majority construes General Statutes (Rev. to 1997) § 53a-46a (e) and (f) to require that, in determining whether death is the appropriate punishment, the sentencer at the selection phase must be certain beyond a reasonable doubt that the aggravating factors outweigh any mitigating factors by a preponderance of the evidence. I agree with the majority's conclusion in part I E that the statute requires the sentencer to determine that the aggravating factors outweigh any mitigating factors by any amount or degree in order to impose the death penalty.[1] I disagree, however, with the majority's

[1] I continue to disagree, however, with the method of statutory interpretation set forth in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003). Because I believe that the language of General Statutes (Rev. to 1997) § 53a-46a (f) is plain and unambiguous, I would not consult the legislative history of the statute.

conclusion in part I F that the jury must be instructed that it "must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors . . . ." I further disagree with the majority's conclusion in part II that the alleged prosecutorial misconduct in the present case rises to the level of reversible constitutional error. Accordingly, I respectfully dissent. Because I agree with the remainder of the majority opinion rejecting the defendant's remaining claims, I would affirm the judgment of the trial court.

I

In reaching its conclusion that the jury must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, the majority first notes that the defendant's brief fairly can be read to make the alternative claims (1) that the state constitution requires that the balance of the aggravating factors against the mitigating factors must tip greatly in favor of the aggravating factors and (2) that, even if there is no such constitutional requirement, the legislature has left a gap in the statute by failing to specify the level of certitude that the jury must have in making its determination, which this court must fill by declaring that the jury must be certain beyond a reasonable doubt. Addressing the defendant's first claim, the majority concludes, as a matter of statutory interpretation, that the statute requires that the jury determine that the aggravating factors outweigh the mitigating factors only by any amount or degree. Applying the framework for the analysis of state constitutional claims set forth in *State v. Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), the majority then rejects the defendant's constitutional claim, largely on the basis of its conclusion that, as a general jurisprudential principle, "the reasonable doubt standard focuses on the jury's subjective sense of certitude in arriving at the critical finding or judgment, not on the quantum or degree by which one factor out-

weighs another." Rephrasing this conclusion, the majority states that the reasonable doubt standard "is simply inapt to measure the balance between the aggravating factors and the mitigating factors."[2]

Turning to the defendant's alternative claim, that the legislature has left a gap in the statute that this court must fill, the majority agrees with the defendant that "because the legislature was silent as to the required level of certitude imposed on the jury's weighing determination, there is a statutory lacuna . . . ." It also concludes, without the benefit of an analysis under *Geisler*, that "there would be a potentially significant state constitutional question about our capital sentencing scheme" if the statutory gap were not filled by requiring the trial court to instruct the jury that "it must be persuaded that death is the appropriate penalty in the case, and that its level of certitude in arriving at that ultimate weighing judgment must be beyond a reasonable doubt."

I believe that this chain of reasoning is flawed. Specifically, I do not agree (1) that the reasonable doubt standard focuses solely on the fact finder's level of certitude, (2) that there is a gap in the statute that must be filled or (3) that the statute is of questionable constitutionality under our state constitution.

I first address the majority's conclusion that the reasonable doubt standard does not focus on the quantum of the evidence produced by the state, but on the fact finder's subjective degree of certitude. I believe, to the contrary, that, although a fact finder's subjective degree of certitude is conceptually distinct from the quantum

---

[2] In this regard, I find it curious that, at the *end* of its *Geisler* analysis, the majority concludes that the defendant's constitutional claim is simply inapt because the beyond a reasonable doubt standard simply does not mean what the defendant says it means. If that were the case, I do not understand why that fact, standing by itself, would not be dispositive of the claim.

of evidence, it is, in the context of ordinary fact-finding, a *function* of the quantum of evidence.[3] The standard that we apply to insufficiency of the evidence claims makes this clear.[4] In considering such claims, we do not inquire into the fact finder's subjective degree of certitude, but, instead, ask whether the *cumulative* force of the evidence was *sufficient* to establish the defendant's guilt beyond a reasonable doubt. The terms "cumulative" and "sufficient" are, in their very nature, quantitative. Therefore, I believe that the defendant's first claim is inapt, not because he mistakenly believes that the reasonable doubt standard focuses on the relative weight of the cases made by each side, but because he mistakenly believes that our state constitution requires a larger quantitative margin between the weight of the aggravating factors and the weight of the mitigating factors than is provided by the statute.[5]

[3] The majority notes that New York's weighing statute applies the reasonable doubt standard solely to the fact finder's subjective level of certitude and applies a substantiality factor to the outcome of the weighing process. In my view, this statute shows only that it is *possible* conceptually to separate the level of certitude from the quantum of proof, not that the reasonable doubt standard, as it is typically applied in a criminal fact-finding context, focuses solely on the level of certitude. Although I agree that, for example, it would be conceptually possible to require a fact finder to be intellectually certain that something is probably true, I do not believe that, as a general rule, fact finders are required to engage in such epistemological hairsplitting. In other words, I believe that the New York statute does not embody the reasonable doubt standard as it is typically applied, but distorts it.

[4] See *State* v. *Luurtsema*, 262 Conn. 179, 200, 811 A.2d 223 (2002), in which this court stated: "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.)

[5] Although I believe that the weighing process is essentially a moral determination that does not easily lend itself to a quantitative analysis, I also believe that the legislature rationally could have required, as has the New York legislature, that the aggravating factor substantially outweigh the mitigating factor, rather than provide, as it did, that the aggravating factor outweigh the mitigating factor by any amount, no matter how small. In my

Conversely, I believe, as I discuss more fully later in this dissenting opinion, that the defendant's alternative claim, that the jury must be instructed that it be certain beyond a reasonable doubt that the aggravating factor outweighs the mitigating factor, is inapt because applying the reasonable doubt standard to the moral determination of whether the defendant deserves death distorts the standard by severing the level of certitude from any quantitative evaluation of evidence, and is both confusing and unnecessary.

I next address the majority's conclusion that there is a gap in the statute that makes it constitutionally suspect. The majority reaches this conclusion by comparing the current weighing statute to our former statute. As the majority correctly notes, this court concluded in *State* v. *Daniels*, 207 Conn. 374, 383–86, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989), that, under our former statute, after the state had proved beyond a reasonable doubt that the defendant had committed a capital offense and an aggravating factor existed, to avoid a sentence of death, the defendant was required to establish the existence of a mitigating factor by a preponderance of the evidence. Thus, under that statute, if the defendant established that there was up to a 50 percent probability that a mitigating factor existed, he would be sentenced to death, whereas, if he established a 51 percent probability of mitigation, he would be sentenced to life in prison. The only difference that I can discern between that statute and our current statute is that, formerly, if the jury found a mitigating factor,

view, such a provision would require the jury to make the purely moral determination that the defendant deserves death and the quantitative determination that he would deserve death even if the aggravating factor were much less aggravating or the mitigating factor much more mitigating. In other words, the provision essentially would build a buffer zone into the jury's determination that the defendant deserves death.

it was required to impose a life sentence even if the aggravating factor greatly outweighed the mitigating factor.[6]

The majority concludes, however, that there is a gap in our current statute because, unlike under our former statute, the state is not "required to carry its ultimate burden of persuasion in support of the imposition of the death penalty by the standard of beyond a reasonable doubt . . . ." Under our former statute, however, as under our current statute, the state was required to establish beyond a reasonable doubt only that the defendant was *eligible* for the death penalty. It is implicit in the majority's reasoning, therefore, that it believes that, under our former statute, the jury's determination that the defendant was eligible for death amounted to a default determination that the defendant deserved death beyond a reasonable doubt. In other words, once an aggravating factor had been found, the defendant presumptively deserved death unless he could establish that he deserved mercy. If that was the case under our former statute, however, I fail to see why it should not also be the case under our current statute. The fact that, under our current statute, the jury may not grant mercy if it determines that the aggravating factors outweigh the mitigating factors should not change the fact that, by having found an aggravating factor, it already has determined beyond a reasonable

---

[6] It is well established that this difference is of no constitutional significance under the federal constitution. As the United States Supreme Court repeatedly has recognized, " 'the state may shape and structure the [capital sentencer's] consideration of mitigation [as it sees fit] so long as it does not preclude the [sentencer] from giving effect to any relevant mitigating evidence. *Johnson* v. *Texas*, 509 U.S. 350, 362 [113 S. Ct. 2658, 125 L. Ed. 2d 290] (1993); *Penry* [v. *Lynaugh*, 492 U.S. 302, 326, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)]; *Franklin* v. *Lynaugh*, 487 U.S. 164, 181 [108 S. Ct. 2320, 101 L. Ed. 2d 155] (1988).' " *State* v. *Cobb*, 251 Conn. 285, 484, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000), quoting *Buchanan* v. *Angelone*, 522 U.S. 269, 276–77, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998).

doubt that the defendant presumptively deserves death. Put another way, the fact that our former statute went beyond the requirements of justice—and the federal constitution—by allowing the jury to grant mercy even in cases where the aggravating factors outweighed, and even greatly outweighed, the mitigating factors, did not somehow render the jury's determination that the defendant presumptively deserved death more reliable. Rather, it rendered the jury's determination that the defendant deserved mercy *less* reliable.

Conversely, if the majority believes that the determination under our former statute that an aggravating factor existed did *not* constitute a default determination that the defendant deserved death, then it must concede that the ultimate determination by the jury as to whether the death penalty should be imposed was not made under a reasonable doubt standard. Indeed, the jury was not required to have any particular level of certitude that the defendant had failed to establish a mitigating factor by a preponderance of the evidence. We repeatedly have concluded there was no constitutionally significant gap in our former statute. See *State* v. *Cobb*, 251 Conn. 285, 459–60, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Ross*, 230 Conn. 183, 254–55, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Accordingly, I cannot perceive why there is such a gap in our current statute.

Having divined this purported gap, however, the majority concludes that the only way to bridge it, consistent with our state constitution, is to require the trial court to instruct the jury that it must be certain beyond a reasonable doubt that the aggravating factor outweighs the mitigating factor by a fair preponderance of the evidence. As I have indicated, this conclusion is not based on an analysis under *Geisler*, which heretofore has provided the analytical framework for our consider-

ation of state constitutional claims. Instead, the majority apparently adopts a new analytical framework for state constitutional claims involving the death penalty, under which this court considers: "(1) the nature of the death penalty; (2) an overarching need for reliability and consistency in the imposition of the death penalty; and (3) the nature of the jury's determination to render a verdict requiring the penalty."[7] The majority then states repeatedly and emphatically that death is different, that both this court and the United States Supreme Court have repeatedly recognized that due process requires that the death penalty be imposed consistently and reliably, and that the jury's decision "necessarily calls upon the intellectual, moral and emotional resources of the jurors in a way that far exceeds any factual determination of guilt or innocence." I do not disagree with any of these propositions. I do not believe, however, that they compel the majority's conclusion.

First, as the majority recognizes, it is well established as a matter of federal constitutional doctrine that the due process requirement for consistency and reliability in the imposition of the death penalty focuses primarily on the eligibility phase and can be achieved without imposing any "specific standards for balancing aggravating against mitigating circumstances" during the selection phase. *Zant* v. *Stephens*, 462 U.S. 862, 875 n.13, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).[8] The

---

[7] I agree with Justice Zarella's response to the majority's argument that a *Geisler* analysis is not required in this case. See Justice Zarella's dissenting opinion. After this opinion, parties will be able avoid the strictures of *Geisler* by claiming that they are not asking this court to resolve a state constitutional question, but are merely pointing to a possible constitutional infirmity. The standard that will be applied to determine whether such a possible constitutional infirmity exists in any particular case is open to conjecture.

[8] See also *State* v. *Cobb*, supra, 251 Conn. 484 (" 'It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the [sentencer's] discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized

majority's insistence that this requirement for consistency and reliability is a constitutional minimum and that "[s]tates are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty"; (internal quotation marks omitted) *State* v. *Ross*, supra, 230 Conn. 234, quoting *Boyde* v. *California*, 494 U.S. 370, 377, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); mixes apples and oranges. The requirement for consistency and reliability during the eligibility phase serves to *narrow* the class of offenders eligible for the death penalty, while the principle enunciated in *Boyde*, that states constitutionally may limit the exercise of the sentencer's discretion in considering mitigating factors during the selection phase, serves to *broaden* the class of offenders actually sentenced to death by channeling the sentencer's discretion to grant mercy. In other words, the court in *Boyde* simply recognized that states, i.e., state *legislatures*, may do precisely what our legislature has done, namely, require the sentencer to impose the death penalty even if it finds a mitigating factor, if it determines that the aggravating factor outweighs the mitigating factor. See *Boyde* v. *California*, supra, 377. Moreover, *Boyde* could not, as the majority suggests, have "left open" the possibility that states, i.e., state *constitutions*, may provide greater protection to capital

---

determination.' "); *State* v. *Ross*, supra, 230 Conn. 232 ("statutory requirement that, before death may be imposed, the sentencer must find at least one statutorily mandated aggravating circumstance is a constitutionally permissible response to the need to avoid standardless sentencing discretion"). Thus, the selection phase is concerned purely with individualized sentencing, not with consistency and reliability. See also *Walton* v. *Arizona*, 497 U.S. 639, 662, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Scalia, J., concurring) (criticizing *Woodson* v. *North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 [1976], and *Lockett* v. *Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 [1978] [plurality opinion], because, in those cases, "uniform treatment of offenders guilty of the same capital crime [during the selection phase] was not only not *required* by the Eighth Amendment, but was all but *prohibited*" [emphasis in original]), overruled on other grounds, *Ring* v. *Arizona*, 536 U.S. 584, 597–609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

defendants during the selection phase for the simple reason that that possibility can never be foreclosed by the articulation of federal constitutional doctrine. Accordingly, I see nothing in any of the portions of *Ross* quoted by the majority to support its conclusion that our state constitution provides greater protection in the selection phase than does the federal constitution.

Second, with regard to the majority's statement that the jury's decision "necessarily calls upon the intellectual, moral and emotional resources of the jurors in a way that far exceeds any factual determination of guilt or innocence," and that the statute must "give due deference to the awesome and wrenching nature of the jury's task," I note that the United States Supreme Court "has always premised its capital punishment decisions on the *assumption* that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' " (Emphasis added.) *Caldwell* v. *Mississippi*, 472 U.S. 320, 341, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). The *Caldwell* court stated that its "Eighth Amendment jurisprudence has taken *as a given* that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State." (Emphasis added.) Id., 329. To ensure that the jury is aware of the gravity of its task, we previously have concluded that "any instruction by the trial court indicating that the court rather than the jury will actually impose sentence should also repeat the instruction that the court is bound to impose sentence in accordance with the jury's findings on mitigating and aggravating factors and, consequently, that the responsibility for deciding whether the defendant will receive a sentence of death or life imprisonment without the possibility of release rests with the jury." *State* v. *Breton*, 235 Conn. 206, 249, 663 A.2d 1026 (1995). I am no less confident than the Supreme Court that, upon

being properly instructed pursuant to *Breton*,[9] the jury will understand its awesome role and that it will bring to this most wrenching of decisions the requisite moral seriousness. Accordingly, I see no need to build into the weighing statute an additional instructional layer to ensure that the jury does not approach its task casually.

Moreover, I believe that the instruction required by the majority in this case is not only unnecessary, but will also be confusing to a jury, particularly if the jury previously has applied the reasonable doubt standard in the guilt phase. As I have indicated, in the fact-finding context, the standard requires a high level of certitude based on the quantum of evidence produced. I believe that instruction required by the majority will create a risk that the jury will apply the standard in the same way during the penalty phase proceeding and conclude that a high level of certitude requires a great disparity

[9] In this case, for example, the trial court instructed the jury that "[a]lthough the jury does not expressly decree the death penalty shall be imposed, the jury does make . . . specific findings on aggravating and mitigating factors . . . from which the imposition of the death penalty, or, in the alternative, a sentence of life without the possibility of release necessarily follows." It also instructed the jury that "[y]ou must recognize that your decision is not one of simply making objective findings, rather you are in fact and in the law actually making a decision whether the defendant should be sentenced to life imprisonment without possibility of release or death." Finally, the court instructed the jury that the "[p]enalty of death is qualitatively different from a sentence of imprisonment no matter how many years. From the point of view of [the defendant] it is different both in its severity and clearly in its finality. From the point of view of society the action of the state taking the life of a person differs dramatically from any other state action. It is of vital importance to the defendant and the community that any decision to impose the death penalty would be based on reason rather than caprice or emotion. The responsibility for determining the existence of factors upon which the imposition of the death penalty depends is exclusively yours, not mine. And indeed the responsibility of deciding whether death or life imprisonment without possibility of release should be imposed is yours within the confines of the law I have described. Remember that in capital cases the jury is to serve as the link between contemporary community values and standards of decency. And that no man is to be condemned to death unless his fairly selected jury unanimously agrees that he should be."

between the relative weights of the aggravating factor and the mitigating factor, thereby undermining the intent of the statute.[10]

## II

The majority concludes that certain improper statements made by the prosecutor during the state's final, rebuttal argument, viewed in the context of the entire penalty phase, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161, 836 A.2d 224 (2003). I disagree.

There is no question that this prosecutor's remarks were improper and that such behavior does a disservice to the office of state's attorney, to the dignity of the court and to the people of this state. Nevertheless, we must be mindful that "[t]he touchstone of due process analysis on cases of alleged prosecutorial misconduct is the fairness of the trial, *not the culpability of the prosecutor.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Focusing on the fairness of the proceeding, I cannot conclude that the defendant was deprived of a fair penalty phase hearing. Although this prosecutor has engaged in conduct apparently calculated to come as close as possible to the constitutional line without crossing it, I believe he did not cross that line in this case and deprive the defendant of a fair trial. First, the improper remarks were confined to the state's final, rebuttal argument, which constituted a

---

[10] Contrary to the majority's suggestion, I do not believe that it is conceptually impossible to assign a particular level of subjective certitude to a moral determination. I do believe, however, that, as it is typically applied, the reasonable doubt standard imposes a requirement for a high level of certitude *based on* a quantitative evaluation of the evidence and, therefore, an instruction requiring that level of certitude divorced from any quantitative evaluation is likely to cause confusion.

small portion of the overall penalty phase hearing. Moreover, as the majority notes, the state's case for its aggravating factor was very strong. Because I believe that there was overwhelming evidence to support the aggravating factor and relatively little to support the mitigating factors, I would conclude that the ultimate verdict would have been the same absent the prosecutor's conduct. Accordingly, I would not reverse the judgment on this ground.